COPY

1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4  - - - - - - - - - - - - - - -x

5  UNITED STATES OF AMERICA,      :

6             Plaintiff,     :

7    vs.               :   Case No: 05-0991 (JGP)

8  WILLIAM P. TEDARDS, JR. and   :

9  YVONNE TEDARDS,          :

10           Defendants.    :

11  - - - - - - - - - - - - - - -x

12

13                   Washington, D.C.

14                Monday, March 27, 2006

15

16

17  Deposition of:

18              YVONNE TEDARDS

19  the Deponent, called for examination by counsel for the

20  Plaintiff, pursuant to notice and agreement as to time and

21  place, at 501 Third Street, N.W., Washington, D.C., before

22  Timothy Atkinson, a Notary Public in and for the District of

23  Columbia.

24

25

2

```
 1  APPEARANCES:

 2              On Behalf of the Plaintiff:

 3              PAUL A. MUSSENDEN, ESQUIRE

 4              Assistant United States Attorney

 5              555 4th Street, N.W.

 6              Washington, D.C.  20530

 7              (202) 305-4740

 8

 9              On Behalf of the Defendants:

10              Pro Se

11

12              On behalf of the Department of State:

13              RICHARD MASSEY, ESQUIRE

14              2201 C Street, N.W.

15              Suite 2238

16              Washington, D.C.  20520

17              (202) 647-4554

18

19

20

21

22

23

24

25
```

3

```
 1                           I N D E X

 2   WITNESS:                EXAMINATION:              PAGE:

 3   Yvonne Tedards     Direct - Mr. Mussenden           4

 4

 5                         E X H I B I T S

 6   EXHIBIT NO:             DESCRIPTION:               PAGE:

 7        1            Notice of Deposition              11

 8        2            June 2002 Lease                   16

 9        3            Attachment A to Lease             17

10        4            Markup of the Lease               23

11        5            Notice of Outstanding Rent        29

12        6            Notice Dated July 21, 2004        30

13        7            Complaint                         32

14        8            Answer to Complaint               32

15        9            Counterclaim                      39

16       10            Letter from the State             49

17                     dated November 15, 1996

18       11            Lease Agreement, May 1, 1996      56

19                     though April 30, 1999

20

21

22

23

24

25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

4

```
1                    P R O C E E D I N G S
2                                         (11:35 a.m.
3   Whereupon,
4                     YVONNE TEDARDS
5   was called as a witness and after having been first duly
6   sworn, was examined and testified as follows:)
7                   DIRECT EXAMINATION
8         BY MR. MUSSENDEN:
9    Q.   Good morning, Mrs. Tedards.
10   A.   Good morning, Mr. Mussenden.
11   Q.   As you know, my name is Paul Mussenden.  I'm an
12  Assistant U.S. Attorney representing the United States in the
13  action that was filed against you and your husband for the
14  recovery of rent.  Also present on behalf of the Department of
15  State is Richard Massey, the Office of Foreign Missions, and
16  also Karen Coudill who's an investigator with the U.S.
17  Attorney's Office.
18         MR. MUSSENDEN:  I note for the record that Mr.
19  William Tedards, the named codefendant and counter-claimant,
20  is also present and seated to the left of Mrs. Tedards.
21         BY MR. MUSSENDEN:
22   Q.   Please state your full name and spell your last name
23  for the record?
24   A.   My name is Yvonne Tedards, T-E-D-A-R-D-S.
25   Q.   Have you been deposed before, Mrs. Tedards?
```

1    A.    No.

2    Q.    I'm going to review --

3    A.    Well, I should correct that.

4    Q.    Okay.

5    A.    Sort of.

6    Q.    Sort of?

7    A.    I was divorced and we started a deposition and then

8  it was ended abruptly, and so that was the end of that, so it

9  was very short.

10    Q.    Okay.  How long ago was that roughly?

11    A.    I don't know, 12 years ago, 15 years ago.

12    Q.    Well, I'm going to go over some of the rules that

13  govern the proceedings in general.  It will help us to get

14  through the deposition faster, but it's also important because

15  these rules and procedures are required by the Court.

16    A.    I understand.

17    Q.    First, you notice the court reporter is taking down

18  everything everyone says and is creating what I will refer to

19  as the record, which is basically a transcript of all that's

20  said today.  So it's very important for you to give audible,

21  clear and verbal answers, and by verbal I mean actual words

22  because we have a tendency as we get into the rhythm of

23  questions and answers you might say uh-huh and that requires

24  to get a word out of you, either a yes or a no, okay?  Do you

25  understand that?

6

1        A.    Yes.

2        Q.    Second, also very important, is to wait until the

3    question is asked before you answer, and that's important for

4    a couple of reasons.  First, the court reporter can't record

5    both of us properly at the same time, so just for the clarity

6    of the record it's important to wait.

7             Second, you may anticipate incorrectly what I may be

8    trying to ask.  You know, my question may ask you schooling

9    and you think I'm talking about undergraduate, but it's really

10   graduate school, so it's important for you to wait until I

11   finish asking the question so that your response is actually

12   responsive to the question I ask.  Do you understand that?

13       A.    Yes.

14       Q.    Now the court reporter will create a transcript in

15   booklet form and you'll get a chance to review it, and you'll

16   have an opportunity to make any changes you deem necessary.

17   You should bear in mind, however, that if those changes are

18   material, I'm allowed to comment on your changes if this case

19   goes to trial.  By material I mean a change that affects a

20   significant aspect of your testimony.  A typical example is if

21   this was a car accident case and you said the light was green

22   when it's very important whether or not it was green or red

23   and then you read your transcript later and change that, that

24   would be material.  So the point is to give your best

25   testimony today.  Do you understand that?

1          A.    I understand.

2          Q.    Next, and perhaps most important, is that the court

3    reporter administered an oath to you just as we started, and

4    from that point on you are under oath under penalty of perjury

5    just as if you were testifying in a court of law.  Do you

6    understand that?

7          A.    Yes.

8          Q.    If I ask a question and you don't understand it,

9    don't answer.  Every question you answer, it will be assumed

10   that you understood the question, and sometimes my questions,

11   you know, may not be as understandable as they should be, and

12   I don't mind at all, you know, restating it or rephrasing it

13   so that you understand it, okay?  Do you understand that?

14         A.    I do.

15         Q.    And if you need to take a break, of course, just let

16   me know, no problem.  We'll take a break.  What I do ask is

17   that before we take a break you answer whatever question is

18   pending before we take the break.  Do you understand that?

19         A.    Yes.

20         Q.    Any alcohol or drugs in the last 24 hours?

21         A.    Yes.

22         Q.    Okay.  Which one?

23         A.    Alcohol.

24         Q.    Okay.  Would any of that affect your ability to give

25   truthful testimony today?

8

1    A.    No.

2    Q.    Any questions of me before we start about the

3  procedure?

4    A.    No.

5    Q.    Okay.  Did you review documents -- I think I know

6  the answer to this -- before -- in preparation for your

7  deposition today?

8    A.    Yes.

9    Q.    Did those documents consist of what you provided to

10  me so far?

11    A.    Yes.

12    Q.    Anything in addition to that?

13    A.    Yes.

14    Q.    Like -- can you describe?

15    A.    I had some working notes, printouts, from my

16  accounting program.

17    Q.    Okay.  Do you have those on you today?

18    A.    Yes.

19    Q.    Can I take a look at that?

20    A.    Yes.  Do you want the whole thing?

21    Q.    Yes, please.

22        MR. MUSSENDEN:  Mrs. Tedards has just provided me

23  with a stack of documents.

24        BY MR. MUSSENDEN:

25    Q.    Can you describe what's in my hand, Ms. Tedards, for

1    the record?

2          A.    I have to look at it first.

3          Q.    Okay, sure.

4          A.    This is an accounting software called Quicken, and

5    these are printouts that I made prior to departure from

6    Tucson, Arizona to come here for this deposition, and there

7    are a couple of other documents, as well.  But basically I

8    have assigned categories to different types of expenditures

9    and, due to the short notice of the deposition schedule, I was

10   unable to cull the information specifically related to you out

11   of these different categories that I've assigned.  So what I

12   did is I printed the whole -- all the categories I could think

13   of just to have them in hand, but I have not had an

14   opportunity to review them.

15         Q.    As far as the content of those documents, what

16   information is contained in there generally?

17         A.    My confidential personal expenditure, but in this

18   case particular to Garfield Street.

19         Q.    Expenses during the term of the lease that's at

20   issue in this case?

21         A.    From the entire period of residency at Garfield

22   Street --

23         Q.    Okay.

24         A.    -- which would be 1996 through 2004.

25         Q.    Okay.

1    A.    This is not that.  This is something else.

2    Q.    Okay.  Are those documents that you reviewed in

3  preparation for your depo also?

4    A.    No, I did not.

5    Q.    Okay.  Any other documents that you reviewed in

6  preparation for your deposition today?

7    A.    I read through the files that I copied for you.

8    Q.    Anything else?

9    A.    No.

10    Q.    And did you discuss your testimony with Mr. Tedards

11  before starting your deposition?

12    A.    No.  I mean we just -- I shall rephrase that, yes.

13    Q.    Okay.  What did you discuss?

14    A.    We discussed the different documents, looked at the

15  pictures.  That's it.

16    Q.    You didn't discuss what the claims were and what

17  support you had?

18    A.    What support I had for the claims?

19    Q.    Um-hum.

20    A.    No, because I'm not the lawyer and so I don't

21  interpret that.  I just provide the documentation that you

22  asked me to produce.

23    Q.    Let's see if we can agree on just a couple of things

24  to speed us along.  You were served --

25         MR. MUSSENDEN:  I'll have this marked as Exhibit 1.

1        (Whereupon, the document that was referred to as Exhibit

2        Number 1 was marked for identification.)

3        BY MR. MUSSENDEN:

4        Q.   You were served on -- I'm showing to you what's been

5    marked as -- for the record as Exhibit 1.  You were served

6    with this Notice of Deposition -- on the day it was taken,

7    correct?

8        A.   Yes.

9        Q.   And on the second page there's a description of the

10   documents to be produced, and it says all records, documents,

11   memoranda, notes, bills, receipts or any other record

12   contained in your files or in your possession related to your

13   tenure as a tenant at the premises known as 34010 Garfield

14   Street, Northwest, Washington, D.C. 20007 and, in particular,

15   to the Lease Agreement with the  Office of Foreign Missions,

16   U.S. Department of State, executed by you on June 18th, 2002.

17   Did you produce those documents?

18       A.   I produced our records, documents, memorandum,

19   notes.  Bills, not all.  Receipts, I did not copy receipts for

20   this document production.  Some of the receipts were already

21   produced and I just -- I'm sorry, I did not have time.  I ran

22   out of time.

23       Q.   Okay.  Are those receipts related to your tenure

24   under the lease you signed on June 18, 2002?

25       A.   Yes.

1  Q.  Okay.  When do you think you'll be able to -- well,

2  continue.

3  A.  Okay.

4  Q.  Let me let you continue.  I'm sorry.

5  A.  Those receipts, I did not recopy as individual

6  receipts, but most of them are already attached in the

7  correspondence that you have in the -- you have it already,

8  most of them.

9  Q.  So there are no receipts then that was not produced

10  previously?

11  A.  There might be a few more.  As I said, in looking at

12  that report, I was trying to highlight all the items that I --

13  directly with the property, and I have to now go through and

14  locate all those receipts and make them jive.

15  Q.  Okay.  Any other documents that you were unable to

16  produce that are responsive to this request?

17  A.  I believe there may be more photographs somewhere,

18  but I am uncertain.  I had to develop 55 rolls of film to come

19  up with the ones I produced for you.  They were taken over a

20  period of time on different cameras, film stored in different

21  locations.  The move has created difficulty for us, but I

22  believe I have the majority of them, what I can remember.

23  Q.  If there are any other documents responsive to this,

24  then you can -- I don't know, maybe in a couple weeks you may

25  be able to produce those?

13

1      A.    As you know, I brought you a stack today.

2      Q.    Sure, ma'am.  I appreciate it.  You seem to have

3  covered much of what we would need, but just so we have it in

4  our files, if there's anything left maybe we can agree on a

5  couple of weeks or three weeks you can provide that.  Is that

6  agreeable?

7      A.    Okay, yes.

8      Q.    What's your address?

9      A.    6470 North Silversmith Place, Tucson, Arizona 85750.

10      Q.    Phone number?

11      A.    (520) 577-9877.

12      Q.    Date of birth?

13      A.    4/18/57.

14      Q.    You mentioned you were married before.

15      A.    Yes.

16      Q.    Okay.  Any children by that marriage?

17      A.    No.

18      Q.    You were married to Mr. Tedards when?  I don't want

19  to create any riff here.

20      A.    I say '94.

21            MR. TEDARDS:  June '94.

22            WITNESS:  June '94.

23            BY MR. MUSSENDEN:

24      Q.    How many children do you have?

25      A.    Four.

```
 1        Q.    What are their ages?

 2        A.    You want their names or just the ages?

 3        Q.    Names and ages.

 4        A.    Okay.  Emily is age 11, Jeremy is 10.  We have

 5   twins, Stefanie with an F and Natalie who are both 8.

 6        Q.    And so all were living with you at --

 7        A.    Garfield Street.

 8        Q.    -- Garfield Street?  Where were you living before

 9   Garfield Street?

10        A.    I was living on Biltmore Street.

11        Q.    Do you remember the address?

12        A.    I don't recall the address.

13        Q.    That's in Washington, D.C.?

14        A.    Adams Morgan.

15        Q.    Were you renting then?

16        A.    Yes.

17        Q.    Ever live in a similar residence to Garfield Street,

18   meaning property of the State Department or some asset of a

19   foreign country or ambassador's house, anything similar to

20   that?

21        A.    No.

22        Q.    Can you describe your education?

23        A.    I lived in El Salvador, went to Catholic school

24   there, came to the United States, finished high school,

25   started business school at Strayer, did not complete, took
```

1  some courses here and there.  Basically that's it.

2     Q.   Was the business school -- that was towards an

3  undergraduate degree?

4     A.   Undergrad, yeah.

5     Q.   Okay.  How many years of study did you complete

6  there?

7     A.   About two.

8     Q.   Where are you currently employed?

9     A.   I'm self-employed.

10     Q.   Self-employed?  What's your -- self-employed as

11  what, what's your business?

12     A.   My husband has a law practice, so I'm the

13  administrator of the law practice and mother of four.

14     Q.   How long have you been -- before becoming the

15  administrator of your husband's law practice, what occupation

16  did you have?

17     A.   None.  I was -- none.

18     Q.   Are you paid a salary?

19     A.   No.

20     Q.   So you're self-employed, but you have no income --

21     A.   Correct.

22     Q.   -- from that employment?

23     A.   Correct.

24     Q.   What do you report to the IRS as income?

25     A.   He's the sole proprietor, generates the income and

1  pays the expenses.  I just work the job without payment, so I

2  mean self-employed in that respect.

3      Q.    And based on your testimony so far, then you were --

4  were you the administrator of your husband's law practice

5  during the term of the lease, the June 2002 lease?

6      A.    Yes.

7      Q.    Have you ever been arrested before, Mrs. Tedards?

8      A.    No.

9      Q.    Have you ever been convicted of a crime?

10     A.    No.

11     Q.    Let me show you what we'll have marked as Exhibit 2.

12         (Whereupon, the document that was referred to as Exhibit

13         Number 2 was marked for identification.

14             BY MR. MUSSENDEN:

15     Q.    Let me know if you recognize that as the June 2002

16  lease.

17     A.    Do you want this other one back?  Do I just give

18  this one back?

19     Q.    Yeah.

20     A.    There's a page missing.

21     Q.    Okay.  What page is missing?

22     A.    The attachment.

23     Q.    What did the attachment -- as you recall, what did

24  the attachment refer to?

25     A.    Pets.

1    Q.   Pets?

2    A.   Attachment A, yes.

3    Q.   Okay.  Is Attachment A referenced in the lease

4 somewhere?

5    A.   Yes.

6    Q.   Okay.  Can you point that out to me?

7    A.   Yes.  It's on page 6, paragraph 1, 2, 3, 4, 5.

8    Q.   Okay.  I'm going to show to you an Attachment A that

9 -- well, let me know if this is the attachment you're

10 referring to.

11          MR. MUSSENDEN:  We'll have that marked as 3.

12      (Whereupon, the document that was referred to as Exhibit

13      Number 3 was marked for identification.)

14          BY MR. MUSSENDEN:

15    Q.   I'm showing you Attachment A that's marked as

16 Exhibit 3.  Is that the attachment you were referring to, Ms.

17 Tedards?

18    A.   It appears to be, but it's unsigned.

19    Q.   Okay.  The attachment you recall was actually

20 signed?

21    A.   I must refer to my record to make sure that my copy

22 is the same copy that you have, but yes.

23    Q.   Okay.  But you recall -- what you recall as

24 Attachment A was actually signed, is that true?

25    A.   Yes.

1      Q.    Okay.  But as far as the content of Attachment A,

2  does that appear to reflect the Attachment A that you recall?

3      A.    It appears to.

4      Q.    Let's refer back to Exhibit 2, the actual lease.  Is

5  that your signature on page 7?

6      A.    Yes, it is.

7      Q.    Okay.  And what's the date that you signed that

8  lease?

9      A.    June 18, 2002.

10     Q.    Now let's go over -- that appears to be except for

11 the attachment a copy of the -- an accurate reflection of the

12 copy of the lease you signed, correct?

13     A.    Oh, is it a copy of my copy?  I can just say it

14 appears to be.

15     Q.    Okay.  That's fair enough.  Let's just go over some

16 of the terms you agreed to.  The premises was 3410 Garfield

17 Street, Northwest, Washington, D.C. 2000 -- with a zip code of

18 20007, correct?

19     A.    Yes.

20     Q.    All right.  Can you describe the house?

21     A.    It's a four-story house on the corner of 34th Place

22 and Garfield Street in Northwest, Washington.

23     Q.    How many rooms?

24     A.    I'm not sure.

25     Q.    Was it a fairly big place?

1    A.    Fairly.

2    Q.    Do you recall the square footage?

3    A.    It had been said it was 7,200.  I never confirmed

4  it.

5    Q.    Okay.  This lease was for a three year term

6  beginning June 1st, 2002 and extending through May 31st, 2005,

7  is that true?

8    A.    Yes.

9    Q.    And under the terms of the lease you were required

10  to pay $4,900 per month during the first year of the lease,

11  correct?

12    A.    Yes.

13    Q.    5,150 per month from June 1st, 2003 to May 31st,

14  2004, correct?

15    A.    Yes.

16    Q.    5,400 per month from June 1st, 2004 to May 31st,

17  2005, correct?

18    A.    Yes.

19    Q.    And the rent was due on the first day of each month,

20  correct?

21    A.    Yes.

22    Q.    There was also a late fee of 5 percent of the rent

23  payable for the month if the rent was received later than the

24  10th day of the month, isn't that true?

25    A.    Yes.

1      Q.    As far as utilities was concerned, let me refer your

2  attention to page 2, under the paragraph titled Utilities and

3  Services.

4      A.    Yes.

5      Q.    As one of the tenants, you were responsible for

6  utilities, correct, paying for utilities?

7      A.    Yes.

8      Q.    And utilities included exterminating, isn't that

9  true?

10     A.    It says that, yes.

11     Q.    And under Maintenance Responsibilities and Costs as

12  a tenant you were responsible for providing all security

13  system maintenance and repair, is that true?  I'm referring to

14  page 3 now at the top of the page.

15     A.    Where are you?

16     Q.    At the top of the page, the last sentence of the

17  first paragraph there.

18     A.    Yes.

19     Q.    Now under Repairs and Alterations, do you see that

20  paragraph on page 3?

21     A.    Yes.

22     Q.    As a tenant, you were supposed to promptly report in

23  writing to the Office of Foreign Missions any defect, damage,

24  malfunction or breakage.  Do you see that language there?

25     A.    Yes.

```
 1        Q.   And you recall agreeing to that term before you

 2   signed, correct?

 3        A.   It wasn't up to me to interpret the contract.  I

 4   just pay expenses and deal with repairs.

 5        Q.   You're not saying you didn't agree to that when you

 6   signed?

 7        A.   Did I agree?  I didn't agree, but I signed it.

 8        Q.   You didn't agree, but you signed it?

 9             MR. TEDARDS:  This is not a --

10             MR. MUSSENDEN:  Hang on, hang on.  Sir, sir, while

11   we're on the record, you know, we -- we can't speak on the

12   record.  Do not --

13             MR. TEDARDS:  I'm pro se, representing --

14             MR. MUSSENDEN:  Yeah.  You're not being deposed

15   today.

16             MR. TEDARDS:  I'm representing her.  I'm

17   representing us.

18             MR. MUSSENDEN:  Okay.

19             MR. TEDARDS:  And what I'm saying is --

20             MR. MUSSENDEN:  No, no, no, Sir --

21             MR. TEDARDS:  -- you are having her read from a list

22   --

23             MR. MUSSENDEN:  Off the record.  Off the record.

24   Let's go off the record.

25                          (Off the record)
```

1                          (On the record)

2              BY MR. MUSSENDEN:

3         Q.    Now, Ms. Tedards --

4         A.    I would like to say something.

5         Q.    Why don't we keep it so that you respond to a

6    question, okay?  Is it just that you want to clarify your last

7    response?

8         A.    I want to clarify the position that I had when I

9    came here.  I was not representing myself pro se, so for the

10   record I am not representing myself pro se.

11        Q.    Okay.  Well --

12        A.    My husband is representing both of us in this case.

13        Q.    All right.  Well, that's a matter of record.

14        A.    Fine.

15        Q.    The record is clear that you are pro se, so there's

16   -- you know, unless that changes, which you're free to find an

17   attorney, whether it be your husband or whatever, as far as

18   the record is concerned, you're here pro se and that's what

19   I'm -- the representations I'm following.  Okay?

20        A.    Well, then should we discontinue the deposition

21   until I do have one because then I will request a lawyer?

22        Q.    Well, I'm going to continue the depo here today.  If

23   you want to -- I mean those are decisions you're going to have

24   to make.  As far as I'm concerned, I'm entitled to depose you

25   today as a pro se defendant, okay, and I'm going to continue

1  that unless you, you know, state that you're not going to do

2  otherwise, and we'll take that matter up, you know, if that

3  becomes the case.  Okay?

4       A.   All right.

5       Q.   When you signed this lease you said -- is it your

6  testimony that you signed this lease, but didn't agree to the

7  terms, is that what you're saying?

8       A.   I'm sorry.  My husband reviewed the lease.

9       Q.   All right.  You reviewed the lease also, didn't you?

10       A.   I glanced at it.

11       Q.   Well, you did more than glance at it, did you not?

12  Didn't you review line by line the lease and let your husband

13  know --

14       A.   I did -- sorry, go ahead.

15       Q.   -- let your husband know what you thought of the

16  terms?

17       A.   To the best of my ability, perhaps yes.

18       Q.   Okay.  In fact -- I'm providing to you --

19            MR. MUSSENDEN:  We'll have this marked as the next

20  in order.

21            REPORTER:  Exhibit 4.

22            MR. MUSSENDEN:  Exhibit 4.

23       (Whereupon, the document that was referred to as Exhibit

24       Number 4 was marked for identification.)

25            BY MR. MUSSENDEN:

1      Q.    Exhibit 4 is a markup of a draft of this lease that

2  you reviewed.  That's your handwriting on that lease, isn't

3  it?

4      A.    Yes, it is.

5      Q.    And on that markup isn't it true that you point out

6  all the differences between this lease and the previous lease

7  that you entered in the previous term, isn't that true?

8      A.    That is a word for word -- comparison between one

9  document, the old document, and a new document.

10     Q.    Okay.  And you did this word for word comparison --

11  on this document in Exhibit 4, what does the word new refer to

12  in your handwriting on the margin?

13     A.    To tell you the truth, I don't know.  I'd have to

14  look at the old lease to figure out why I would have written

15  that.

16     Q.    Okay.  But --

17     A.    There's a previous -- preceding lease for the

18  previous three year period that I would have looked at to

19  compare old versus new.

20     Q.    Okay.  And when you say new there, what you mean by

21  that is that this is a new term that was not included in the

22  old lease, isn't that true?

23     A.    I don't know without looking at the other one and

24  doing the comparison.

25     Q.    And then you marked on here reworded.  What you mean

1  by that is that the language is this lease is reworded from

2  the language in the previous lease, isn't that true?  Just

3  take a look at page 2 or page 3, rather.  Under Repairs and

4  Alterations you say reworded.  Is that your handwriting there?

5      A.  Yes.

6      Q.  Okay.  And what you mean by that is that's -- this

7  particular lease, that clause is reworded from the way it was

8  stated in the previous lease, isn't that true?

9      A.  Yes.

10     Q.  Okay.  So, in fact, you reviewed all the terms in

11  pretty much fair detail before you signed the lease, isn't

12  that true?

13     A.  No, I did not.

14     Q.  And you say that even though you've reviewed this

15  and marked it up line by line?

16     A.  That's correct.

17     Q.  Okay.  When you have check marks by these paragraphs

18  in your markup, what does that mean?

19     A.  It probably means that there were no changes within

20  that paragraph, so word for word it remains the same.

21     Q.  All right.  Let's look at -- going back to the lease

22  that you -- the draft you ultimately signed in Exhibit 2,

23  under Repairs and Alterations, I think it's on page 3, you

24  also agreed that the tenant will not alter, change or add to

25  the premises without advance written permission of the

1  landlord.  Do you see that there?

2      A.    I'm sorry?

3      Q.    That the tenant will not --

4      A.    Where are you?

5      Q.    Oh, I'm in the mid-paragraph.  Oh, the second

6  paragraph.

7      A.    Oh, here.  Can you repeat the question, please?

8      Q.    You also agreed that the tenant may not alter,

9  change or add to the premises without the advance written

10 permission of the landlord, isn't that true?

11     A.    I signed the agreement and that's what that says.

12     Q.    Okay.  And, in fact, when you reviewed the lease,

13 looking at your review in Exhibit 4, you specifically noted

14 that that was a new section, didn't you?

15     A.    No.  There's a new word.

16     Q.    There's a new word.  What did you circle when you

17 reviewed the lease before signing it, what language did you

18 circle?  Could you read it on the record?

19     A.    Approval.

20     Q.    Approval.  There's more than that circled there,

21 though, isn't there?

22     A.    Yes.

23     Q.    Okay.  Can you read what's circled?

24     A.    All permits or fees which may be required in

25 connection with an approved request shall be at tenant's

1  expense.

2      Q.   Okay.  And also written -- and also required in that

3  paragraph that you reviewed is that the landlord shall have 30

4  calendar days following tenant's written request for such

5  permissions in which to notify tenant of approval or

6  disapproval.  Do you see that language?

7      A.   Yes, that's what it says.

8      Q.   And before signing did you -- strike that.  Let's go

9  to page 5.  And under Notices, notice is defined there, in

10 order to provide proper notice as being in writing and

11 delivered to the persons set forth in the address below, and

12 it has the address for the United States Department of State,

13 Office of Foreign Missions.  Do you see that?

14     A.   Yes.

15     Q.   Okay.  Is that the way you provided notices whenever

16 you had a notice to provide under the lease?

17     A.   Yes, I believe so.

18     Q.   And on page 6 can you read the short paragraph under

19 Representations, Changes in Lease?

20     A.   Tenant has read this lease.  All promises made by

21 landlord are in this lease.  There are no others.  This lease

22 can be changed only by an agreement in writing signed by and

23 delivered to each party.

24     Q.   Let's look at what you reviewed before signing that

25 section.  You checked that as having been reviewed with no

1  changes, correct, from the previous lease?

2      A.  It appears so, yes.

3      Q.  There came a time, Mrs. Tedards, when you stopped

4  paying rent, is that true?

5      A.  It was an offset.

6      Q.  Did there come a time when you did not pay the rent

7  for a particular month?

8      A.  Not in my mind.

9      Q.  Are you saying that you paid the rent during the

10  entire term of the lease?

11     A.  I felt that the lease had been -- both parties,

12  excuse me.  OFM failed to maintain the property.  Therefore, I

13  incurred costs, and since I could only pay one or the other,

14  we paid for the expenses and I offset the rest.

15     Q.  Ms. Tedards, did you pay rent for January 2004?

16     A.  I offset it.

17     Q.  Did you pay the rent for January 2004?

18     A.  I offset it.

19     Q.  Do you understand the question?

20     A.  I do.

21     Q.  Okay.  Did you pay the rent, Mrs. Tedards, for

22  January of 2004?  We can get to the reasons why you may or may

23  not have.  All I'm asking you now is did you or did you not

24  pay the rent for January 2004?

25     A.  Are you asking me if I wrote a check for the rent

1  due?

2      Q.   I'm asking whether you paid the rent for January

3  2004.  You paid rent for some months under this lease,

4  correct?

5      A.   Yes.

6      Q.   Okay.  Using that same understanding of paying rent,

7  isn't it true that you did not pay rent for January of 2004?

8      A.   Under that understanding, no.

9      Q.   And the same is true for February of 2004, isn't

10  that true, you did not pay rent February of 2004?

11      A.   Under that understanding, no.

12      Q.   Let me show you a notice that was sent to you.

13      MR. MUSSENDEN:  I'll have this marked as Exhibit 5.

14      (Whereupon, the document that was referred to as Exhibit

15      Number 5 was marked for identification.)

16      BY MR. MUSSENDEN:

17      Q.   Take a look at that.  You received this.  I got this

18  from the documents you forwarded to me.  Let me know when

19  you've had a chance to review that.

20      A.   Okay.

21      Q.   Now by June 15th, 2004, as this notice reflects, you

22  had outstanding rent in the amount of $24,345.07, isn't that

23  true?

24      A.   That's what it says.

25      Q.   Well, isn't it true that you hadn't paid rent in

1    this amount by that time as a result of --

2        A.    There are some figures in here that are incorrect.

3        Q.    What do you mean by that?

4        A.    The April numbers on this sheet are incorrect.

5        Q.    Okay.   What's incorrect about it?

6        A.    Well, I have to refer to my documents.   There's a --

7    I produced in discovery a handwritten sheet where I was going

8    through these figures and recalculating the proper amount.

9        Q.    Okay.   With the exception of April, does this

10   accurately reflect the amount of rent that you had not paid up

11   to this point in time?

12       A.    Well, I haven't calculated all the amounts, but the

13   amount noted for rent for January and February are accurate,

14   and May is accurate and June appears to be accurate.   I don't

15   know about -- I'm not sure.

16       Q.    Okay.

17       (Whereupon, the document that was referred to as Exhibit

18       Number 6 was marked for identification.)

19            BY MR. MUSSENDEN:

20       Q.    Let me have you take a look at another notice.   This

21   is dated July 21st, 2004.   What did we mark that as?

22       A.    Exhibit 6.

23       Q.    Exhibit 6 is a letter dated July 21st, 2004 to

24       yourself and Mr. Tedards concerning the June 18, 2002

25       lease.   Let me know if you -- let me know when you've had

31

1          a chance to review it.

2          A.    I've read it.   The figures are still incorrect on

3    page 2.

4          Q.    Page 2.   And is that because of that April partial

5    payment?

6          A.    Correct.

7          Q.    Everything else is accurate?

8          A.    Again, I don't know about the late fees because I

9    haven't verified the math on that.

10         Q.    But the rent due is correct?

11         A.    Yes.

12         Q.    Now at some point you left the property, the

13   premises, Garfield Street, 3410 Garfield Street, is that true?

14         A.    Yes.

15         Q.    When did you do that?

16         A.    The end of July 2004.

17         Q.    Before doing so you didn't provide any notice to

18   OFM, the Office of Foreign Missions, isn't that true?

19         A.    No.   We had already been terminated.   It was not

20   necessary.

21         Q.    My question's a little different.   Before you left

22   you did not provide -- you didn't notify OFM at all, isn't

23   that true?

24         A.    No.

25         Q.    Do you agree that the total amount that you failed

1 | to pay in rent is $36,098.12?

2     A.   No.

3     Q.   What do you think is the total amount you failed to

4 | pay in rent?

5     A.   I don't know where you got that 36,000 from.  It's

6 | not on here.

7     Q.   So you reviewed the records for your deposition,

8 | correct?

9     A.   I glanced at it.

10     MR. MUSSENDEN:  I'll have this marked as Exhibit 7

11 | and Exhibit 8.

12     (Whereupon, the documents that were referred to as

13     Exhibit Numbers 7 and 8 were marked for identification.)

14     BY MR. MUSSENDEN:

15     Q.   I'm showing you what's been marked as Exhibit 7 and

16 | Exhibit 8.  One is the complaint.  Exhibit 7 is the complaint

17 | that we filed in this case, and Exhibit 8 is the answer that

18 | you filed in this case.  Do you recognize that document,

19 | Exhibit 8, as your answer to our allegations?

20     A.   Yes.  It's not complete.

21     Q.   What's not complete?

22     A.   It stops at page 6.  The rest of it's missing, so I

23 | can't determine if this is the whole thing or the right one,

24 | for that matter.

25     Q.   Okay, that's fine.  If you look at paragraph 24 of

1  your answer, Exhibit 8 --

2      A.   Yes.

3      Q.   -- can you read what it says there?

4      A.   Paragraph 24 says Defendants admit the -- of

5  paragraph 24.

6      Q.   Okay.  Can you refer to 24 -- the allegations in 24

7  that you admit to?

8      A.    During the month of March 2004 Defendants paid

9  their full rent.  During the month of April 2004 Defendants

10 made a partial rent payment of $3,423.33.  Defendants did not

11 pay the remaining amount of $1,984.17 for April 2004, nor did

12 Defendants pay the late fee of 99.20 for April 2004.

13     Q.   Do you agree then that the amounts listed for the

14 partial payment in April is accurate as far as the complaint

15 and your answer is concerned?

16     A.   Yes, but there's an error I see.

17     Q.   There's an error in your answer or is there an error

18 in the complaint?

19     A.   There's an error in the answer.

20     Q.   In the answer?

21     A.   Yes.

22     Q.   Okay.  What's the error in the answer?

23     A.   My husband prepared the answer and I believe he took

24 the list that you had as an attachment in your complaint and

25 just took it as valid, and --

1       Q.    Can you point out --

2       A.    -- he should have, but it is not accurate.

3       Q.    Okay.  You were provided a notice of -- after you

4  left in July of 2004 you were provided a notice explaining to

5  you the restoration costs that the State Department incurred

6  to restore the premises to a state of good repair.  Do you

7  recall receiving that notice indicating costs of about

8  $11,000?

9       A.    I believe it was attached to one of the

10  correspondence -- back and forth correspondence, yes.

11      Q.    And you agree that -- I know you take issue with

12  some of those costs.  Do you agree that at least some of those

13  costs were legitimate?

14      A.    A few.

15      Q.    A few.  In terms of dollar amounts -- the total

16  amount was $11,572.84.  In terms of the dollar amount, how

17  much of that do you think were legitimate costs to restore the

18  premises?

19      A.    I have to refer to correspondence that would say how

20  much.  Of the items outlined on that document, which ones he

21  would say might be our responsibility, but in no way agreement

22  to your costs.  I may have my own valuation for that.

23      Q.    Roughly speaking, how much of that would you think

24  was properly assessed as restoration costs?

25      A.    Maybe $1,500, off the top of my head.

1     Q.   Okay.  You'd agree that there were some things left

2   undone in terms of holes that needed to be patched and some

3   pictures, et cetera?  There were some things that were left

4   undone by you when you left that needed to be repaired,

5   wouldn't you agree with that?

6     A.   I don't consider holes in -- picture hanging wall --

7   picture holes, the picture hanging, something that I had to

8   repair.  That's normal wear and tear with the rental of the

9   unit.  It had walls.  I hang pictures.

10    Q.   So in your view if you leave holes in the walls,

11  that's something that you don't have to restore when you leave

12  -- as a tenant when you leave a rented property?

13    A.   It depends on which -- I'm sure everybody has their

14  own standard.  I don't know.

15    Q.   I'm asking for yours.  You don't believe that that's

16  a cost that you should bear as a tenant in terms of restoring

17  that to the condition when you first came -- entered the

18  lease?

19    A.   Not picture hanging holes, no, and I had permission

20  to hang the other items that caused the bigger holes.

21    Q.   And the bigger holes, what do you mean by that, for

22  example?  Give me an example.

23    A.   We hung some wall racks, some wall display racks

24  that you would see in a typical store, and the State

25  Department contractor installed them for us prior to entering

1  the premises back in '96, and he installed them with these

2  huge toggle bolts.  He got the supplies and everything, and so

3  he installed them.  All I did was take them out.

4      Q.  And you don't think it was your responsibility to

5  repair that?  That hole wasn't there when you came -- sorry.

6  That hole wasn't there when you came into the residence?

7      A.  I would repair the holes for all the racks that I

8  hung, yes, and I include that in my 1,500.

9      Q.  Okay.  Now you did not contact the Office of Foreign

10  Missions to conduct a walk-through of the premises before

11  leaving, isn't that true?

12      A.  I didn't know I was required to.

13      Q.  Do you recall writing a letter agreeing that at

14  least some of the costs, the restoration costs I'm talking

15  about, were legitimate?

16      A.  Yes.

17      Q.  And you don't have that -- do you have that

18  correspondence here?

19      A.  Yes.

20      Q.  Okay.  Would it take you more than a couple minutes

21  to find it?

22      A.  No.

23      Q.  Okay.

24          REPORTER:  Can we go off the record?

25          MR. MUSSENDEN:  Yes, go off the record.

1                              (Off the record)

2                              (On the record)

3              WITNESS:  Can you repeat your question, please?

4              BY MR. MUSSENDEN:

5       Q.    Yes.  Do you recall writing a letter acknowledging

6  that at least some of the restoration costs, some of the

7  $11,572.84, were legitimately billed?

8       A.    I'm sorry.  Can you repeat that again?

9       Q.    Yes, I'll repeat that.  Do you recall writing

10  correspondence where you acknowledged that at least some of

11  the $11,572.84 was properly billed as your responsibility?

12      A.    Yes.

13      Q.    Okay.  Do you recall the amount?  Did you find that

14  letter in your records?

15      A.    Yes.

16      Q.    What's the date of that letter?

17      A.    February 9, 2005.

18      Q.    And do you recall the amount you indicate was

19  legitimately billed?

20      A.    Based on the amount of your $11,000 list, we would

21  -- we accept responsibility for $4,084.15.

22      Q.    Why do you believe that the remainder was not

23  legitimately billed as your responsibility?

24      A.    Because they were replacing items that we had

25  requested replacement for, had been repaired irresponsibly,

1  had not gotten done, had not been done for us for our lease,

2  were preexisting to the previous lease and the one before that

3  for the previous years from 1996 forward.

4       Q.   When you say preexisting, what are you referring to?

5  What do you mean by that?  Preexisting to the previous lease,

6  what are you referring to there?

7       A.   I have -- there are items on that list.  For example

8  -- I'll give you one example.

9       Q.   Please.

10      A.   There is a line entry for replacement of a light

11  fixture in a particular bathroom that was replaced because

12  they wanted to replace it, but I have provided in my

13  documents, discovery documents, I provided a photograph of

14  that same fixture going way, way back that shows that it was

15  rusted and corroded when we got it.  And I also have

16  correspondence that says that the State Department refused to

17  fix it, so there is no reason why I should be charged -- we

18  should be charged for it when we're leaving.

19      Q.   What did you do with that fixture during the term of

20  the lease?

21      A.   It was still there.  We left it there.  It remained

22  on the property.

23      Q.   Okay.  Let me have you take a look at what we'll

24  have marked as Exhibit 9.

25           MR. MUSSENDEN:  Is that where we're at?

1              REPORTER:  Yes.

2        (Whereupon, the document that was referred to as Exhibit

3        Number 9 was marked for identification.)

4              BY MR. MUSSENDEN:

5        Q.    Let me know if you recognize that document as your

6    counterclaim against the government in this case.

7        A.    Well, it looks like it.

8        Q.    Okay.  Now what's the basis of this counterclaim

9    generally?

10       A.    I'm not the lawyer.  My husband's the lawyer.  You'd

11   have to ask him.

12       Q.    Can I see the document?  All right.  You submitted

13   this with your husband, it has both of your names on there, to

14   the Court, correct?

15       A.    Yes.

16       Q.    Okay.

17       A.    That's the signature --

18       Q.    All right.  And this was filed on the court docket

19   as Document Number 6 on July 11, 2005, and you represented

20   that this was your counterclaim, correct?

21       A.    It appears to be the one that my husband filed on

22   our behalf, yes.

23       Q.    All right.  And what I'm asking is since you filed

24   that claim against the government, I'm just asking generally

25   what the basis is.  Why do you believe there's a claim against

1   the government in this case?

2       A.   They failed to meet their obligations and -- that's

3   it.

4       Q.   Okay.  Let me have you look at a specific paragraph.

5   You're not saying by filing this counterclaim that you don't

6   owe any rent to the government as a result of you not paying

7   rent under the June 2002 lease, are you?

8       A.   I'm saying I think we have an offset that is

9   substantial, that could wipe out the rent due, yes.

10      Q.   That could wipe out the rent due?

11      A.   Yes.

12      Q.   Okay.  But you're not saying that you don't have

13  anything due?

14      A.   Well, as we went through earlier month by month on

15  that sheet that said whether I've made a payment or not and

16  you wrote down the amount per month, I have agreed with what

17  was written down there.

18      Q.   Okay.  What's the dollar amount that you believe in

19  filing this counterclaim that should be offset?

20      A.   It's very difficult to determine right now, and the

21  plan is to hire an expert to come up with that figure.

22      Q.   An expert?

23      A.   Yes.

24      Q.   What kind of an expert?

25      A.   Accounting expert who can come up with -- who can do

41

1  it better than I can.  I will provide the data, and then he

2  will provide the damages.

3      Q.   Okay.  What amount do you think, you know, ballpark?

4      A.   Well, I think we've stated that we have an offset to

5  the entire amount that we owe.

6      Q.   Right.  And what's the amount?  Just give me a

7  ballpark figure.  Do you think it's $5,000, it's $10,000?

8      A.   To tell you the truth, I have not run a tape on it,

9  so I don't know.

10     Q.   Okay.

11     A.   I have -- there is a document that lists all of the

12 out-of-pocket payments.  If I may look for my letter, I'll

13 tell you which one it's in, but it's got bullets and it shows

14 -- has an attachment that shows all the amounts that we --

15 okay, here it is.  It shows all the amounts that we've

16 expended.  It shows which ones I have a receipt attached.  It

17 shows which were paid by personal check, and it also indicates

18 which items I didn't have a receipt for at that very moment.

19 So that would be the letter dated November 30th, 2004.

20     Q.   So are you saying then that without that expert you

21 can't say how much the government owes you under this

22 counterclaim, is that your testimony?

23     A.   That's correct.  It's ongoing.

24     Q.   Let me refer you to page 9 of the counterclaim, page

25 9 of Exhibit 9, for the record, paragraph 11.  The amount in

1  that paragraph, is that the amount of the counterclaim or are

2  you saying that you need an expert to verify that amount?

3      A.    That is the amount that we had, I believe, submitted

4  up through that January 2004 period.  Yeah, it even says

5  through the end of December 2003.

6      Q.    What does that amount represent in paragraph 11?

7      A.    If I recall correctly, I believe that's the amounts

8  that appear in the attachment to that November 30th letter

9  would add up to that.

10     Q.    Why do you believe that the government under the

11 lease was responsible for those expenditures that you made?

12     A.    Because they failed to make them on their own.

13     Q.    Okay.  Can you point out the lease provision that

14 required the government to make each of the expenditures that

15 constitute the amount in paragraph 11?  Can you point to the

16 paragraph in the lease?

17     A.    Can I point to the paragraph in the lease?

18     Q.    Yes, Exhibit 2 --

19     A.    Well, they're spread out through different

20 paragraphs.

21     Q.    Okay.  Can you identify the paragraphs for me?

22     A.    Well, can you specifically do a item by item because

23 I don't want to do a general answer because I may not be

24 correct?

25     Q.    Well, I don't know what items.  I don't believe that

43

 1  there are any items that the government's responsible for, so

 2  you're going to have to tell me.

 3       A.   Okay.

 4       Q.   Right now I just wanted to know the terms of the

 5  lease that you believe were breached.

 6       A.   Well, again, I'm not a lawyer, so I would assume

 7  that most of this stuff you would find under either Utilities

 8  and Services for Charity, Maintenance Responsibilities and

 9  Costs, Repairs and Alterations, Fire and Damage, so most of

10  them, I guess, are on page 2 and 3.  I don't know, maybe page

11  4, too.  I don't -- I'm not sure.  Again, I'm not the lawyer

12  here.

13       Q.   Is there anywhere in that lease you can identify

14  requiring the government to pay for the expenses you claim in

15  your counterclaim?

16       A.   They were required to provide me a inhabitable house

17  for which I am paying rent.  It was uninhabitable, and I

18  should not be required to pay rent.

19       Q.   Okay.  But you --

20       A.   There are a lot of things that -- yeah, go ahead.

21       Q.   You're saying that the government breached its

22  obligations under the lease?

23       A.   Yes.

24       Q.   And I assume that you mean that they breached an

25  obligation to pay for some expenditures, is that correct?

44

1      A.   Yes.

2      Q.   And I'm asking you to identify where in this lease

3 does that obligation lie.

4      A.   Not all obligations are in the lease.

5      Q.   Not all obligations were in the lease?

6      A.   No.   The State Department undertook many obligations

7 that were not in the lease.   As an example, exterminating.

8 The house was infested with roaches and ants, and while it

9 does say in the lease that we're responsible for

10 exterminating, the State Department paid for all of it --

11      Q.   They did?

12      A.   -- for '96, '97, '98, '99, 2000, 2001, 2002 and

13 2003.   They took care of all of the exterminating costs.

14      Q.   I see.   But you agree that you --

15      A.   That does present -- I'm sorry, go ahead.

16      Q.   Can you finish your statement?

17      A.   I said they were unable to provide us with a vermin-

18 free house and so, therefore, I think they went to the side of

19 the lease and just went and paid those expenses because there

20 was a constant problem with that.

21      Q.   But you would agree that it wasn't their

22 responsibility under the lease, it was actually your

23 responsibility to take care of those payments, isn't that

24 true?

25      A.   No, not until they could provide me with a free --

1   vermin-free house.

2       Q.   Well, we discussed earlier that -- and you just

3   apparently acknowledged that it was the tenant that was

4   responsible for exterminating, isn't that true?

5       A.   You asked me to read the lease there.  I did.

6       Q.   And under the lease terms it's the tenant that's

7   actually responsible for the exterminating, isn't that true?

8       A.   After it's been provided as a free and clear

9   residence, yes.

10      Q.   Now you took possession of the property after

11  signing the lease.  You didn't require the State Department to

12  do anything more before taking possession, did you?

13      A.   I already had possession.  I did nothing to acquire.

14      Q.   Okay.  So --

15      A.   They were already doing the payments on that.

16      Q.   So you're saying that when you first took possession

17  it was uninhabitable, but you took possession anyway?

18      A.   Right.  When I first took possession in 1996, as

19  part of my walk-through, I indicated that there were rat

20  problems in the house, which they -- eventually it took five

21  years to get rid of the rats.  As you see from the pictures,

22  there are rats in my children's toys, rats on my sofa, rats in

23  the corner eating my furniture and rugs.  Yes, that is a

24  problem, I agree, and they finally fixed it.  They came

25  through and dealt with some holes, but they continued to pay

1  for the exterminating because the ants were coming into my

2  house and roaches, too.

3       Q.   But it was good enough for you to live in the house

4  for five years, wasn't it?

5       A.   No, it was not good enough.

6       Q.   Well, why did you stay?

7       A.   I had made an investment.  We had made an investment

8  in the house.

9       Q.   But if it was uninhabitable, Mrs. Tedards, you got

10 to agree with me that you can't live for five years in some

11 place that's uninhabitable, right?

12      A.   I have to rephrase my uninhabitable.

13      Q.   Okay.

14      A.   It was not totally uninhabitable, but nobody likes

15 to live with rats, and I'm sure if you have children, nobody

16 would like to have children to be exposed to the rats.

17      Q.   That's true.

18      A.   Right.

19      Q.   And what you agreed to in this lease was that you

20 would be responsible for taking care of any problems like that

21 exterminating, correct?

22      A.   But I didn't pay for it.

23      Q.   That's true.  It was very generous of the

24 government.  I'm glad that you can acknowledge that.

25      A.   As it was generous of me.

1    Q.   Okay.  There's an important provision here that you

2 read earlier that all promises made by the landlord in this

3 lease, there are no others, so the landlord's obligations, as

4 you agreed to under the lease, are those that are stated in

5 the lease.  Would you agree with that?

6    A.   Understood, yes.

7    Q.   Now you can't tell me the value of each breach that

8 the government made, is that what you're saying?

9    A.   No, not completely, not yet.

10    Q.   Did you give notice that you were making these --

11 incurring these expenditures for the repair?  Did you give

12 notice and obtain approval or disapproval under the terms of

13 the lease?

14    A.   We sent the State Department a letter listing all

15 the items that needed to be fixed on October 2002.  They

16 failed to repair them, so we had to repair some of them.

17    Q.   But you never obtained approval before making those

18 expenditures, isn't that true?

19    A.   I sent them a letter that the work needed to be

20 done.

21    Q.   But my --

22    A.   The State Department did not respond.

23    Q.   My question is this, you didn't -- you can't show me

24 any documentation that shows your request for approval or a

25 response from the State Department approving any of the

1    expenditures you're claiming in your counterclaim, can you?

2         A.    We told the State Department that we would pick up

3    these expenses and make the repairs after they sent us a

4    letter saying their funds had been cut off in February of 2003

5    and indicated that they would no longer be making any repairs

6    to the premises.  We had a pending list of items that had not

7    been dealt with.

8         Q.    So you can't show me anywhere where you received

9    approval for the expenditures incurred, isn't that true?

10        A.    I also don't have anything that says that they

11   disapproved.

12        Q.    Right, but my question is you can't show me or no

13   documentation exists that you received approval for the

14   expenditures you incurred, isn't that true, Mrs. Tedards?

15        A.    I don't think so, but it might be implied in the

16   lease.  I'm not sure.

17        Q.    As we stand today after you've reviewed all these

18   documents, you can't point one out to me, an approval by the

19   State Department for these expenditures --

20        A.    No.

21        Q.    -- isn't that true?  Now you didn't -- you agree

22   it's your obligation to provide notice before incurring

23   $12,000 in expenses.  Why do you believe that the OFM is now

24   responsible for that or somehow breached the lease?

25        A.    They breached the lease, too, and I had to incur the

1  expense.  They breached it first by denying the repairs.

2      Q.   Right, but you were aware that you could not deduct

3  or not pay rent because you made a repair?  You knew that,

4  right, during the term of the lease?

5      A.   No, I would not do that, no.

6      Q.   I mean, in fact, way back in 1996 -- I'm going to

7  show you a document and we're going to mark it Exhibit --

8          MR. MUSSENDEN:   What are we up to?

9          REPORTER:   10.

10     (Whereupon, the document that was referred to as Exhibit

11     Number 10 was marked for identification.)

12          BY MR. MUSSENDEN:

13     Q.   I'm showing you a letter from the State Department

14  dated November 15, 1996.  I want you to read the first two

15  sentences of the third paragraph.

16     A.   I'm sorry.  What?

17     Q.   The first two sentences of the third paragraph.

18     A.   Also, I find it necessary to direct your attention

19  to page 1 of our Leasing Agreement under the section marked

20  Rent.  Paragraph 2 explicitly states in no event may any

21  amount be subtracted from rent.

22     Q.   So you were aware that even if you didn't understand

23  what you agreed to that certainly you could not fail to pay

24  rent simply because you made repairs, isn't that true?

25     A.   That's a standard -- looks like standard lease thing

1    and, of course, that's what everybody wants.  That's not what

2    everybody gets.

3        Q.    But that's what you agreed to, correct?

4        A.    That's the standard lease that was provided to me.

5    I agreed to it, yes.

6        Q.    How many people were living in the house?

7        A.    Well, varying people.  We had six immediate family

8    members and one to two nannies.

9        Q.    Anyone else?

10       A.    No, not that I recall, no.

11       Q.    When you say one to two nannies, at a time or you

12   had two nannies there sometimes at the same time?

13       A.    Both.

14       Q.    Both.  Okay.  That's a lot of people using the

15   house?

16       A.    Yes.

17       Q.    How many pets were there?  You had three cats, you

18   said?

19       A.    The list is on the addendum, but yes, three cats.

20       Q.    And what other pets were there?

21       A.    Fish, birds.

22       Q.    How many birds?

23       A.    Three.

24       Q.    They were all caged?

25       A.    Yes.

1    Q.    Any dogs at any time?

2    A.    No.

3    Q.    Would you agree that having that amount of people

4  and pets contributed to the disrepair of the house?

5    A.    No.

6    Q.    Now under the previous leases you already mentioned

7  that for quite some time the State Department made a lot of

8  repairs at their expense during the course of the lease, isn't

9  that true?

10    A.    I'm sorry.  Repeat the question.

11    Q.    During the course of the lease, even from the

12  previous leases to the one that we're discussing in this case,

13  the State Department made repairs to that house continually,

14  isn't that true?

15    A.    Yes.  It was a high maintenance repair house, yes.

16    Q.    And they spent quite a bit of money making those

17  repairs, correct?  They incurred the expense themselves, isn't

18  that true?

19    A.    A lot of it by choice.

20    Q.    Okay.  Now by the time you signed the 2002 lease you

21  had repairs already done to the house that included

22  appliances, correct, new appliances?

23    A.    I'm sorry?

24    Q.    You already -- by the time you signed the 2002 lease

25  you already had appliances repaired or replaced in the house,

1    isn't that true?

2        A.    By whom?

3        Q.    By the State Department or yourself.    There was --

4    appliances were replaced by the time you signed that lease,

5    correct?

6        A.    Yes.

7        Q.    There were repairs done to the water damage that you

8    were complaining about, isn't that true, by the time you

9    signed the lease in 2002?

10        A.    Not all.

11        Q.    Not all, but some were done, correct?

12        A.    Some.    Some were ongoing.

13                        (Off the record)

14                        (On the record)

15            BY MR. MUSSENDEN:

16        Q.    So you started paying rent in June 2002, a lot of

17    the repairs that you discussed in your counterclaim were

18    already taken care of, isn't that true?

19        A.    No.

20        Q.    But some were, is that correct?

21        A.    Some may have, but I couldn't be specific.

22        Q.    Now the photos that you provided in the document

23    request predate the 2002 lease, isn't that true?

24        A.    Yes.    Well, I don't know.    I'd have to look at the

25    pictures.

1        Q.    I'm holding the pictures that you sent in my hand.

2        A.    Okay, um-hum.

3        Q.    Can you just take a thumb through?  They're all

4    dated.  Tell me if you find any pictures that were taken

5    during the term of the 2002 lease.  I've checked and there

6    weren't any, but you let me know.

7        A.    Are there any pictures -- I'm sorry.  What is the

8    direct question again?

9        Q.    Yes.  Are there any photos that you produced in your

10   document request -- in response to our document request that

11   were taken during the term of the June 2002 lease?

12       A.    There could have been.

13       Q.    Well, they're all dated, so you can let me know.

14       A.    Sorry.

15       Q.    Careful.

16       A.    Of these, probably.  I think these -- a lot of these

17   are the older pictures.

18       Q.    Okay.  Well, why don't we go off the record from a

19   minute and you let me know if there are any of those photos

20   that are during the term of the 2002 lease?

21            MR. MUSSENDEN:  Off the record.

22                      (Off the record)

23                      (On the record)

24            BY MR. MUSSENDEN:

25       Q.    Are there any photos taken during the term of the

1  2002 lease that you took a look at just now?

2      A.    These photos are photos that I made to record issues

3  and none of these are dated 2004, but they represent 2004

4  issues -- continuing issues in the case.

5      Q.    Let me ask the question so we have a clear question

6  and answer on the record.  Isn't it true that there are no

7  photos that you produced in your document -- in response to

8  our document request that were taken during the term of the

9  2002 lease?

10     A.    In that stack, no,

11     Q.    Okay.  Do you have any photos that were taken during

12 the term of the 2002 lease?

13     A.    I believe they did exist.

14     Q.    None that you have produced or that you have

15 available, correct?

16     A.    Right.  I produced what I have available.

17     Q.    Okay.  So if they exist, you would have produced

18 them, I presume, isn't that true?

19     A.    Yes, but I don't need to take the same picture every

20 year every time it rains.

21     Q.    Do you have any photos or did you take any photos of

22 the condition of the premises when you left in July of 2004?

23             REPORTER:  Excuse me.  I need to --

24                     (Off the record)

25                     (On the record)

```
 1              REPORTER:  We're back on the record.
 2              BY MR. MUSSENDEN:
 3         Q.    Did you take any photos of the condition of the
 4    premises when you left in July of 2004?
 5         A.    I did not.
 6         Q.    Let me just go over a few allegations that I need
 7    some help understanding in your counterclaim.  I'm showing you
 8    again what's been marked as Exhibit 9.  In paragraph 7 you
 9    describe the lease relationship between OFM and counter-
10    claimants.  I'm on page 8, paragraph 7.
11         A.    Yes.
12         Q.    Now the lease that you signed -- you mentioned a
13    lease that was signed on March 7th, 1996?
14         A.    Yes.
15         Q.    Okay.  And is that the lease that's the basis for
16    your counterclaim?
17         A.    I don't know.  You'll have to ask my lawyer, Bill my
18    husband.
19         Q.    You mean your husband?
20         A.    Yes.
21         Q.    Even taking a look at that lease, you would agree
22    that that lease ended -- it was from -- it was for a three
23    year term, correct, with a definite ending period, April 30th,
24    1999?
25         A.    It was continuing with a end date, yeah, because
```

1  they wanted to renegotiate the rate, yes.

2      Q.   Okay.  Well, let me -- this is from your files that

3  you produced.  Here's the -- there is a lease that begins, a

4  least that begins on May 1st, 1996, as identified in paragraph

5  7, and can you identify the end date of that lease?

6      A.   April 30, '99.

7      Q.   Okay.  Thank you.

8          MR. MUSSENDEN:  You know what, let's have this

9  marked just for the record.  The witness just read from what's

10 being marked as Exhibit --

11         REPORTER:  11.

12         MR. MUSSENDEN:  -- 11.  It's a Lease Agreement for

13 the lease term for three years beginning May 1st, 1996 through

14 April 30th, 1999.

15     (Whereupon, the document that was referred to as Exhibit

16     Number 11 was marked for identification.)

17         BY MR. MUSSENDEN:

18     Q.   Taking a look at the counterclaim, go to page 9,

19 look on page -- look at paragraph 10.  There you allege that

20 on or about February 5th, 2003, OFM informed counter-claimants

21 that for some unknown period of time OFM would not have access

22 to funds to carry out its maintenance and repair obligations.

23 Counter-claimants responded to OFM by telephone and said we

24 would absorb OFM's obligations for awhile and would settle the

25 account later.  OFM made no objection.  Who did you talk to by

57

1  phone?

2      A.    I did not.

3      Q.    Who did?

4      A.    Bill Tedards did.

5      Q.    Okay.  So you have no information or recollection

6  even from your conversations with your husband as to who that

7  conversation -- who was on the other end of that conversation

8  for the State Department?

9      A.    No.  I was on the -- his end of the conversation.

10     Q.    Okay.  You were present at the time?

11     A.    I was present.

12     Q.    Okay.  But obviously you couldn't hear what was said

13  on the other side?

14     A.    Correct.

15     Q.    Since you were present, did your husband tell you

16  who he was talking to, Mr. Tedards?

17     A.    I don't recall.

18     Q.    What do you mean there when you say absorb OFM's

19  obligations?

20     A.    That we would take on the responsibility of picking

21  up the repairs to the premises.

22     Q.    That you believe were State Department's, OFM's

23  obligations?

24     A.    Yes.

25     Q.    What type of repairs were you referring to?

1    A.    At the time I wasn't sure, but whatever came up,

2  leaks, damage --

3    Q.    Okay.

4    A.    -- water damage.

5    Q.    When you say obligations, are those obligations that

6  are defined as the State Department's under the lease?

7    A.    Um-hum, yes.

8    Q.    Can you point out to me where that is?  I'm showing

9  to you again Exhibit 2.

10    A.    Now, again, it's probably somewhere in all these

11  pages all over the place.

12    Q.    Well, this is your -- my only chance to learn from

13  you the basis for your claim, so you're going to have to

14  pinpoint for me what paragraphs?

15    A.    Pages 2 and 3, and perhaps 4.

16    Q.    Okay.  Let's start on page 2, and why don't you read

17  me the paragraph -- the term that obligates the OFM to pay for

18  any of the expenditures that you incurred?  Why don't we go

19  off the record and you can let me know on what pages you find

20  the term that obligates the OFM to pay for the expenditures

21  that you incurred, okay?

22                     (Off the record)

23                     (On the record)

24         BY MR. MUSSENDEN:

25    Q.    My last question pending was your -- I asked to

 1    identify any term in the lease that would obligate the OPM,

 2    State Department to pay for any of the expenditures you

 3    incurred.  Have you had a chance to review that and you have a

 4    response?

 5         A.   On page 3 it says nothing contained herein or

 6    otherwise is intended to, nor shall cause the tenant to be

 7    responsible for repairing or maintaining any structural

 8    elements on the premises, all of which landlord hereby agrees

 9    to maintain and repair.

10         Q.   Page --

11         A.   It's on page 3.

12         Q.   Page 3, okay.  Under what paragraph?

13         A.   Repairs and Alterations.  It's about midway.

14         Q.   Okay.  Nothing contained herein or otherwise, okay.

15    So is it your testimony then that the expenditures you

16    incurred were for structural elements, for the roof?

17         A.   Yeah.

18         Q.   Okay.  Can you point to anything in your documents

19    that shows an expenditure for a structural element or the

20    roof?

21         A.   Anything relating to the walls and the floors and

22    the doors, the windows, I would put in that category.

23         Q.   Well, I'm referring to a specific expenditure or

24    amount that you're claiming in your counterclaim.  Can you

25    point to any of those that constitute a payment for a

1  structural element or the roof?

2      A.   May I refer to that November 30th letter?

3      Q.   Sure, you can refer to anything that will assist in

4  your answer.

5      A.   Do you have to admit it since I'm referring to it?

6      Q.   We can have it marked.

7      A.   All right.  Then I'd like to admit it and mark it.

8  You have a copy of it.

9      Q.   What's the date of that letter?

10     A.   That's the 11/30th -- excuse me.  Here it is.

11 November 30th, 2004.

12     Q.   2004?  Okay.  You're going to have to point that out

13 to me.  I don't know that I --

14     A.   I did provide a copy in the discovery.

15     Q.   Could it have been a January 9, 2004 letter?

16     A.   No.  It's November 30th, 2004.  It has a ten page

17 attachment where I itemized all of the expenses and provided

18 copies of the receipts.

19     Q.   Let me take a look.

20     A.   It went to Mr. Sonfeld (phonetic sp.), November 30,

21 2004, and this was provided twice.  The first time with a

22 lesser description and not the receipts prior to that, and

23 this is just, I think, a follow-up to Mr. Sonfeld and it's

24 about an inch thick.

25     Q.   Well, I'm asking for specific expenditures that were

1  --

2       A.   Okay.

3       Q.   -- structural -- for a structural element.

4       A.   Well, I consider -- anything that's structural, I

5  consider anything that's built-in, coming into or out of the

6  walls, out of the ceiling.  That's my definition of

7  structural.  So I would say the dishwasher.

8       Q.   Isn't a dishwasher an appliance?

9       A.   I'm supposed to maintain and repair.  It's not an

10  appliance.

11      Q.   You don't call a dishwasher an appliance?

12      A.   I do call a dishwasher an appliance.

13      Q.   Okay.  So that wouldn't be structural, correct?

14      A.   It could be.

15      Q.   You believe that could be?

16      A.   Yes.

17      Q.   Okay.  And at this -- the cost for the dishwasher is

18  what you believe the OFM's obligation was under your

19  counterclaim?

20      A.   Yes.

21      Q.   Okay.  What other structural elements --

22  expenditures do you think OFM was responsible for?

23      A.   The cook top.

24      Q.   Do you have a cost associated with that?

25      A.   Yeah.  I have 1,803.75.

1      Q.    Okay.  One more time.

2      A.    1,803.75.

3      Q.    And what about the cost of the dishwasher that you

4  believe was OFM's responsibility?

5      A.    I gave that.

6      Q.    Yeah.  I didn't get the amount.

7      A.    Oh, I'm sorry.

8      Q.    -- the dollar amount.

9      A.    1,221.37.

10     Q.    Okay.  Any other structural elements?

11     A.    Yeah.  Repair to the garage door.  I'm just going to

12  be reading everything on this list here for this attachment.

13  Would you like to copy it?

14     Q.    No.  I'd like you to tell --

15     A.    Okay.

16     Q.    -- because not everything there would be a

17  structural element.

18     A.    Okay.  All right.

19     Q.    I haven't -- I mean, in our view, there's been no

20  structural element identified thus far, but I want your view.

21     A.    Okay.  All right, that's fine.  All right.  So did

22  you get the garage door --

23     Q.    I got the --

24     A.    -- 94.12?

25     Q.    Okay.

1      A.    Okay.  We have a broken water line for $145.

2      Q.    What's the date of the broken water line?

3      A.    9/26/03.

4      Q.    And the date of the garage door repair?

5      A.    9/26/03.

6      Q.    And the date of the cook top, if I can take you back

7 that far?

8      A.    12/30/03.

9      Q.    And the --

10     A.    7/10/03 --

11     Q.    Okay.

12     A.    -- for the dishwasher.

13     Q.    Okay.

14     A.    Then I have fence, replacement of fence, and that's

15 1,167.50.

16     Q.    What date?

17     A.    8/03.  I have electrical, and there are several

18 charges here, six charges from 4/22/03 to 9/16/03.  I've not

19 added them up, but here we go, 45.37, 272.53, 1,646.95,

20 341.27, 1,288.73, 1,368.72.

21     Q.    Now when you say electrical, what type of -- do you

22 have a description of the type of repair?

23     A.    Yes.  This is for the fourth floor ceiling light

24 fixture, the outdoor balcony lights, the attic fan, two garage

25 florescent light fixtures, spotlights on the side yard, on the

64

1  east yard, one light fixture at the base of the kitchen

2  stairs.  Okay, that's about it.

3      Q.    Any other expenditures you believe were structural

4  and the responsibility of OFM as it relates to your

5  counterclaim?

6      A.    Yeah.  The balconies were unusable.  We had to

7  install tile.  I'm not sure I have all the receipts for that,

8  but so far on this report we put in 3,702.59.

9      Q.    Anything else?

10     A.    I have landscaping, undetermined amount.

11     Q.    Well, you're not claiming that in your counterclaim

12 if you can't determine the amount, are you?

13     A.    It has yet to be determined.  I have to collect the

14 receipts.  I'm still trying to locate those.

15     Q.    What's the date of the landscaping?

16     A.    Well, it would have been -- it's ongoing.  It was

17 ongoing.  I have to -- I would have to look at some of the

18 files, correspondence that we had back and forth, because

19 there's some costs associated with structural repairs.  There

20 was a hurricane in 1999.  Trees were cut down.  We had issues

21 with drainage and runoff, and there were some, what I

22 consider, structural repairs in terms of putting in -- what do

23 you call those train log things -- anyhow, we had to build a

24 retaining wall.  The retaining wall was insufficient.  Then we

25 had to put in a drainage system.

65

1    Q.    This is as a result of the hurricane in 1999?

2    A.    Yes.

3    Q.    Well, that --

4    A.    Because there were ongoing issues and so I had to

5    re-landscape, and so I had re-landscaping costs associated

6    with that.

7    Q.    Those costs wouldn't be born under the 2000 --

8    incurred under the 2002 lease, correct?

9    A.    I believe the retaining wall was done during the

10    2002 lease, but I'm not certain, in which case once that was

11    accomplished, the landscaping was addressed, took everything

12    down.

13    Q.    You would agree that because the landscaping costs

14    are not determined to date, that they wouldn't be part of the

15    12,033.44 --

16    A.    That's right.

17    Q.    -- listed in your counterclaim in paragraph 11,

18    right?  Are you planning to amend the complaint to add that or

19    are you deciding that you're not going to claim those as part

20    of your counterclaim?

21    A.    I have to defer to the legal expert.  I don't know

22    how it's done, but I understand that our damages, you know,

23    are going to be determined at a later date.  These are just

24    preliminary.

25    Q.    Okay.  Let's finish up with the structural -- the

66

1  expenditures for structural damage or the roof that you

2  believe was OFM's responsibility under the lease.

3      A.   Okay.   Next is a water leak, 616.03, $350.   There

4  are pictures of that somewhere where the ants were coming in.

5  The shelves -- water had come in through the wall in the

6  playroom under the window, the front of the house.  I had to

7  have that repaired because I had -- it was a little room full

8  of stuffed toys that belonged to my children.   They were

9  getting damp and ants --

10      Q.   Well, let me say --

11      A.   -- so I had to have the wall repaired and sealed to

12  clean it all up and get rid of the moisture problem.   I also

13  bought humidifiers to go down there to -- or dehumidifiers,

14  excuse me, and air filters to try to get rid of the smell.

15      Q.   You're not saying the humidifier costs were OFM's

16  responsibility, are you?

17      A.   Well, when I had a previous leak, the OFM brought in

18  a humidifier [sic] to take care of the problem, yes, so I'm

19  claiming that, as well.

20      Q.   I'm talking under the terms of the lease you're not

21  saying that a humidifier would be a structural damage, a cost

22  associated with structural damage, are you?

23      A.   If the place was operating properly, I would not

24  need it.

25      Q.   Now the wall repair and the water leaks, you said

67

1    there are photographs of that, but we discussed earlier that

2    you don't have any photographs of damage done during the term

3    of the 2002 lease, correct?  All those photographs predate the

4    2002 lease, correct?

5        A.    All those do.

6        Q.    Yeah.  I'm just trying to clarify, okay?  You're not

7    saying that you have photographs of these water leaks during

8    the term of the 2002 lease, are you?

9        A.    I believe there is.

10        Q.    Okay.

11        A.    If it's not in that stack, it's probably in a

12    different stack.

13        Q.    Well, can we agree that you would produce any of

14    those photos that are available in three weeks with the other

15    documents that you may find, receipts?

16        A.    Yes.

17        Q.    Okay.  Thank you.  Anything else -- any other

18    expenditures that are structural damages that you believe was

19    the OFM's responsibility under the 2002 lease?

20        A.    I have another one here for 293.99 dated 6/30/03 --

21        Q.    What kind of repair was that?

22        A.    -- where we had a balcony water leak into the master

23    bedroom closet.

24        Q.    From where, where was the water leaking from?

25        A.    From the balcony, master bedroom balcony, exterior

1  wall, so it would be the south wall.  It damaged my clothing,

2  my shoes.  The first time it occurred, the State Department

3  sent in a crew to try to fix it, and they sent in a

4  dehumidifier for a couple weeks.  Then it improved.  And then

5  we had a second leak, I believe, and that was after the

6  February 2003 letter, so I basically just repeated what they

7  did, got the same equipment to clean it all up.  The balcony

8  had not been repaired properly.

9        Q.    So the first time it occurred, the State Department

10  actually paid for the repairs?

11        A.    Yes.  The second time they did not, so I did it --

12  we did it.

13        Q.    And that second time was after the February 2003

14  letter you received?

15        A.    Well, this says 6/30/03, so yes.

16        Q.    Yes.  Did you request the approval of the State

17  Department and receive approval before making that repair?

18        A.    As I understood, we were going to take expenses --

19  take on the expenses after my husband's conversation with OFM

20  following that letter where we said we would pick up the

21  costs.

22        Q.    All right.  Let me ask you again.  Did you -- isn't

23  it true, let me ask you this way, that you did not receive

24  approval for that repair to the balcony that we're discussing

25  right now from the State Department?

69

1    A.    No, I did not receive approval.

2    Q.    Did you receive approval for any of the repairs that

3  you've described so far?

4    A.    No.  They just didn't respond.

5    Q.    Respond to what?

6    A.    To indications that there was all this work that

7  needed to be done.  We had a list and they did not repair them

8  even prior to the February 2003 letter.

9    Q.    When you say a list, do you mean a request for

10 approval of the expenditure before you spent the money, is

11 that what you mean?

12    A.    Prior --

13    Q.    Well, Ms. Tedards, let me ask it this way.  For any

14 of these expenses, isn't it true that you did not request

15 permission to incur the expense before you spent the money for

16 any of these items you just listed?

17    A.    I think it was by default.

18    Q.    Which means that you didn't actually request

19 permission before you incurred any of these expenses, isn't

20 that true?

21    A.    No.  I put them on notice with my previous letter of

22 October that all these repairs had to be done.

23    Q.    So you didn't request permission, isn't that true?

24    A.    No.

25    Q.    When you say no, you mean you didn't request

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1  permission, right?

2      A.   Right.

3      Q.   All right.  Were you going to continue, you have

4  some other expenditures you believe are payable by OFM under

5  the lease?

6      A.   Yes.  On July 3, '03 there's a 300 expense for that

7  water leak in the master bedroom and, again, the same

8  reasoning as the previous one where they had -- the water

9  damage into the master bedroom was taken care of by them --

10     Q.   Okay.  I need --

11     A.   -- and I just followed the same procedure they did.

12     Q.   Now these expenditures you're identifying is how you

13 came up with the 12,033.44 in paragraph 11 of your

14 counterclaim, correct?

15     A.   I believe so.  I don't have a running tape, so --

16     Q.   Okay.  I'm not trying to be meticulous.  I have to

17 -- this is the part of the case where I have to verify and

18 determine what these claims are against us, so I'm trying to

19 make sure that I do everything I can to learn that today.

20 Continue.  I think I interrupted you.

21     A.   Then I have toilets, 218.03, 208.85, toilets not

22 functioning.

23     Q.   So these are the purchase of new toilets or repair?

24     A.   Oh, no, just repair.

25     Q.   And the dates?

1        A.    That was 2/18/03.  Next one, 4/10/03 for 319.38.  I

2   have the second floor heat pump quit working.  I had that

3   repaired.

4        Q.    Okay.

5        A.    6/12/03, I had repaired the closets in the lower

6   level playroom.

7        Q.    What kind of repair was it to the playroom?

8        A.    One of the older pictures there showed that the

9   closets had a very large shelf that was not supported in the

10  center and an empty box on it.  It was bowing anyway even with

11  an empty box.  Eventually over time that just broke.

12       Q.    You're saying that this is a structural damage?

13       A.    I am.  It's attached to the wall.  The shelf was

14  attached to the wall.  The poles are attached to the wall.

15       Q.    Okay.  What's the amount -- I'm sorry.  What's the

16  amount of that repair?

17       A.    Oh, it's 375.

18       Q.    Okay.  Anything else, any other repairs, structural?

19       A.    Though it appears that that one is in a little

20  grouping here, so I would say 375 plus 58.16 plus 140.98, plus

21  300, plus 139.29, plus 160.

22       Q.    These are all in the closet repair grouping?

23       A.    Yeah, I would say so.  It looks like it also

24  includes under that north window where I had to make the

25  repairs to that shelf with the water damage on the north wall.

1     Q.   Have you so far read every single repair that

2 appears on this sheet that you're reading?

3     A.   We're only on page 6.

4     Q.   And how many pages are there?

5     A.   It goes to page 10.

6     Q.   Okay.  And these pages constitute the amount of

7 expenditures you believe the OFM was responsible to pay that

8 constitutes the offset in your counterclaim?

9     A.   In part, yes.

10     Q.   In part, okay.  Are all of these expenditures

11 structural or are there some in here you would agree are not

12 structural and, therefore, not properly OFM's responsibility?

13     A.   I would have to look at each one of them.  Okay,

14 here's one.  Pest control is not structural.

15     Q.   Okay.  What's the cost of that?

16     A.   Well, 18 times 75.

17     Q.   Any others that are not structural, that you would

18 agree are not structural, on that list?

19     A.   No.  I have door locks, the rheostats.

20     Q.   You'd agree that door locks are not structural,

21 wouldn't you?

22     A.   They're attached to the door that belongs to the

23 building.  I certainly do.  All right.  Here's a locksmith.

24 That's structural.  But, okay, item 11 that's on page 9 of 10,

25 it actually doesn't have a figure on there.  It's to be

1  provided.

2      Q.   What's the total amount that you have calculating

3  from the list at the last page?

4      A.   All the way through the last page?

5      Q.   Right, the total amount of all of those items on

6  that page?

7      A.   Well, I don't know because I don't see a tape, so

8  uncertain.

9      Q.   When you see a tape, what exactly are you referring

10  to?

11      A.   Adding machine tape --

12      Q.   Okay.

13      A.   -- where I run -- you know, run the total.

14      Q.   Right, but there's no total on that document?

15      A.   No, no, there's no total.

16      Q.   I'm trying to find a way to speed this up.

17      A.   Yeah, but there's no total.

18      Q.   If you're telling me --

19      A.   My best guess is that that $12,000 figure, I must

20  have run a fast tape on this.

21      Q.   On this meaning --

22      A.   On these figures.

23      Q.   -- what you're reading there?

24      A.   On the figures here without the missing blanks.

25      Q.   Okay.  Do you mind if we attach that to the record?

1       A.    No, not at all.  Well, I do mind because this is my

2   only copy, but if you'd like to make a copy, you may.

3              MR. MUSSENDEN:  Are you going to be the court

4   reporter for tomorrow?

5              REPORTER:  Yes.

6              WITNESS:  There's a November 30th letter provided to

7   Mr. Sonfeld.

8              BY MR. MUSSENDEN:

9       Q.    Well, let's have that -- what we'll do is we'll

10  consider the list that you attached to that November 30th

11  letter the support for the amount of your counterclaim with

12  the exception of the pest control and the locksmith which

13  doesn't have a cost as nonstructural, okay, unless, of course,

14  you can identify for me now anything else you'd agree that's

15  not structural.

16      A.    I have a couple -- okay.  There are three other

17  things that are not structural --

18      Q.    Okay.

19      A.    -- but they're associated with structural and

20  directly related to structural.

21      Q.    No.  I'm going to work with --

22      A.    That's why I'm putting them --

23      Q.    -- I'm going to work with not structural only.

24      A.    Well, what I consider -- I'm sorry, what?

25      Q.    I'm happy to work with just what we can agree that's

1 not structural.

2    A.   Structural to me is a rat hole in the wall that

3 allows a rat to come in and eat my personal property.  That is

4 a problem that is directly related to structural, so I'm

5 including that, and that is part of here.

6    Q.   What's not structural that we can agree on?  We're

7 good with pest control.  I'm happy that we can agree to

8 something.  The locksmith, if we had an amount, we could agree

9 to that also.  Anything else that's not structural?

10    A.   Well, I have here $65 for the miraculous repair and

11 saving of all my designer boots, thank you, because of the

12 water leak, so that is not structural in itself, but it is

13 caused by structural damage --

14    Q.   Okay, but --

15    A.   -- and it's directly related to the balcony leak

16 into the master bedroom closet.

17    Q.   Okay.  So I have $65.  I don't have a category.

18 What's the type of repair?  Is it a balcony --

19    A.   This says leak from second floor balcony into master

20 bedroom.

21    Q.   And we're agreeing that --

22    A.   Those are my good shoes, the -- Lizard and Tony

23 Lamas (phonetic sp.) and my Nieman Marcus and Walterside

24 (phonetic sp.) boots.

25    Q.   Okay.  Now those don't cost $65?

```
 1        A.    No.  Those are actually several thousand dollars.

 2        Q.    Right.

 3        A.    5,000 rough at least.

 4        Q.    So what's the $65 for?

 5        A.    That's how much this nice little man charged me to

 6   actually polish and clean them up and save all of them.

 7        Q.    Oh, okay.  And we're agreeing that that's not

 8   structural?

 9        A.    That's not structural --

10        Q.    Okay.

11        A.    -- but it's part of my damages.

12        Q.    Okay.  Anything that's not structural?  He cleaned

13   all of them for $65?

14        A.    He did.  He was a miracle worker.  I gave him hug

15   when I was finished.  All right.  The next thing on here is

16   3/28 -- 3/28 is the estimate I got to replace my -- for the

17   replacement, excuse me -- the replacement cost of the sofa

18   cover that got eaten by the rats, which is directly related to

19   structural.

20        Q.    But we're agreeing it's not a structural --

21        A.    We're agreeing that is nonstructural.

22        Q.    Okay.  All right.  Anything else?

23        A.    And then there's an estimate here, which I don't

24   know if it's in the $12,000 total, which is the estimate for

25   repairing the oriental rugs that got chewed up by the rats,
```

1  too, because of the holes in the wall.

2      Q.   Now when you say an estimate, that's not a repair

3  you actually -- expenditure you actually incurred?

4      A.   I haven't incurred it yet because I'm waiting.

5      Q.   Okay.

6      A.   I'm leaving my rug as evidence.

7      Q.   So you didn't incur the 328.05 [sic] you just

8  identified, correct?

9      A.   What's 3/28/05?

10      Q.   Replacement cost for the sofa cover.

11      A.   That was 3/28, yeah, and that was 1,710.  I have not

12  incurred that cost.

13      Q.   Okay.  What was the 3/28/05?

14      A.   I've actually incurred a -- I would say

15  approximately -- I think it was $300 to repair versus replace

16  it.

17      Q.   1,710 refers to what?

18      A.   Replacement.

19      Q.   Okay.  An estimate, correct?

20      A.   No, that's actual.

21      Q.   Actual.  And 3/28 refers to what?

22      A.   The date of that estimate.

23      Q.   Okay.  All right.  We were going to go down that

24  road forever then.  Okay.  I'm glad you said the date.  Okay.

25  Anything else you see there that's nonstructural?

```
1        A.   I don't think so.

2        Q.   Okay.

3        A.   There may be more, but I don't know.  That's what I

4  have so far.  Again, this list -- my little package here of

5  the accounting stuff will show me what else there is.

6        Q.   Okay.

7        A.   This is a preliminary list.

8        Q.   Now you say in paragraph 12 that on about January

9  14th, 2004 you followed with a detailed list?

10       A.   I'm sorry.  What are you referring to?

11       Q.   On your counterclaim.

12       A.   Oh, my counterclaim.

13       Q.   Right, paragraph 12.  That's on page 10.  On or

14 about January 14th, 2004 counter-claimants followed with a

15 detailed record of expenditures for the post-February 5th,

16 2004 period.

17       A.   Yes.

18       Q.   Now you mean through the end of December 2004 in

19 that paragraph, right, not 2003?

20       A.   No.  It is correct as stated.

21       Q.   It says post-February 5th, 2004 period through the

22 end of December 2003.

23       A.   Oh.

24       Q.   That would be just a typo?

25       A.   You know what, there's a typo on the February 5,
```

1  2004.  That should be a 3.

2        Q.   That should be a 3?

3        A.   That should be a 3.

4        Q.   Okay.  All right.  Do you have that detailed list

5  with you?

6        A.   Yes.

7        Q.   That was also sent to our office?

8        A.   Yes.  You don't have it?  It's in that package I

9  FedEx'd.

10        Q.   Yeah, I probably do.  I just don't have it here.

11  Okay.  Is it a similar detailed list like the one you were

12  just reading to me?

13        A.   It is actually the predecessor list, yes.  Okay.

14  January 14th -- yes.  January 14th is a predecessor list to

15  the one we just read off, yeah.  And the one that I just read

16  from is dated November 30, 2004, and the January 14th list is

17  dated January 14th, 2004, and one has bullets and footnotes

18  and all kinds of -- the November 30th one is the one that has

19  the footnotes and stuff.

20        Q.   Okay. Now in paragraph 13 you say that in February

21  you admit that you didn't make a rent payment, and you explain

22  that because of -- you did not make a rent payment to OFM

23  because the list of expenditures submitted in January would

24  more than offset the rent for the month of February also.  No

25  communication was received from OFM during the month of

1  February.  Where under the lease does it provide for you --

2  does it allow you to fail to pay rent as an offset?

3      A.   I've had it.  It doesn't.

4      Q.   It doesn't provide for that, does it?

5      A.   No.

6      Q.   And in paragraph 14 you refer to heating and air

7  conditioning equipment failing, but we agreed earlier that as

8  a tenant you're responsible for the heating and air

9  conditioning repair costs, isn't that true, under the lease?

10     A.   I'm required for the maintenance, yes --

11     Q.   Right, to pay --

12     A.   -- but I'm not for the replacement, no.

13     Q.   You replaced -- in March 2004 you replaced the

14  entire heating and air conditioning system in the house?

15     A.   No.  We did not replace it, no --

16     Q.   Okay.

17     A.   -- but it needed replacing and we could not absorb

18  that cost.

19     Q.   Okay.

20     A.   So had no air conditioning during that period and it

21  was a very humid, hot Washington spring and summer.

22     Q.   Now the additional expenditures you identify in

23  paragraph 15, you said you incurred them on or about April

24  10th, 2004.  Do you have a list of those additional

25  expenditures that you identify in paragraph 15?

1    A.    I have a page -- a printout of additional payments

2  to the electrical people.  I've got a payment plan for the

3  attic fan replacement.

4    Q.    These are expenditures that are identified in

5  paragraph 15, correct?

6    A.    Yes.

7    Q.    And these are for electrical --

8    A.    Yes.

9    Q.    -- for the fan?

10    A.    Yes.

11    Q.    What's the total amount?

12    A.    Keep in mind this is the total of -- okay.  I would

13  say 1,726.67 minus 150.

14    Q.    Why are you subtracting the 150?

15    A.    Because that 150 is pest control payments that are

16  included in that other figure of pest control payments.

17    Q.    Okay.  You're reading from a document.  Can you

18  identify the date of the document and whether or not we

19  received it?

20    A.    The date of the document is dated April 9th, 2004,

21  and yes, you did receive it.  I sent it with the April rent --

22    Q.    Okay.

23    A.    -- and check number 10237, and it was also produced

24  in discovery.

25    Q.    Okay.  Is it attached to a correspondence that's

1  also dated?

2       A.   No.

3       Q.   Okay.

4       A.   It's a single page.

5       Q.   Now in paragraph 16 you say that counter-claimants

6  continued to withhold the rent in an attempt to draw

7  cooperation from OFM, but received no response.  Withholding

8  the rent in that fashion would be a breach of the lease,

9  wouldn't you agree?

10      A.   Yes, I guess, not according to me, though.

11      Q.   Now in paragraph 18 you indicate that OFM did not

12  indicate a walk-through or inspection of the premises was

13  necessary upon vacating.

14      A.   No.

15      Q.   But we agreed earlier that was a specific term in

16  the lease, on the June 2002 lease that you signed, isn't that

17  true?

18      A.   Can you point that out to me, please?

19      Q.   Sure.  Well, let's use the one that's marked.  Is

20  that Exhibit 2?

21      A.   I believe this may be a -- here it is.

22      Q.   Yeah.  I'm referring to Exhibit 2.  Actually you may

23  be correct on that.  We're looking right now.  Okay.  Maybe

24  we'll move on to another question.  Do you --

25      A.   May I put this aside?  I want to make sure that we

1    know that it's in limbo here.

2         Q.    We're going to make a copy of this.  Do you rent or

3    own your residence in Arizona?

4         A.    Rent.

5         Q.    Do you own any property elsewhere?

6         A.    No.

7         Q.    None?  Do you earn a salary now, an annual salary?

8         A.    No.

9         Q.    Understood all the questions I've asked you, Mrs.

10   Tedards?

11        A.    Yes.

12        Q.    Answered every question truthfully?

13        A.    Yes.

14        Q.    Anything you'd like to add or change before we close

15   your deposition?

16        A.    Just to note again for the record that I do not have

17   my lawyer because I thought it was going to be, you know,

18   Bill, to be able to object to any questions that you asked

19   that were -- might have been improper, but other than that,

20   I'm fine.

21             MR. TEDARDS:  There wasn't much to object to in your

22   deposition.

23             MR. MUSSENDEN:  Thank you.  We'll go off the record

24   for just a brief moment.

25                            (Off the record)

1                        (On the record)

2              BY MR. MUSSENDEN:

3        Q.    Thank you, Mrs. Tedards.  I have no further

4   questions and we agreed that while the exhibits that were

5   referring to in your deposition will be attached to your

6   deposition, we'll simply refer to the same exhibits in Mr.

7   Tedards' deposition tomorrow as Yvonne Tedards 1 or whatever

8   other easy reference the court reporter can come up with, and

9   that's agreeable to everyone, correct?

10       A.    Yes.

11       Q.    Thank you.

12             (Reading and signature not waived.)

13             (Whereupon, at 2:30 p.m., on Monday, March 27, 2006,

14  the deposition was concluded.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2        I, Timothy Atkinson, a Shorthand Reporter and a Notary

 3   Public, do hereby certify that the foregoing witness,

 4   YVONNE TEDARDS, was duly sworn on the date indicated, and

 5   that the foregoing is a true and accurate transcription of

 6   my stenographic notes and is a true record of the testimony

 7   given by the foregoing witness.

 8        I further certify that I am not employed by or related

 9   to any party to this action by blood or marriage and that I

10   am in no way interested in the outcome of this matter.

11        In witness whereof, I have hereunto set my hand this

12   12th day of April, 2006.

13

14

15                              _____/S/_____

16                              Timothy Atkinson,

17                              Notary Public in and for the

18                              District of Columbia

19

20   My commission expires:

21   February 28, 2011

22

23

24

25
```