COPY

1

1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4  - - - - - - - - - - - - - - - -x

5  UNITED STATES OF AMERICA,      :

6             Plaintiff,      :

7     vs.            :   Case No: 05-0991 (JGP)

8  WILLIAM P. TEDARDS, JR. and   :

9  YVONNE TEDARDS,         :

10          Defendants.     :

11  - - - - - - - - - - - - - - - -x

12

13                     Washington, D.C.

14                Tuesday, March 28, 2006

15

16

17  Deposition of:

18             WILLIAM P. TEDARDS, JR.

19  the Deponent, called for examination by counsel for the

20  Plaintiff, pursuant to notice and agreement of counsel as to

21  time and place, at 501 Third Street, N.W., Washington, D.C.,

22  before Timothy J. Atkinson, a Notary Public in and for the

23  District of Columbia.

24

25

2

```
 1  APPEARANCES:

 2              On Behalf of the Plaintiff:

 3              PAUL A. MUSSENDEN, ESQUIRE

 4              Assistant United States Attorney

 5              555 4th Street, N.W.

 6              Washington, D.C.  20530

 7              (202) 305-4740

 8

 9              On Behalf of the Defendants:

10              Pro Se

11

12              On behalf of the Department of State:

13              RICHARD MASSEY, ESQUIRE

14              2201 C Street, N.W.

15              Suite 2238

16              Washington, D.C.  20520

17              (202) 647-4554

18

19

20

21

22

23

24

25
```

3

```
 1                        I N D E X
 2  WITNESS                EXAMINATION              PAGE
 3  William Tedards        Direct - Mr. Mussenden      3
 4
 5                      E X H I B I T S
 6  EXHIBIT NO.            DESCRIPTION               PAGE
 7      1             Notice of Deposition            5
 8      2             June 2002 Lease                21
 9     12             Letter from State Department   23
10                    dated September 22, 2004
11     13             Letter to the State Department  60
12                    dated January 9, 1997
13     14             Letter from OFM                67
14     15             Letter dated January 12, 2005  88
15
16
17
18
19
20
21
22
23
24
25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

4

```
 1                    P R O C E E D I N G S
 2                                         (10:00 a.m.)
 3   Whereupon,
 4                    WILLIAM P. TEDARDS, JR.
 5   was called as a witness and after having been first duly
 6   sworn, was examined and testified as follows:)
 7                    DIRECT EXAMINATION
 8        BY MR. MUSSENDEN:
 9        Q.   Good morning, Mr. Tedards.
10        A.   Good morning.
11        Q.   As you know, my name is Paul Mussenden and I'm
12   representing the State Department in a lawsuit that the
13   government filed against you and your wife for recovery of
14   rent, and also in your counter-claim against the State
15   Department.
16             For the record, I'll note that also present on
17   behalf of the State Department is Richard Massey, and for the
18   United States Attorney's Office Karen Caudill.  To the left of
19   Mr. Tedards is Yvonne Tedards, his wife and the codefendant in
20   this case.
21             Let me have you state your full name and spell your
22   last name for the record.
23        A.   William Price Tedards, Jr. --
24        Q.   Have you been deposed before Mr. Tedards?
25        A.   -- T-E-D-A-R-D-S.
```

1       Q.    Sorry.  Have you been deposed before?

2       A.    Yes.

3       Q.    How many times?

4       A.    I don't know, lots.

5       Q.    Lots?

6       A.    Yes.

7       Q.    And in what capacity?

8       A.    Testifying expert, party in divorce case, defendant

9  in retaliatory lawsuits by corporate defendants that my

10 clients sued, things like that.

11      Q.    All right.  Well, you understand the ground rules

12 very well then?

13      A.    Yes, I do.

14      Q.    And so if you can keep your voice up and verbalize

15 your answers, that would be great.

16      A.    Yes.

17      Q.    And, as you know, you're under oath under penalty of

18 perjury just as if you were testifying in a court of law.

19 Understand that?

20      A.    Yes.

21      Q.    Okay.  Other than Mrs. Tedards, did you discuss your

22 testimony today with anybody else?

23      A.    No.

24      Q.    Okay.  Let me show you what we have marked.

25            MR. MUSSENDEN:  Is this -- doesn't matter, I guess.

6

1          REPORTER:  Yes.  You can tell by the date at the

2    bottom, the 28th.

3          MR. MUSSENDEN:  Okay, good.

4       (Whereupon, the document that was referred to as Exhibit

5       Number 1 was marked for identification.)

6          BY MR. MUSSENDEN:

7       Q.    I'm showing you Exhibit 1 which is a Notice of

8    Deposition.

9       A.    Yes.

10      Q.    Attached to that is a document request.

11      A.    Yes.

12      Q.    With the exception of the documents that Mrs.

13   Tedards agreed to produce in three weeks, did you produce all

14   documents responsive to this request?

15      A.    Yeah, I believe so, but when we responded we told

16   you we were still looking --

17      Q.    Right.

18      A.    -- when we sent our first response, and I think she

19   alluded to some of the things that she thought she might still

20   have to look for, but yes.

21      Q.    With that exception?

22      A.    Yes.

23      Q.    Thank you.  Now can we agree on the record that the

24   additional documents will be produced, let's say, April 18th,

25   which is about three weeks from today without a separate

1   document request?

2       A.   Yes.

3       Q.   Okay.  If this case goes to trial, what witnesses

4   will you have testifying to establish your claims and

5   defenses?

6       A.   Well, apart from the two of us, I think you learned

7   yesterday that we'll have an accounting expert who will

8   assemble all the threads of our damages on our counter-claim,

9   and we reserve the right to call anyone that you call, anyone

10  from the State Department, for our own purposes if necessary,

11  and so far that's all we would expect.

12      Q.   Let's talk a little bit about this accounting expert

13  that you have identified for the first time.  I heard about it

14  yesterday.  Is there any reason why you didn't identify this

15  witness during discovery?

16      A.   I don't know if we were asked.  I don't know if we

17  had a question to identify either witnesses or to identify

18  experts.  If we did and we failed to identify them, then we're

19  amending that response, but I don't remember a request.

20      Q.   Well, you remember going through the Rule 16.3

21  process where there was a list of topics including whether or

22  not --

23      A.   Early disclosure?

24      Q.   Right.

25      A.   Well, yeah.  I --

8

1      Q.    Let me finish.

2      A.    I would not have known about the expert at that

3   point.

4      Q.    Right, but you indicated, I believe -- I wasn't on

5   the case at that point, but in reviewing the file you

6   indicated that -- both parties indicated that you didn't

7   anticipate any experts in this case, so there was no reason

8   why we would ask you for something that you said you wouldn't

9   be producing.

10      A.    I see.

11      Q.    Is there any reason why you didn't during discovery

12   disclose or alert that you would have an expert in this case?

13      A.    Yes.  We didn't -- at that time, at the beginning,

14   we didn't really know how complicated it was to assemble all

15   the places from which the damages come and the problem we

16   would have, and when we were trying to do it, we decided we

17   needed to get our accountant to do it to get it straight.

18      Q.    When did you first decide this?

19      A.    Oh, I'd say within the past couple of weeks.

20      Q.    Within the past couple of weeks?

21      A.    Yeah.

22      Q.    Well, there --

23      A.    As we were getting ready --

24      Q.    Okay.

25      A.    -- for our testimony we realized that there was an

1    awful lot of stuff, and we felt that it would be better

2    presented by a third party expert who could sit down and

3    assemble it all and compute it, add it up.

4        Q.    Do you know the name of the witness?

5        A.    Well, our first choice would be our regular

6    accountant whose name is Richard Coleman, but I'm not sure

7    that it will be convenient for him to do it.  He's located in

8    Maryland, Baltimore, I believe, but that would be our first

9    choice.

10        Q.    And the area of expertise will be accounting?

11        A.    Yes.

12        Q.    Will this witness be needed to defend against the

13    government's lawsuit against you or to support your counter-

14    claim?

15        A.    I don't think he's necessary to defend.

16        Q.    But to support your counter-claim he is necessary?

17        A.    Yes.

18        Q.    Do you believe that you can't prove your case

19    without the expert witness?

20        A.    That we cannot?

21        Q.    Um-hum.

22        A.    No, we don't believe we cannot.

23        Q.    So why do you believe you need an expert to testify?

24        A.    We believe that the damage part of our case will be

25    better presented by an expert.  We think we can prove the case

1  and the entitlement to damages without the expert.

2      Q.   Isn't just a simple calculation of rent due and

3  expenditures?

4      A.   No.

5      Q.   What's the complication that requires expert

6  testimony?

7      A.   Well, if you look at where our damages come from,

8  they come from three or four different places, and one of the

9  places they come from is damages as a result of failure to

10  provide the premises in a proper condition on a continuing

11  basis.

12      Q.   How would an accountant assist you with establishing

13  that?

14      A.   We will tell the accountant what we went through as

15  a result of that, what adjustments we made, what kinds of

16  expenses we made, what kinds of losses we had, and the

17  accountant will translate that into a number for us.

18      Q.   He'll establish failure to provide the premises?

19      A.   No.  We'll establish the failure to provide the

20  premises, but it's what we had to do as a result.  Do you want

21  an example?

22      Q.   Sure.

23      A.   Okay.  You saw in Yvonne's list an item called

24  balcony tiles.  So what happened is the balconies on this

25  house, which are an important part of the house because, you

1  know, they're an important part of the outdoor space, and

2  there are five of them.  The balconies on the house were

3  unusable and leaked water, and they were that way the whole

4  time and they didn't drain.  And they were covered with kind

5  of a roofing tar, and if you put a piece of furniture on it,

6  it would, you know, penetrate it.  It seemed like it was just

7  some kind of a rough roofing tar.

8         And we worked back and forth with the State

9  Department about this problem, and then they could never

10 either stop the leaks or get the balconies to drain or get the

11 surface where you could use it.  In other words, if you walked

12 on the surface in your bare feet, they would turn black.  And

13 it spilled up whenever it rained along the --

14    Q.   How is this relevant to what the expert is going to

15 testify to?

16    A.   So -- well, I'd like to tell you what the damage is

17 first.

18    Q.   Well, you're explaining to me tiles.  I want to know

19 why is an expert necessary to establish failure to provide the

20 premises.

21    A.   So what we did eventually, and the State Department

22 saw this and actually thought it was good -- they said I like

23 that when their representative was there at one point.  We got

24 swimming pool tiles and covered all the balcony floors.

25    Q.   Okay.  Now you're going through what you did.  How

1   is the expert connected to that?  What will he have to say?

2       A.    We acquired the tiles, and then the tiles were there

3   during the remaining period of our tenancy, and now they're

4   still there today.

5       Q.    What will the accountant say with regard to that.

6       A.    -- and they have a value.  They have an initial

7   purchase price, and then the question is -- because we had to

8   do that to fix something that the State Department couldn't on

9   the house, and we've left them today, the question is what is

10  the financial value that ought to be attributed to it.  All we

11  know is the initial purchase price of it.

12      Q.    Now won't you need some kind of appraiser, a real

13  estate appraiser to do that?  How will an accountant assist

14  you with telling you the value that your improvement to a

15  house has made?

16      A.    We'll probably depreciate it in a regular way, but I

17  don't do that kind of thing.  The accountant can do that.

18      Q.    And that's what you believe the accountant is

19  qualified to do?

20      A.    Well, I'm giving you an example.

21      Q.    Okay.

22      A.    Yeah.

23      Q.    You mentioned three or four areas.  One was failure

24  to provide the premises.  What's the second, third and fourth

25  area of damages that the expert will testify to?

1     A.    Well, the first area -- the way I would look at, the

2  first area is the area that I think you looked at yesterday to

3  some extent, and those were expenditures that we made in the

4  period after February of 2003 when we were notified that the

5  State Department would not be able to make expenditures for an

6  unknown period of time.  The expenditures --

7     Q.    What other areas?

8     A.    -- we made over the next year --

9     Q.    What other area?

10    A.    -- and those have to be properly added up.

11    Q.    Okay.  That's the second area.  What's the third

12  area?

13    A.    Right.  All right.  The third area is defects and

14  problems that we notified to the State Department prior to

15  that, prior to the February letter.  This would have been in

16  October and January of 2003.

17    Q.    What will the accountant say, expert testimony?

18  What will  he say?

19    A.    We will tell the accountant what we did, what

20  expenditures or other things we had to do in order to adjust

21  to the fact that these defects weren't fixed, and then the

22  accountant will have to evaluate that, put a number on it.

23    Q.    What's the fourth area of damages that the expert

24  accountant will testify to?

25    A.    Most of the damages will probably come from those

1    three areas. I seem to recall that there was a fourth area, a

2    fourth type, type, if you want to call it, of damage, but I

3    can't remember what it is right now.

4        Q.    Well, what have you done to retain this expert?

5        A.    To date?

6        Q.    Yes.

7        A.    Nothing.

8        Q.    Nothing?

9        A.    We're not going to use the expert unless we're

10   actually going to try the case. If you win your Summary

11   Judgment Motion and none of our claims are allowed, then we

12   wouldn't even have the expert.

13       Q.    What's your address?

14       A.    6470 North Silversmith Place --

15       Q.    Your phone number?

16       A.    -- Tucson, Arizona, (520) 577-9877.

17       Q.    Your date of birth?

18       A.    Date of birth is May 21st, 1942.

19       Q.    Social security number?

20       A.    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.

21       Q.    Where were you born, sir?

22       A.    Greenville, South Carolina.

23       Q.    Before your marriage to Mrs. Tedards in 1994, were

24   you ever married?

25       A.    Yes.

1      Q.   How many times?

2      A.   Once.

3      Q.   What was your first wife's name?

4      A.   First name?

5      Q.   Her maiden name.

6      A.   Maiden name?

7      Q.   Full name.

8      A.   Meredith Krieger, K-R-I-E-G-E-R.

9      Q.   And when were you divorced?

10     A.   1980 -- you know, I don't know the exact date.  It

11 was somewhere between 1980 and 1983, I believe.

12     Q.   Okay.  Any children by your first marriage?

13     A.   Yes.

14     Q.   How many?

15     A.   One.

16     Q.   The name and age of that child?

17     A.   Same as my name, William Price Tedards, III, age 36.

18     Q.   Before entering the 1996 with the State Department,

19 had you lived in Washington, D.C.?

20     A.   Previously?  Yes.  I've lived there and in New York

21 for all my adult life, one or the other.

22     Q.   Okay.  Were you renting some place else in

23 Washington, D.C. before moving into Garfield Street?

24     A.   Yes.

25     Q.   Okay.  Where was that?

1      A.    It was the address that Yvonne identified yesterday,

2  and I don't remember it.   It was Biltmore Street in Adams

3  Morgan.

4      Q.    Okay.

5      A.    I don't remember the house number either.

6      Q.    Okay.   How long had you lived in D.C. before moving

7  into the Garfield residence?

8      A.    I think about two or three years.   I moved there

9  from New York, and I can't remember when in the early '90s.   I

10 have to think back.

11     Q.    Describe your -- why did you move to Washington, for

12 work?

13     A.    I lived in New York while my son was going to

14 secondary school and college, and when he graduated from

15 college, when he graduated as an undergraduate, that's when I

16 left roughly.   I didn't need to be so close to him.

17     Q.    Can you describe your education?

18     A.    Bachelor of Arts in economics and political science,

19 and law degree.

20     Q.    Where did you obtain your B.A. from?

21     A.    Washington and Lee University.

22     Q.    And your law degree?

23     A.    Same.

24     Q.    Same.   Okay.   What year did you obtain your law

25 degree?

1        A.    1967.

2        Q.    And your undergraduate degree?

3        A.    1964.

4        Q.    Currently you own your own law practice?

5        A.    Yes.

6        Q.    And how long have you been in practice?

7        A.    As a sole proprietor?

8        Q.    Yes, sole proprietor.

9        A.    I think it's been a sole proprietorship since about

10   1986.

11       Q.    Just prior to that, what was the structure of your

12   law practice or where were you working?

13       A.    I experimented with running the Washington office of

14   a New York law firm for -- I'm not sure how long, a couple of

15   years, two or three years.

16       Q.    What's the name of the firm?

17       A.    It's Buffalo based.  The first name in the firm was

18   Jaeckle, J-A-E-C-K-L-E.  The second name is Fleishman.  I'm

19   not sure I remember the third name.  It might have been Nugel,

20   N-U-G-E-L.

21       Q.    Okay.  And you were a partner in that firm?

22       A.    Yes.

23       Q.    Do you currently have any other jobs other than your

24   civil practice?

25       A.    No.

1      Q.    In what jurisdictions do you hold a current license

2  to practice?

3      A.    D.C.

4      Q.    And where do you operate your law practice?

5      A.    D.C.

6      Q.    How many employees do you have?

7      A.    One.

8      Q.    What's their salary?

9      A.    Total compensation, perhaps -- I'm estimating,

10  75,000.

11      Q.    What kind of practice do you have, what kind of law

12  do you handle?

13      A.    It's been called abuse of power.  It's

14  representation of individuals and small entities who are

15  deemed abused, as our side would call it, by the corporations

16  and the government and governments, principally state

17  governments.

18      Q.    So you represent plaintiffs?

19      A.    Sometimes.  I have mixed defendants and counter-

20  claimants.  They're just as frequent as plaintiffs maybe.

21  Depends on how the case happens.

22      Q.    What do you mean by abuse of power, what kind of

23  positive action do you bring?

24      A.    Contracts is heavy on behalf of small franchisees,

25  insurance agents in battles with their insurance companies and

1  franchisors, 1983 actions where we're obviously the plaintiff

2  against state and municipal governments for 14th Amendment,

3  racial discrimination and other types of equal protections.

4  Those are examples.

5      Q.    Okay.  Does your wife work for you?

6      A.    Yes.

7      Q.    Okay.  In what capacity?

8      A.    She described administrator.  I think that's a good

9  word for it.

10      Q.    Is she a paid employee?

11      A.    Well, it's a common income.  It's a joint income.

12  Neither one of us is actually paid, but whatever the net

13  income is, we have it.

14      Q.    Is she self-employed?

15      A.    I think you could call it self-employed, yes.

16      Q.    What would the IRS call it or what do you ask the

17  IRS to call it?

18      A.    I don't think the IRS has to do with it because it's

19  a joint income.  She and I work together and our income is our

20  income, and it's reported jointly.

21      Q.    Is she a partner?

22      A.    No.  I have no partners.

23      Q.    Okay.

24      A.    It's a sole proprietorship.

25      Q.    And what's your net monthly income?

1      A.    It's not regular.  It fluctuates --

2      Q.    On average?

3      A.    -- monthly and annually.

4      Q.    On average, average monthly?

5      A.    Well, I could give you an annual, for example, and

6  then you could -- I think for 2005, I don't know the exact

7  figure, but a figure I've heard as a net income is about 165.

8      Q.    During the term of the June 2002 lease, sounds like

9  your occupation was your solo practice, correct?

10     A.    Yes, yes.

11     Q.    Did you use the residence as an office, as well?

12     A.    In the sense of a home office.  It wasn't the office

13  address, but I -- with four little kids, you know, I tried to

14  work as much as possible at home and I travel a lot, so --

15     Q.    Did you write off a portion of the rent as a

16  business expense?

17     A.    Yes.

18     Q.    How much?

19     A.    I don't know the answer to that.  The accountant who

20  we discussed would know that.

21     Q.    What's the approximate amount?

22     A.    I'm sorry.  I actually don't know, maybe a quarter.

23  It was a floor.  We used a floor for it.

24     Q.    Did you have any clients come to the residence, to

25  your office?

```
 1        A.    Only if someone were in town and came socially to

 2  visit, but there were never clients there for business,

 3  except, I think, one time we had a litigation that happened to

 4  be close by.  It was in the Eastern District of Virginia, in

 5  our neighborhood, in other words, and we did have those

 6  clients come to the house and talk with us and go over the

 7  case but, other than that, no.

 8        Q.    Okay.  What was your average monthly income during

 9  the term of the 2002 lease, June 2002 lease?

10        A.    I don't know.  I'm sorry.  I don't know.  I believe

11  it would have been higher than the one I gave you for 2005 --

12        Q.    Okay.

13        A.    -- but I don't know the answer.

14        Q.    I'm not asking for an exact.  Just give me an

15  approximate amount.

16        A.    You know, it fluctuates so widely because this type

17  of work has a late contingency.

18        Q.    Right.  That's why I'm asking for approximate.

19        A.    It's very hard to -- I can't -- I might make a

20  really wild guess for 2002.

21        Q.    Go for it.

22        A.    Average monthly income?

23        Q.    If you want to do it in annual like you indicated

24  for your present income.

25        A.    Well, let's put it this way, it has fluctuated as
```

1  high -- over several years it has fluctuated as low as lower

2  than that 165, and it has fluctuated as high as over 300, and

3  I just don't know where it would have been at that particular

4  time.  And I'd like to -- if that becomes relevant, we can

5  always produce our tax returns, but I'd like to not be held to

6  my estimates.  I really don't know when you pinpoint a time as

7  estimates.

8       Q.    Now you were present for Mrs. Tedards deposition

9  yesterday, so to expedite your testimony regarding the lease

10 terms, I'm just going to ask you if we can agree to certain

11 basic terms of the lease that I need to confirm just for the

12 record, okay?

13      A.    Sure.

14      Q.    If you can just state yes for each statement you

15 agreed to.  For those you disagree with, we'll spend a little

16 more time on those issues.  I'll tried to cover as many issues

17 as I believe are undisputed first, all right?  Let's refer to

18 the exhibits here.  Exhibit 2 that I'm showing you is the June

19 2002 lease.

20      (Whereupon, the document that was referred to as Exhibit

21      Number 2 was marked for identification.)

22           BY MR. MUSSENDEN:

23      Q.    Can we agree that Exhibit 2 is an accurate copy of

24 the lease you signed in June 2002?

25      A.    I'll simply adopt the same caveats that Mrs. Tedards

1  did.  I think she said there was an attachment or something.

2      Q.   No.  I'm asking you, so you take a look at that and

3  you tell me if that's an accurate copy of the lease.

4      A.   I can't say.  It may be missing an attachment based

5  on what I've heard, so --

6      Q.   Okay.

7      A.   -- I'm not sure.

8      Q.   Take a look at it -- well, you signed that lease.

9  Let me know if that's an accurate copy of --

10     A.   Yes.

11     Q.   -- the lease that you signed.  There may be an

12  attachment to that, but let me know if that's an accurate

13  copy.

14     A.   The signature page is -- it's my signature, and on

15  pages 1 through 7 preceding it there's nothing missing --

16     Q.   Okay.

17     A.   -- so it looks okay.

18     Q.   Okay.  All right.  The lease was for the premises

19  known as 3410 Garfield Street, Northwest, in Washington, D.C.

20  20007, correct?

21     A.   Yes.

22     Q.   You reviewed the lease and agreed to its terms

23  before signing, correct?

24     A.   Yes.

25     Q.   And under the terms of the lease you were required

24

1  to pay $4,900 per month during the first year of the lease,

2  5,150 per month from June 1st, 2003 through May 31st, 2004,

3  correct?

4      A.   Yes.

5      Q.   5,400 a month from June 1st, 2004 through May 31st,

6  2005, correct?

7      A.   Yes.

8      Q.   The rent was due on the first day of the month,

9  correct?

10      A.   Yes.

11      Q.   And a late fee equivalent to 5 percent of the rent

12  payable for the month if the rent was not [sic] received later

13  than the 10th day of the month, correct?

14      A.   Yes.

15      Q.   Now to save time confirming the amounts we believe

16  we are entitled to and you failed to pay, I want you to take a

17  look -- we'll mark this as Exhibit --

18          REPORTER:  I believe it's 12.

19          MR. MUSSENDEN:  12.

20      (Whereupon, the document that was referred to as Exhibit

21      Number 12 was marked for identification.)

22          BY MR. MUSSENDEN:

23      Q.   And Exhibit 12 is a letter from the State Department

24  dated September 22nd, 2004 with an attachment of the amounts

25  due as of August 31st, 2004, and a total.  Why don't you just

1    take a look at that and let me know if you agree with that

2    amount due as of August 2004.  The markup you see on the

3    attachment, I believe, is the markup that your wife, Mrs.

4    Tedards, referenced yesterday.

5        A.  Well, you said as of -- oh, here it is.  All right.

6    Here is what I would not be sure about or disagree with, okay?

7    The first two items are items related to the deductible repair

8    clause in the lease, and I don't know anything about those.  I

9    can't confirm that those are accurate.

10        Q.  Which -- can you identify for there record?

11        A.  November 5th, 2002, repair deductible, 305, late

12    fee, and I can't confirm that one.  And the next one, January

13    21st, 2003, says repair deductible, 440, late fee.  I don't

14    know what those are.  I can't confirm them.  Then when you

15    start into the monthly rents, let's see, I disagree with the

16    final month of August -- for August 2004 because we were gone

17    as of July 31st in response to the Notice to Vacate.

18        Q.  Okay.  Can I see that?

19        A.  Yes.

20        Q.  First of all, all of the amounts you agree were owed

21    as a result of your failure to pay rent, correct?

22        A.  I don't know who will end up owing who.  No, I can't

23    agree with that.  What I can say is we did not make these

24    payments.  That I can say.  I can't say who will end up owing

25    who what, but we did not make these payments that are listed

1   here except the first two.  The first two I don't know about.

2       Q.   Let's deal with the first two first and then your

3   qualifications.  Okay.  The first two payments you identified

4   was November 5, 2002, repair deductible and late fee, and a

5   January 21st repair deductible and late fee, correct?

6       A.   Those are the ones that I can't confirm.  I don't

7   know what they are or whether they're accurate.

8       Q.   Okay.  The other amount you agree you did not pay as

9   rent --

10      A.   Yes.

11      Q.   -- and you were responsible -- but you also agree

12  you were responsible for paying the rent, correct?

13      A.   I didn't pay the rent, no.  Yvonne paid the rent

14  usually.

15      Q.   Well, you were -- I mean certainly --

16      A.   We were the tenants and --

17      Q.   You're responsible, you're not disputing that,

18  right?

19      A.   -- so we paid the rent.

20      Q.   Okay.  So you agree that under the lease as a

21  signatory and a tenant to the lease you're responsible for

22  paying the rent, correct?

23      A.   Yes.

24      Q.   We're not going to dispute that?

25      A.   I  understand.

1    Q.    And you agree that you failed to pay the rent for

2   the months listed here with the exception of August, okay?

3    A.    Yes.

4    Q.    So if I'm -- I'm trying to understand your testimony

5   as to where the disagreement is, okay?

6    A.    Yes.

7    Q.    You're not saying that you weren't obligated to pay

8   rent those months, are you?

9    A.    What I'm saying is that whether we owe the State

10  Department a certain amount or they owe us a certain amount

11  and what those amounts are, I don't think have been determined

12  and I'm not prepared to concede that we owe anything.  But I

13  am confirming that in those months, those rent payments which

14  the lease specifies were not made by us.

15   Q.    Okay.

16   A.    That's what I'm saying.

17   Q.    In addition to them not being made, you would agree

18  that you were responsible for paying the rent in those months

19  that you did not pay?

20   A.    You mean we were supposed to pay the rent as opposed

21  to somebody else, is that what you mean?

22   Q.    Sir, sir, do you understand my question?

23   A.    No.  That's what I asked.  I don't understand.

24   Q.    I want to avoid any games.  This is a standard

25  lease.  You're a lawyer and you understand what the

1   obligations are.  I'm asking you some basic questions because

2   we need to confirm some things on the record.  I don't believe

3   that they're disputed.  You're a tenant and you agree that

4   you're obligated to pay rent each month, correct, under the

5   lease?

6       A.   Yes.

7       Q.   And so when you failed to -- in January and the

8   months that you failed to pay, you would agree that you were

9   responsible for paying even though you didn't pay, wouldn't

10  you agree with that based on the terms of the lease?

11      A.   Oh, if you put it that way, as the tenant we are

12  responsible for paying the rent.

13      Q.   Okay.

14      A.   Right, that's true.

15      Q.   All right.  Now for January 2004 with the rent --

16  here it's 5,150.  Are you saying that you are not responsible

17  or are you saying that you don't owe the State Department that

18  amount?

19      A.   I'm saying that I don't know who will owe who what

20  at the end of the day.  That's all I'm saying.

21      Q.   That's a separate --

22      A.   I just don't know.

23      Q.   That's a separate question.  All I want to know is

24  do you agree that you owe the State Department the amount

25  listed for January rent and a late fee?

1      A.    I can't agree to that --

2      Q.    Okay. Why not?

3      A.    -- because I don't know.  Well, if our damages reach

4 or exceed -- were to reach or exceed 30,000, then we would not

5 owe the State Department for that month.  We would be adjudged

6 to have offset it and we wouldn't owe it.

7      Q.    Well, offset is a separate issue.  Before you have

8 an offset you have an obligation.  I'm asking you whether or

9 not we can agree that you had that obligation.

10      A.    We had the obligation to make -- under the lease we

11 had the obligation to make the rental payments as they were

12 specified in the lease as they came due, and this is a list of

13 them, yes.

14      Q.    Okay.

15      A.    Yes.

16      Q.    Of the amount listed, how much of the 36,098.12 do

17 you agree you owe, but take a look at it?

18      A.    Well, I told you that we do -- we contest the

19 validity of the August 2004 charge because we were gone in

20 accordance with the Notice to Vacate as of July 31st.

21      Q.    Okay.

22      A.    And the rest of it, I'll give you the same answer I

23 gave before, I agree that these were amounts specified for

24 those months and we did not make those payments, and under the

25 lease, the lease specifies that we are not make these payments

1  in these months and we did not.

2      Q.    Okay.  What amount do you agree that you owe?

3      A.    I don't know.  I can't agree with what -- to what

4  I'm going to end up owing right now or what I even owe right

5  now.  It's a legal question.  We think we have damages that

6  offset this and we don't know how much it is.  We don't know

7  how much it's going to be, so I can't tell you how much I owe.

8      Q.    But I have to learn that today, sir.  This is your

9  deposition, so you have to tell me.  If you believe you have

10  damages, then you have to know what those are.  I have to know

11  what those are.

12      A.    All right.

13      Q.    I mean unless we leave your deposition open and you

14  can come back and tell me at some later time what those

15  damages are.

16      A.    Well, you may choose to use that or do the

17  accountant, one or the other, but I will say this then, I

18  believe our damages will reach or exceed the amount of the

19  State Department's legitimate claims, and so I won't owe

20  anything.

21      Q.    Okay.

22      A.    I'll say that for now, and you know that I know that

23  I'm not sure that's how it's going to come out.

24      Q.    Okay.  What do you base that on?

25      A.    I base it on a rough idea of what all the damages

 1    are likely to be as I've seen it, but until it's done in a

 2    proper way by an accountant, I can't confirm that I'm going to

 3    be right.

 4        Q.    So when you filed your complaint, your counter-claim

 5    --

 6        A.    Yes.

 7        Q.    -- and you listed amounts in your counter-claim,

 8    you're saying you really had no idea what those amounts were,

 9    but you listed them anyway?

10        A.    We listed the amounts that we were able to identify

11    and confirm at that time.

12        Q.    And that's what I'm asking you about.

13        A.    Yeah.

14        Q.    Yeah.

15        A.    At that time.

16        Q.    I mean you understand that I need to learn what the

17    damages are against the State Department today, correct?

18        A.    Yes.  I think the counter-claim -- I don't have it

19    here in front of me, but I think the counter-claim probably

20    says what estimates or whatever damages we're adjudged to

21    have, rather than a specific fixed amount.

22        Q.    Right.  I mean that's what discovery is for.  I get

23    to discover exactly what that amount is, and that's what I'm

24    aiming to learn.

25        A.    Yeah.

1    Q.    So we can agree that you can come back at your

2    expense and explain that to me so we don't waste our time

3    today, but I need to know that.

4    A.    Well, yeah.    See, the accountant does the answer.

5    The accountant, as accountants often do, may say look, you

6    can't attach any value to that, sorry.    As an accounting

7    matter, you can't put a dollar figure on this.

8    Q.    Well, I get --

9    A.    You can't put a dollar figure on that.

10    Q.    Well, as you know, this is your complaint, so I get

11    to learn that from you.

12    A.    I know, I know, and it's just that I'm not the one

13    who knows the precise answer right now.

14    Q.    Were you the one that filed that counter-claim?

15    A.    Yes.

16    Q.    All right.    Let me ask you this, when you filed that

17    counter-claim, did you make a determination that the legal

18    contentions and the claims that are in that counter-claim were

19    warranted by existing law or by a non-frivolous argument for

20    the extension, modification or reversal of existing law

21    established in a new law?

22    A.    Yes.    I did not violate Rule 11 when I filed.

23    Q.    And did you make a determination that the

24    allegations and other factual contentions, including the

25    amount, had evidentiary support or are specifically so

1    identified or likely to have evidentiary support?

2        A.    Every amount that is in here does have evidentiary

3    support.

4        Q.    Okay.

5        A.    And the claim says we want damages in an amount to

6    be determined at trial, yes.

7        Q.    Okay.  And, as you know as a lawyer, discovery is

8    for the parties to find that out so we're not surprised at

9    trial, right?

10       A.    Yes.

11       Q.    You agree that this process is appropriate?

12       A.    And I would further say you're entitled to know

13    before this case ever goes to trial.

14       Q.    Okay.

15       A.    If it's going to go to trial, you're entitled to

16    know -- you're entitled to see that expert's report --

17       Q.    Yeah.

18       A.    -- examine him, the whole works.

19       Q.    Well, the expert is a whole separate issue.  During

20    the discovery process I'm entitled to know what your -- now if

21    you're saying you have no idea what your counter-claim was

22    based on, then -- you know, is that what you're saying?

23       A.    No.

24       Q.    Okay.

25       A.    I know what it's based on.  I just don't know what

1    the number valuation of the claim will finally be.

2        Q.    What's the basis, the evidentiary basis before you

3    filed this with the Court, for claiming in paragraph 11

4    counter-claim submitted a list of expenditures to OFM totaling

5    $12,033.44, a very specific amount?  What is the evidentiary

6    basis if today you don't have any idea without having the

7    expert for listing that in the complaint?

8        A.    I sent you -- I didn't say I didn't have any idea.

9    This is exactly what I said to you.  I want to be clear about

10   this.  I said every amount that is in this counter-claim has

11   evidentiary support now, so it's not that I have no idea.  Now

12   I sent you a letter on November the 30th.

13       Q.    Are you saying that at some -- that the 12,000 is

14   not accurate?

15       A.    Do you want me to answer your question?  You asked

16   me what the evidentiary support is for the allegation in

17   paragraph 11 that we sent you a list of expenditures totaling

18   12,033.44.

19       Q.    Well, part of that -- that's the amount of your

20   counter-claim, right?

21       A.    No, that's not.  It just identifies a letter we sent

22   you and a set of expenditures.

23       Q.    You said that's the amount that the counter-

24   claimants have absorbed through the end of December 2003.

25       A.    That could be right.  That's the absorption part of

1  the damages.  You remember how we described that?

2      Q.   Okay.

3      A.   That's the expenditures we had over a period of time

4  of about ten months or so while the State Department was

5  unable to make repairs.  That's what that is.  And it says we

6  sent a letter on or about January 9th, 2004, so we -- and I

7  think we've given you that letter.

8      Q.   Now is the reason why you don't believe that you owe

9  the amounts in the September letter, Exhibit 12, that list

10 that we went over, is the reason you believe you don't owe

11 that based on the amount that you believe you're entitled to

12 in your counter-claim?

13     A.   I think with the qualification that, you know, I

14 accepted three items from that list, that I think -- I either

15 don't know about it or I don't think we owe it regardless of

16 the counter-claim.  Take those three items out and you have

17 about $30,000 left.  I believe that the damages we will try to

18 establish in our counter-claim will constitute our entire

19 offset or anything we will claim as an offset, yes.

20     Q.   Okay.

21     A.   Yes.

22     Q.   Well, let's talk about that.

23     A.   Yes.  And, for the record, I don't want to be --

24 and, if I may, you sort of have to let me answer your

25 question.  I have the January 9th, 2004 letter in front of me,

1    which we also reproduced for you in discovery, and it says

2    attached is a draft preliminary list of paid expenses totaling

3    $12,033.44, and then there's a list attached to it.  And that

4    is the evidentiary support for the allegation in paragraph 11.

5        Q.    Okay.  You said that your counter-claim -- what's

6    the legal basis for you suing the State Department?  Why do

7    you believe that you can sue the State Department?

8        A.    Well, I think the two claims in the counter-claim,

9    are breach of contract and --

10       Q.    And you cannot determine -- is it your testimony

11   that you cannot determine how much -- the value or the amount

12   of your counter-claim without an expert, is that your

13   testimony?

14       A.    I can't say that it's impossible to do without an

15   expert.  What I can say is that an expert will do it better,

16   more professionally, more objectively, and will present it

17   with the appropriate accounting concepts such as depreciation,

18   things like that that I'm not sure I know how to do.  I can't

19   say that I couldn't do it without an expert.

20       Q.    Well, you --

21       A.    If you challenged our use of an expert and the Court

22   said I won't let you have an expert, I'm sure we could do it.

23   I just don't know if we'd do it as well.

24       Q.    When do you -- well, I want to know today, okay,

25   whether you're saying -- if you can calculate your damages,

1  then we need to do that today.  If you're saying you cannot,

2  Mr. Mussenden -- I can't tell you, Mr. Mussenden, because I

3  need an expert, then I need to know that.  I need to know one

4  or the other, okay?  So let me ask you this, my question, do

5  you know what the amount of your counter-claim is, Mr.

6  Tedards?

7       A.    I do not.  I told you that.  I do not have it in my

8  head sitting here, no.

9       Q.    Okay.

10      A.    I can't do it.

11      Q.    Do you need -- is it your testimony that in order to

12  do so, you will require -- in order to do so for purposes of

13  this case, you will require an expert?

14      A.    My testimony is to do it properly I will require an

15  expert.

16      Q.    My question is for purposes of this case, in proving

17  your case, are you saying that you will not be able to do so

18  without the use of an expert?

19      A.    I am not saying that.

20      Q.    Okay.  So in that case how are you planning to

21  establish your counter-claim without an expert?

22      A.    I'm not planning to.  I'm planning to -- as we told

23  you, I'm planning to give the appropriate material to the

24  expert and ask the expert to prepare it professionally.

25      Q.    So you are planning for purposes of this case -- you

1  can't prove the case without an expert?

2      A.   I didn't say I can't do it without an expert.  I

3  said that's the way I'm planning to do it.

4      Q.   Right.  So for purposes of this case -- that's what

5  I'm saying, for purposes of this case, you're saying you will

6  not be able to without an expert?

7      A.   No.  You're not -- this document -- you're not

8  listening to my answer.  I am saying that's the way I intent

9  do it because I think it will be done properly --

10     Q.   Okay.

11     A.   -- and better and less controversial.

12     Q.   And --

13     A.   I am not saying it can't be done without an expert.

14     Q.   Well, I'm not asking you whether it can or cannot be

15  done.  I'm talking --

16     A.   That's exactly -- no.

17     Q.   I'm talking about the reality of how you plan to

18  prove your case.  You know, you can prove cases in several

19  ways, and if you're saying that the way you intend to

20  establish your claims is through the use of an expert --

21     A.   The damages.  Not the claim, but the damages.

22     Q.   Okay.

23     A.   Yes.

24     Q.   How are distinguishing the claims from the damages?

25     A.   Well, the claims are whether the State Department

1   breached the contract or whether the State Department was

2   unjustly enriched.  I don't need the expert for that.  It's

3   the computation part, the damages part, that we intend to use

4   the expert.

5       Q.   Okay.  Let's talk about your claim for breach of

6   contract.  What's the factual basis for that claim?  First of

7   all, how much do you think the State Department owes you for

8   breach of contract?

9       A.   I don't know the answer to that in full.  I only

10  know part of it.

11       Q.   When will you know?

12       A.   Well, we can agree on it.  I tell you what I was

13  planning to do.  What I was planning to do was see if we had

14  to try the case.  It could be settled or a Summary Judgment

15  Motion precluding us from presenting our claims could be

16  granted.  In that case, the expert -- I would never turn to

17  the expert.

18       Q.   Well the Summary Judgment Motion is going to be

19  based on precisely the same thing that's going to happen at

20  trial, so that's why we're going through this exercise.

21       A.   You mean it's going to be -- you're going to bring a

22  Summary Judgment Motion on damages to argue about the amounts?

23  I can't see that.  I'd be surprised at that.  But, anyway, my

24  plan was at the end of summary judgment, if our claims were

25  still in the case and the case had not been settled, at that

1  point we would have the expert work this up for trial.  That

2  was my plan.

3      Q.  Okay.  Well, the whole purpose of discovery, sir, is

4  to prepare for motion or trial, and so I need to know before

5  the motion what it is you're going to use.  I'm entitled to

6  know what it is you're going to use for trial.  And so what we

7  can do is we can agree that you will return and explain to me

8  exactly what the basis of your claims are.  You want to pick a

9  date for that?

10     A.  Well --

11     Q.  We're going to just be going round and round.

12     A.  -- what I would do is I would tender you the expert

13  with a report.

14     Q.  No.  The expert is a completely separate issue.

15  Discovery's closed.  Okay?  That's a completely separate

16  issue, so you can --

17     A.  Well, I'm not seeking discovery.

18     Q.  So let's talk about your expert --

19     A.  I'm not sure what you mean by discovery is closed.

20  I'm not seeking discovery and I'm not precluding you from

21  inquiring either.  I don't understand.

22     Q.  That's something you'll take up with the Court.

23  What I'm interested in is let's set up a date because

24  obviously you're not prepared to tell me what your damages are

25  today.

1      A.    No.  I don't know the full extent of our damages.

2      Q.    Okay, that's fine.  Why don't we call the Court and

3   -- unless we can agree, okay, that you'll return at your

4   expense and the court reporter's expense, and you'll explain

5   to me what we're entitled to know through discovery which is

6   the basis of your claims?  Okay.  I'll go through as much as I

7   can go through today to cut down on costs, and then you'll

8   return and you'll explain to me the basis of your damages.

9   Can we agree on that?

10     A.    Are you saying that you want to try to keep the

11  expert out of the case?

12     Q.    Sir, I'm not speaking about the expert, okay?

13  That's something -- that's a totally separate issue, okay,

14  something that -- in your mind you believe that there's going

15  to be an expert and that's fine.  I'm not going to get

16  involved with that.  All I'm saying is that I've asked you

17  today what is the amount that you're telling my client they

18  owe you and you say I have no idea, okay, and I need to know

19  that, and I think we can agree that I'm entitled to know that,

20  right?  Do you agree with that?

21     A.    Well, I don't agree that I said I had no idea --

22     Q.    But you can't confirm that for me today?

23     A.    -- but I can't confirm the exact amount.

24     Q.    And you would agree that I'm entitled to know that,

25  right, in discovery?

```
 1        A.    You're entitled to know that --

 2        Q.    Okay.

 3        A.    -- at some point.  That's right, you are entitled.

 4        Q.    So when you are ready to tell me that, can we agree

 5   that you will return at your expense, okay, and the court

 6   reporter -- and you will take care of the court reporter and

 7   you will tell me that?  Can we agree on that?

 8        A.    We can agree that if we're going to bring a damages

 9   case we have to give you our damage report, however do it.

10   Yes, we can agree on that, and we can agree on when that's

11   going to occur.

12        Q.    You know that's not what I just asked you, right?

13        A.    No.  You're trying to ask me if I can say it to you

14   myself rather than somebody else.

15        Q.    No.  I'm accepting the fact that you came here today

16   for a deposition and you can't tell me the precise amount of

17   your damages and the basis for them because you need an

18   expert, and I'm saying -- I'm asking you whether you will

19   return at your expense to tell me that.  Will you agree to

20   that or not?

21        A.    Sure.  Everything we do is at our expense.  Yeah,

22   I'm not adverse to that at all.  That has to happen sometime

23   --

24        Q.    Okay.

25        A.    --  if we're going to try the case.
```

1    Q.    All right.  When can you do that?

2    A.    Well, my question is do you need to have that to

3 file your Summary Judgment Motion?

4    Q.    This is discovery, sir, and I --

5    A.    Do you need damages?

6    Q.    Yes.  I need to know -- this is discovery, and this

7 case can go to trial and this is my only opportunity to learn

8 that.  There's a possibility that we go to trial.

9    A.    There is.

10    Q.    This is the only opportunity I have as to what the

11 Court has allowed me, and you're telling me you can't give me

12 what I'm entitled to.

13    A.    No, no.  The Court will allow you anything.  They'll

14 allow you ten depositions.  They'll allow you interrogatories.

15    Q.    Sir --

16    A.    They'll allow you anything.  The Court's not

17 limiting your discovery --

18    Q.    Sir --

19    A.    -- and neither am I.

20    Q.    Sir --

21    A.    But, yes.

22    Q.    -- there a court order in place that clearly

23 delineates this, so we don't have to debate that.  What I'm

24 asking you, will you agree to return and pay for the court

25 reporter?  I'll agree to show up here with my time again to

44

1  learn this.  Can we agree on that?

2      A.  Yes.

3      Q.  Okay.  When will you do so?

4      A.  Well, I'll have to confer about that.  When do you

5  -- what's the latest date that you can afford to learn this?

6      Q.  Well, now we're impacting the schedule of the Court.

7  We'll see if the Court wants to entertain whether we'll do it

8  for your inability to provide this testimony today, but we'd

9  want to do that and have an opportunity to file a Summary

10  Judgment Motion against your counter-claim, so --

11      A.  But do you have an outside date in your mind right

12  now?

13      Q.  As soon as possible.  I can go grab the calendar and

14  we can --

15      A.  Yeah.  We need to know what time frame we're working

16  in.

17      Q.  Okay.

18      A.  We're doing it -- we're doing this to suit your

19  schedule.  You have to tell us by what date you have to have

20  this piece of the information for them.

21      Q.  We're doing this to suit your schedule, sir.  I have

22  scheduled time for this discovery and you're going to take up

23  my time again to do this when you were supposed to be prepared

24  with this today, okay?  So I'll accommodate you if you would

25  agree to take care of the expenses.

1        A.    And how much time do we have in your mind?  What's

2   the latest that you can afford to get this --

3        Q.    I just wanted to have your agreement.

4        A.    -- what our time frame is that we're working with.

5        Q.    We'll do that after we conclude.

6        A.    Okay.

7        Q.    Let's get through as much as we can --

8        A.    Okay.

9        Q.    -- today just to cut down on the costs, and then

10  we'll go pick a date and conclude, okay?

11       A.    Yes.

12       Q.    Let's talk about your breach of contract claim.

13  What's the factual basis for that claim?

14       A.    First, in the period October of 2003 through January

15  of 2004 the State Department breached the contract in that it

16  failed to respond to notices that we were required to give

17  them under the contract, and I believe that the contract,

18  fairly read, requires them to respond to those notices.  And

19  as a result of that, we were unable to carry out our

20  obligation which is to make the necessary repairs and, where

21  necessary, replacements to the appliances and the equipment in

22  the building on the $200 deductible basis.  We were unable to

23  do that and, as a result, the repairs did not get made.

24            And we had the double problem of not doing -- not

25  being able to do what we were supposed to do under the lease

1   and having the -- having to adjust, make certain adjustments,

2   because of the -- so that's what I would start out with as

3   first line.

4          Q.    This is the breach of contract claim?

5          A.    Yes.   This is part of the breach of contract claim.

6   Next --

7          Q.    The term --

8          A.    I'm sorry.

9          Q.    Oh, is this still breach of contract?

10          A.    I just was talking to you about the first part of

11   the breach of contract claim, yes.

12          Q.    Failed to respond to notices.

13          A.    Right.

14          Q.    That's the breach, right, if I understood your

15   testimony correctly?

16          A.    Yes.

17          Q.    And then you went into the consequences of that, but

18   I'm focusing in on the breach.

19          A.    On the breach, right.

20          Q.    And the breach was failure to respond to notices?

21          A.    Right.

22          Q.    Is there some other breach?

23          A.    Yes.

24          Q.    What is that, failure to do what?

25          A.    In February of 2005 -- sorry.

47

1       Q.   2003?

2       A.   Yeah.  Wait a minute.  Let me check my dates again.

3   Yeah.  I have to change the years.  October to January 2002 to

4   2003 is the time period I was just talking about instead of

5   2003 to 2004.

6       Q.   October of -- one more time.

7       A.   2002.

8       Q.   To?

9       A.   January of 2003.  Sorry about that.  Those years

10  were wrong.

11      Q.   You just referred to something to confirm that.

12  What is it you referred to?

13      A.   Well, I looked at the letter that we were talking

14  about a moment ago, January 9th, 2004, and I realized that

15  this letter was a full year after the time period I was

16  talking about.  That's what triggered me to realize that what

17  I've just told as the first date of breach of contract should

18  be a 2002 to 2003 period, not 2003 to 2004.

19      Q.   Okay.  Failure to give notices, and then you were

20  telling me --

21      A.   Failure to respond.

22      Q.   I mean failure to respond to notices.

23      A.   Yes.

24      Q.   And now you were going to explain some other basis

25  for breach.

1      A.    Yes.

2      Q.    In February of 2003 the State Department informed us

3  that it would be unable -- because of a frozen bank account,

4  it would be able to make any kinds of repairs.  I believe they

5  might have put an exception in for extreme emergency.  That

6  letter in itself, of course, would be a breach because the

7  State Department has ongoing repair and replacement

8  obligations under the lease, so the letter itself informing us

9  that they couldn't do that anymore would be a breach or at

10  least, I guess, if you want to call it an anticipatory breach.

11  And you know the story of what happened after that culminating

12  in the January 9th, 2004 letter.  So that's the second.

13      Q.    Okay.  We'll talk about that.  What other basis --

14  factual basis for the breach of contract claim is there?

15      A.    In the period from early 2004 to the end, with our

16  departure July 31st, during that period of time the State

17  Department continued that same breach.  In other words --

18  well, I had a conversation with them in -- I think somewhere

19  around the time that I sent them the January letter and

20  learned that the State Department would continue to be unable

21  to make any kind of repairs or, you know, replace any

22  equipment or anything like that because their bank account was

23  still frozen.  So this would cover the period from early 2004

24  to the end, until we left.

25      Q.    So they continued the same --

49

1      A.    It was the same problem, frozen bank account,

2  inability to do work on the property basically.

3      Q.    Okay.  I understand you're explaining some facts.

4  What is the -- how does that translate into a factual basis

5  for breach of contract?

6      A.    Under the lease the State Department has the

7  obligation -- it has two obligations with respect to upkeep of

8  the property.

9      Q.    Okay.  Let me -- let's cover -- before we move onto

10 that, let's cover -- I have failure to respond to notices.  I

11 have the February 2003 letter.  What I don't have and

12 understand is the third basis for the breach.  Can you restate

13 that?  You were explaining to me a period early January 2004,

14 but I didn't understand --

15     A.    Yes, all right.  Now the -- in the period prior to

16 the October 2002 notices, in other words, in the preceding

17 years, is the part that leads up to this breach --

18     Q.    Which breach?

19     A.    The breaches of the current lease.  In the period

20 prior to that the State Department breached the contract by

21 failing to make repairs for which we adjusted the tiles, for

22 an example, the tiles on the balcony.

23     Q.    You just lost me.  I'm talking only about the June

24 2002 lease, okay --

25     A.    Well --

1    Q.   -- and breaches under that lease.

2    A.   I'm telling you what the breach of contract line is

3 regardless of which lease form it is.

4    Q.   Well, it can't be regardless of which lease form

5 because the only basis for our lawsuit is the June 2002 lease.

6 I'm not sure if you have some other lawsuit pending, but I'm

7 going to confine the testimony today to that lease.

8    A.   Yeah.  I actually am, too --

9    Q.   Okay.

10    A.   -- if you'll let me explain.

11    Q.   Well, let me first -- before we move from one topic

12 to the other, I want to cover our basis for the breaches.

13    A.   All right.

14    Q.   I have a failure to respond to notices.

15    A.   All right.

16    Q.   I have February 2003.  And you're explaining -- and

17 it may be that there's no third basis, but all I want to do is

18 just the third basis for breach.

19    A.   Yeah, and that's what I'm explaining to you.

20    Q.   Okay.

21    A.   The responsibility for serious water leaks and

22 putting those balconies into shape and so forth was a

23 continuing failure that continued right on through the 2002

24 lease and all the way to the end, but these are breaches that

25 started earlier and just continued.  In other words, at no

1  point either before or after the 2002 lease did they ever say

2  look, we're going to get these balconies into shape and you

3  can have all the swimming pool tiles back and, you know, we're

4  going to fix it.  They never did that.  And they never really

5  got the leaks under -- the bad part of the leaks under

6  control.  But these are continuing breaches, not new ones

7  under -- that started happening from 2002 to 2004, but ongoing

8  and continuing.

9       Q.    You lost me again.  What's the conduct, the conduct

10  under the June 2002 lease that constitutes a breach of that

11  lease, okay?  The conduct you're described so far is failing

12  to give notices.  So then the next conduct, you say, was

13  issuing the letter, February 2003.

14       A.    Um-hum.

15       Q.    What conduct are you saying is an additional basis

16  for breach?  What did the State Department do under the June

17  2002 lease?

18       A.    Well, it wasn't issuing the letter.  I mean the

19  letter was the evidence of it.  It was telling us they weren't

20  going to make the repairs.

21       Q.    Okay.  I kind of understand that.

22       A.    Okay, yes.

23       Q.    What in the --

24       A.    And then finally there were ongoing serious

25  problems, and I'll use the balconies as the example.  There

1    were ongoing serious problems that were not addressed properly

2    before the 2002 lease and continued.

3         Q.   So you can't really identify anything that the State

4    Department did -- in addition to what you've already

5    described, you really can't identify any conduct they did that

6    breached the 2002 lease, can you?

7         A.   I've just given you my answer.  I think I have

8    identified breaches of the 2002 lease.

9         Q.   Right.  I'm saying in addition to failing to give

10   notices and with --

11        A.   Failure to respond.

12        Q.   -- failure to respond and the February 2003 letter,

13   you can't really identify any conduct that the State

14   Department did to breach the 2002 lease, can you?

15        A.   The other was refusing or being unable to carry out

16   its ongoing repair or replacement obligations under the 2002

17   lease on problems which began well before, preexisted, in

18   other words, and then continued.  See, when we gave them the

19   notices, we were talking about new problems --

20        Q.   Okay.

21        A.   -- that had come up.

22        Q.   Refusal to continue repairs.  Is that the third

23   thing that's been breached?

24        A.   Well, on a continuing basis, yes, but problems in

25   some cases were preexisting, before we entered the lease.

1    Q.    Under the -- just start with that one.  First of

2  all, refusal to continue repairs, we'll start with the last

3  one, and I'm assuming that this occurred under the June 2002

4  lease because that's the basis for your breach of contract.

5  That's the contract you're talking about, right?

6    A.    Yes.

7    Q.    Okay.

8    A.    Yes.

9    Q.    So here's the contract.  Please identify the

10  obligation under that contract that the State Department had

11  to continue repairs.

12    A.    Well, the State Department's repair obligations are

13  in the paragraph that is on page 3 under the title Repairs and

14  of Alterations, and they -- I'll paraphrase it and then you

15  can read it if you like.  They basically have two obligations.

16  They have an obligation to assist us with any necessary --

17  reasonably necessary repairs or replacements to appliances and

18  equipment that are nonstructural to the extent that the cost

19  exceeds $200.

20    Q.    Okay.  Where do you see that in the lease?

21    A.    In the first three sentences.

22    Q.    Read that obligation, to assist with any reasonably

23  necessary repairs and replacements that are nonstructural.

24    A.    Yeah.  I'll read you the whole thing.  Tenant shall

25  properly report in writing to the Office of Foreign Missions

1   any defect, damage, malfunction or breakage, so those are your

2   notices.  At his or her own expense, not to exceed $200, for

3   repair, tenant shall keep all parts of the premises, including

4   appliances and equipment therein, in a state of good repair

5   and cleanliness.  That's the $200 deductible.

6        Q.    What's the obligation to assist you with reasonable

7   repairs, where does that language occur?

8        A.    This was a $200 deductible that was negotiated with

9   the State Department to make us responsible for the first $200

10  of any equipment or appliances that had to be fixed or

11  replaced.  That's what that clause is.

12       Q.    Okay.  That's what you're referring to?

13       A.    Yes.

14       Q.    Okay.

15       A.    And then you get to the second which is the one that

16  Yvonne read yesterday.  Nothing contained herein or otherwise

17  is intended nor shall cause the tenant to be responsible for

18  repairing or maintaining the structural elements.  So if it's

19  structural, however that's defined, and that's been somewhat

20  ambiguous, if it's structural or roof, it's the State

21  Department's whole responsibility, and we're supposed to tell

22  them and they're supposed to fix it.  If it's nonstructural,

23  equipment and appliances, this lease requires us to give them

24  notice, to get it fixed up to $200, and for them then to cover

25  the rest.  And this is the clause that I am presuming is

1  related to those first two items where they talk about the

2  deductible, you know, the first two I said I wasn't familiar

3  with when you showed me the list of amounts due.  The first

4  two were the deductible.  This is the clause that I'm sure

5  that's referring to and, while I don't know the details of it,

6  I'm sure that's the clause.  And so that's the State

7  Department's obligation.

8       Q.   Okay.  So that's refusing to continue repairs.  On

9  what date did the State Department refuse to repair?

10      A.   Well, it would depend on the item that you identify,

11 you know, because they start at different times, but an

12 example would be the October notices, October of 2002.

13 Starting at that date the State Department simply -- I believe

14 -- to the best of my knowledge -- let me say it this way so

15 I'm sure that I don't overstate it.  To the best of my

16 knowledge, the State Department did not respond to the October

17 notices which we gave them under this clause of the lease, but

18 I can't tell you categorically they never made any response.

19 I'm just not sure about that.

20      Q.   Let's talk about the failure to respond to notices.

21      A.   Yes.

22      Q.   You were required to give written notice before you

23 incurred any expenditure for repairs, correct?

24      A.   I think that's the sense of this paragraph, yes.

25      Q.   You were also required to --

1      A.   I think so.

2      Q.   -- obtain written approval or disapproval before

3  incurring the expense from the State Department, isn't that

4  true?

5      A.   That is not in here.  It's not in this paragraph.  I

6  would think that the idea of a notice is to get them involved

7  and have them take a position on it, yes, but it doesn't

8  actually say that in the paragraph.

9      Q.   Okay.

10     A.   It says we're responsible for it whether we get

11 their approval or not, is what the paragraph says.  You may be

12 talking about the part of the lease that says we can't, you

13 know, put up walls and change the property and stuff like

14 that.  I agree that we can't do that.

15     Q.   So you understand, Mr. Tedards, that you couldn't

16 make -- incur any expenses and have placed that responsibility

17 on the State Department without the State Department approving

18 that, correct?

19     A.   Well, you know, I was just going by this lease.  I

20 mean that's all we have is this lease at this time.  2002

21 forward we only had this lease, and this lease says tenant

22 shall keep all parts of the premises, including appliances and

23 equipment therein, in a state of good repair and cleanliness,

24 and it doesn't actually say anything about what we have to get

25 from the State Department.  It's a straight out obligation of

1   ours, as I read that paragraph.

2          Q.    Right.   Of yours, isn't that true?

3          A.    Up to $200.

4          Q.    True.

5          A.    And what I'm telling you is this was -- if you're

6   permit me two cents of explanation, I think it will help, if

7   that's okay.   It's related to this answer.   This tenancy the

8   whole time was kind of a joint venture where the repair and

9   maintenance expenses were shared in different ways, you know,

10  as the terms were negotiated as you went along because the

11  repair and maintenance of this building was very, very high in

12  cost.

13         The State Department spent $126,000 on this building

14  in repair and maintenance in less than eight years.   If you

15  divided that by eight, that's $15,000 a year which is pretty

16  hefty.   And so there was always a concern with how would this

17  get done, and it was a shared burden right from the beginning.

18  We invested one-half the cost of renovating the kitchen, for

19  example, which desperately needed it.   We invested 100 percent

20  of the cost of strengthening certain beams in the house.

21         And this went back and forth and back and forth, and

22  this lease is the latest configuration of that relationship.

23  And what we decided was State Department has structural, and

24  equipment and appliances we have it, and we had the

25  responsibility to maintain that in good repair for the State

1  Department, not just for us.  It was our obligation, but the

2  equipment and the appliances would be split, 200 for us, rest

3  for them.  That's how it was working from 2002 forward.  And

4  in previous years it was a little different.  You know, it was

5  expressed differently.

6      Q.    Right.  And so the State Department -- under the

7  lease before you incurred any of those expenses, the State

8  Department required notice and their approval or disapproval

9  before you incurred the expense, isn't that true?

10     A.    Let's put it this way.  I would think that's the way

11 it should work.  What should happen is we give them notice,

12 they said all right, here's how we feel about this, and then

13 we get it done.  I would agree that's the way it's supposed to

14 work, but when they do not respond to the notice at all, this

15 lease does not say our obligation is contingent on the State

16 Department's okay.

17           And this is what the lease did.  This lease puts the

18 burden on us to make sure that those equipment and appliances,

19 and there's a lot of them, a lot of lights, lot of machines,

20 lot of stuff in there that is kept up.  This lease puts that

21 on us, and it doesn't say --

22     Q.    And what's what you agreed to, right?

23     A.    It doesn't -- yes, up to $200 --

24     Q.    Okay.

25     A.    -- and they're supposed to pay the rest.  And so

1   when they refused to respond to the notices, they basically

2   dropped the process.  You know, the process just stopped and

3   things either didn't done or we had to do the whole thing.

4       Q.   Is it your contention that regardless of whether

5   they responded to notices or regardless of whether you even

6   gave them notices, that if they didn't respond to what you

7   felt was a notice, that that entitled you to fail to pay rent

8   under the lease?

9       A.   Well, you have to get the intermediate step.   The

10  intermediate step --

11      Q.   Well, why don't you answer that question, do you

12  believe that that entitled you to fail to pay the rent?

13      A.   Eventually, yes, it did.

14      Q.   Under what -- under the terms of the lease?  Where

15  in the lease does it entitle you to fail to pay rent because

16  you didn't receive a notice?

17      A.   Our position is that when the State Department made

18  it's final move in this regard and said we can't fix anything

19  at all because we don't have any money, our position is we

20  still had both the burden and the entitlement to keep that

21  place in good shape and have it somehow accounted for later.

22  Yes, that's obviously our position, you know --

23      Q.   Okay.  And where --

24      A.   -- right or wrong, but there it is.

25      Q.   Well, it's not a right or wrong.  It's whether or

60

1  not it's in the contract because that what's governs, right?

2      A.    Right.

3      Q.    It's not a right or wrong matter.  It's not a moral

4  matter.  It's a contract matter.

5      A.    No.  I'm saying of this may be right or wrong, but

6  that's my theory.

7      Q.    Well, I need to know where in the contract does it

8  permit you, okay -- as you agreed with the State Department,

9  where does it permit you to fail to pay rent if, you know, you

10 don't receive a response to a notice you provided?

11     A.    We were excused from our obligations by a prior

12 material breach in February of 2003 forward.

13     Q.    In other words, you can't really identify anywhere

14 in the lease where that permits you to do that, can you?

15     A.    I am saying that any contract, whether it's a lease

16 or anything else, if there is a prior material breach by one

17 party, the other party has a basis for an excuse.

18     Q.    So you can't identify anywhere in that lease where

19 it permits you to fail to pay rent under those circumstances,

20 can you?

21     A.    There is nothing in the lease that says you don't

22 have to pay rent under one circumstance or another, no.

23     Q.    Okay.  Now let me have you take a look at a January

24 9th, 1997 letter that I'm having -- I had marked as Exhibit

25 13.

1          (Whereupon, the document that was referred to as Exhibit

2     Number 13 was marked for identification.)

3          BY MR. MUSSENDEN:

4     Q.   Do you recognize your signature?

5     A.   Yes.

6     Q.   Okay.  This is a letter you sent to the State

7  Department, correct?  I'll give you a moment to take a look at

8  it.

9     A.   Let me look at it.

10                    (Off the record)

11                    (On the record)

12         WITNESS:  Do I need to know all the details of all

13  the little items in this?

14         BY MR. MUSSENDEN:

15    Q.   No.

16    A.   Okay.

17    Q.   What's the gist of this letter?

18    A.   Telling them about a lot of stuff that needs to be

19  done in the house.

20    Q.   Okay.  You also thank them for putting in a new

21  washing machine, correct?

22    A.   Yes.

23    Q.   From the second page on the top, read from please

24  note.

25    A.   Right.

1      Q.    Read it out loud on the record, please.

2      A.    Please note, we would do these things ourselves and

3  just bill you, but you've made it clear that we cannot do that

4  with this particular property.   Right.

5      Q.    So you understood very well that you couldn't make

6  repairs and then bill the State Department and have them pay

7  for those?

8      A.    In 1997, yes.

9      Q.    All right.   Okay.   Well, you were just telling me

10  that there's this ongoing obligation preexisting, so now

11  you're abandoning that view?   That's not part of your

12  contention, right, anything preexisting?

13      A.    The ongoing obligation I described has nothing to do

14  with us fixing anything.   It has to do with the State

15  Department not fixing anything.

16      Q.    Okay.   But you understood that -- from 1997 you

17  understood that -- you'd agree that the State Department, in

18  your words, made it clear that you could not incur expenses

19  and bill them for them, right?

20      A.    In 1997.

21      Q.    Okay.   Now are you saying that in June 2002 that

22  that changed?

23      A.    In June 2002 we negotiated the new paragraph which

24  obligates us to make the expenses and to incur -- excuse me.

25  It obligates us to take care of the equipment and appliances

1  and to incur the first $200 of expense, and that is the new

2  arrangement in 2002, yes.

3      Q.   Okay.  So it's your contention that the June 2002

4  lease now allowed you to incur expenses without telling the

5  State Department?

6      A.   It allowed us to make the adjustment we had to make

7  when the State Department put us in a position where we had

8  to.  The State Department sent us a letter saying our bank

9  account is frozen.  We can't do anymore work on the house.

10 And I said to them at that time, I said look, I understand.  I

11 had no idea how long their account would be frozen.

12     Q.   We'll talk about that in a minute.

13     A.   And so -- well, excuse me, let me finish.

14     Q.   We'll talk about this February 2003 notice in a

15 minute.

16     A.   I'm answering your question, if you don't mind.  I'm

17 answering your question.  Yes, we were entitled to do what we

18 did after February of 2003.

19     Q.   After February 2003?

20     A.   Yes, and that's the only time we did it.

21     Q.   Okay.

22     A.   Yes.

23     Q.   Let me have you read the last paragraph of that

24 letter you wrote in 1997 aloud on the record.

25     A.   The closing paragraph?

1    Q.    Um-hum.

2    A.    Please consider these comments and let us know what

3 you think.  We enjoy the house very much despite the

4 maintenance complexities and we want our relationship to work

5 well.

6    Q.    Okay.  So, in fact, regardless of what maintenance

7 issues there were, the house was in fine enough repair where

8 you enjoyed it very much, wasn't it?

9    A.    Until the last -- the very last stage, yes, yes.

10    Q.    And what would you describe as that very last stage?

11    A.    Well, I'd say the last stage began in February of

12 2003 when we learned that they weren't going to be able to fix

13 anything at all.

14    Q.    Okay.

15    A.    And if you consider the fact that the State

16 Department spent $126,000 on the house over eight years, what

17 they were really telling us with that letter is, if you use an

18 average, that there's about 15,000 bucks here that we can't

19 cover any more.  That's basically what they were telling us.

20 That would be an average of how much they normally spent, and

21 we had to figure out what to do.

22    Q.    Okay.  In the repairs and alterations clause, can

23 you read the very first sentence before the $200 deductible?

24    A.    Tenant shall promptly report in writing to the

25 Office of Foreign Missions any defect, damage, malfunction or

1  breakage.

2      Q.   Okay.

3      A.   Yes.

4      Q.   And did you do that?

5      A.   We did it in October.  We did it again in January.

6  And in February they said we're out of the game, our account's

7  frozen, I'm sorry, we can't fix anything.  You can leave if

8  you want.  You know, that's how they responded.

9      Q.   Did you ever receive any written approval to incur

10  the expenses that are part of your counter-claim?

11      A.   You mean apart from the provision in the lease that

12  says we have to keep up the appliances and equipment?

13      Q.   No.  My question is --

14      A.   I would --

15      Q.   Let me --

16      A.   -- in the lease --

17      Q.   Let me ask the question.

18      A.   -- but go ahead.

19      Q.   Did you -- for any of the claims and expenditures

20  that are part of your counter-claim, did you receive written

21  approval from the State Department to incur those expenses?

22      A.   And you mean apart from what we're required to do

23  under the lease, is that what you mean?

24      Q.   No.  I'm just asking a straightforward question.

25  For any of the -- let me ask the question first.  For any of

1  the expenditures that are part of your counter-claim, the

2  basis for your counter-claim, did you receive written approval

3  from the State Department to incur those expenses?

4      A.   Yes.  The lease term -- the lease was drafted by the

5  State Department, and the lease term said to us you, at your

6  own expense up to $200, will maintain and fix the appliances

7  and equipment, and that was an -- that was stronger than an

8  approval.  That was an instruction in the lease, yes.

9      Q.   Okay.  We have a disconnect.  For any of the

10  expenditures that you incurred that are part of your counter-

11  claim, for any one of those, did you receive written approval

12  to incur that expense from the State Department?

13      A.   And my answer to you is I would construe the lease

14  term as written approval requiring us to do it, and after

15  February of 2003 I did not believe we had to get written

16  approval.  I believed that we were entitled to do it ourselves

17  and settle it later.  Prior to that time, I would say that we

18  did not receive written approval.  We got an oral endorsement

19  of some of what we had done like the tiles, for example.  Yes,

20  but not in writing.  We never asked for that in writing.

21      Q.   Okay.  So you would agree then that with the

22  exception of this -- you said that you believed that the

23  tenant shall -- this reporting requirement is the approval

24  your talking about?

25      A.   No.  I said it says report.  That's what it says.

1    It doesn't say approve in there, so I can't say that that's an

2    approval requirement.

3        Q.    Okay.

4        A.    I can't actually say that.

5        Q.    And you can't also identify any written approval you

6    got for any one of the expenditures you incurred, can you?

7        A.    Apart from the lease term?

8        Q.    Apart from your lease term you can't identify

9    anything?

10       A.    I can't identify any myself.  I don't know if there

11   was any, no.  I actually don't know.  See, the way this thing

12   was handled, it was a constant discussion back and forth.  It

13   was a practical thing.  We'd fix things, they'd fix things, we

14   paid for things, they paid for things.  It didn't operate

15   exactly in the structure that, you know, you're trying to

16   describe with written approval.

17       Q.    Okay.  Let me have you look at that February 2003

18   notice.  Is that the notice you're referring to?

19       A.    Yes.

20       Q.    It's been marked as Exhibit 14.

21       A.    Yes.

22       (Whereupon, the document that was referred to as Exhibit

23       Number 14 was marked for identification.)

24           BY MR. MUSSENDEN:

25       Q.    Let me take a look at it.  Now what language do you

 1  point to where it indicates the State Department will no
 2  longer make any repairs and that you are authorized to spend
 3  money for those repairs?
 4      A.   It doesn't say anything about authorizing us to make
 5  repairs.
 6      Q.   Okay, good.  I'm glad we can agree on that.  Where
 7  does it say that they're unable to make any kind of repairs?
 8      A.   For the immediate future, OFM is in the unfortunate
 9  position of being unable to respond favorably to other than
10  the most serious repair or maintenance requests.  I understand
11  this situation is a hardship for our tenants and, as a
12  consequence, and then it goes on to say that people can leave
13  early, you know, if they need to.
14      Q.   So there's no place in that notice where it says
15  that the State Department is unable to make any kind of
16  repairs, is there?
17      A.   I called up the person who was --
18      Q.   Let's talk about the notice first.
19      A.   All right.  You want to speak of the notice first?
20      Q.   Right.  We can discuss something different, but --
21      A.   All right.
22      Q.   -- I want an answer to my question on the record
23  first.  Then we can move on to something because everything
24  else is non-responsive.
25      A.   I think the word unable means unable.

1    Q.    Okay.

2    A.    I don't think there's anything ambiguous about that.

3    Q.    Okay.  Let me ask the question first, sir.  There's

4  nothing in that letter that says that the State Department is

5  unable to make any kind of repairs, is there?

6    A.    The letter says they are unable to make anything but

7  the most serious repairs.

8    Q.    Okay.  So we would have to agree then that there's

9  nothing in that notice that says that they will be unable to

10  make any repairs --

11    A.    I've answered your question and I won't repeat it.

12    Q.    -- correct?

13    A.    I will stand by what I read out of that letter --

14    Q.    So you --

15    A.    -- and you will not get me to try to characterize it

16  differently.

17    Q.    Well, I'm just asking you a straightforward

18  question, not a characterization.

19    A.    And I gave you the answer.

20    Q.    Okay.  The State Department in that notice did not

21  tell you that they would be -- they would not make any repairs

22  whatsoever, they did not?

23    A.    In the written notice preceding any phone

24  conversation the State Department said we will be unable to

25  respond to anything but the most serious repairs.

1    Q.   Okay.  Now --

2    A.   That's what it says.

3    Q.   That's what it says.

4    A.   Right.

5    Q.   So if, in fact, you -- well, okay.  After receiving

6    this request -- I mean this notice, did you send the State

7    Department any notices for the expenditures you incurred and

8    ask for their approval?

9    A.   Well, you've got a compound question.  We sent them

10   notices of the expenditures that we had incurred in January of

11   2004.

12   Q.   Okay.  Before incurring those expenses, did you

13   provide notice of the damage or the defect to the State

14   Department after receiving the February 2003 letter?

15   A.   We didn't add any new notices to the ones we had

16   already given them from October and January.

17   Q.   Of what year?

18   A.   2002 and 2003.

19   Q.   Okay.  I'm talking about February of 2003.

20   A.   After February we did not add any new notices until

21   January, until the following January.

22   Q.   After February 2003 did you at any time before

23   incurring an expense give the State Department notice?

24   A.   Yes.

25   Q.   When?

71

1     A.    I called up the State Department, to the person

2   whose name I don't remember, who was in charge of the house.

3     Q.    Written notice.

4     A.    You want it in writing?

5     Q.    Well, that's what the lease requires.  Did you ever

6   give them written notice?

7     A.    No.  You mean prior to incurring the expense?

8     Q.    Right.

9     A.    No.

10     Q.    So after February 2003 you never gave the State

11   Department written notice for any expense you incurred,

12   correct?

13     A.    Prior to the expense?

14     Q.    Right.

15     A.    No.

16     Q.    You agree, sir, that the repair of the heating and

17   the air conditioning was the responsibility of the tenant

18   under the lease?

19     A.    If it's structural, it's 100 percent the

20   responsibility of the State Department under the lease.  If

21   it's equipment and appliance, it's the responsibility of the

22   State Department above $200.

23     Q.    Above $200?

24     A.    I explained to you that that provision is a

25   deductible provision that we negotiated and this is the way

1  the State Department drafted it, but that's what it is.

2      Q.   So it's your contention that the lease provides that

3  for every expense above 200 -- that you incur above $200 the

4  State Department would pay for it?

5      A.   Well, no.  My contention is not to exceed $200 for

6  repair.  Tenant shall keep all parts of the premises,

7  including appliances and equipment therein, in a state of good

8  repair.  That's my contention.

9      Q.   Are all the repairs you made then as part of the

10  counter-claim don't exceed $200?

11     A.   No.  This is a deductible.

12     Q.   Where does it say deductible?

13     A.   I'm telling you that that's what we negotiated and

14  it's the only sensible reading of it.

15     Q.   Okay.  So --

16     A.   Why would the State Department -- if a heating and

17  air conditioning unit broke down that cost $1,500 and the

18  house was deteriorating as a result, why would the State

19  Department say I want you to fix that, but I only want you to

20  spend $200?  That doesn't make sense.  That's not what they

21  meant by this.

22     Q.   I see.  So you're --

23     A.   Yes, it's a deductible.

24     Q.   So you incurred expenses that exceeded $200.

25  Wouldn't that breach the lease?

73

1        A.    No.

2        Q.    Why not?  It said not to exceed $200.  Why wouldn't

3   that breach the lease?

4        A.    It says our expense, our own expense, is not to

5   exceed $200.

6        Q.    Right.  And did you --

7        A.    But it says we're to repair it.

8        Q.    -- incur expenses that exceeded $200?

9        A.    Of course.

10        Q.    Doesn't that completely contradict the lease?

11        A.    No.

12        Q.    Okay.  The next paragraph, 10, your alleged counter-

13   claims, responded to OFM by telephone and said they would

14   absorb OFM's obligations for awhile and would settle the

15   account later.

16        A.    Yes.

17        Q.    When you say responded, you mean to the -- it

18   alleges the February 5th, 2003 letter.  You responded to that

19   by phone?

20        A.    Yes, yes.

21        Q.    Who did you talk to?

22        A.    That's the name I can't remember, but there's always

23   a person who's the, you know, account person on this property,

24   and I just can't remember her name.

25        Q.    Was it a lady?

74

1    A.    It was a lady.  I think -- I'm pretty confident it

2  was a lady, yes.

3    Q.    Do you recall whether her name was Lynn?

4    A.    That could be, yeah.

5    Q.    What did you --

6    A.    I'm just not sure.

7    Q.    When you called, what did you say to her?

8    A.    Well, I called originally because I was curious

9  about how long this might last, and I said, you know, is this

10  just a quick temporary thing or could it last awhile or what,

11  and she explained a little bit about how they had lawsuits

12  about terrorism and so forth, and that this was apparently

13  where this was coming from.  People were always trying to

14  attach the house and so forth, you know, as an Iranian asset.

15  And she said that their lawyers were working on it, but she

16  couldn't say how long it would last.

17        And I said then well, look, I understand the

18  situation you're in.  She made it pretty clear to me, you

19  know, that it would have to be something like the house

20  blowing up or something, you know, before they could get

21  involved.  They were simply not going to be able to make the

22  type of ongoing routine repair that this kind of building

23  required.  As you know, it required $126,000 worth over a few

24  years.  This was regular for this building.  It was not --

25    Q.    Okay.  Let's keep it to what the conversation was.

1     A.    I am telling you what it was.

2     Q.    All right.

3     A.    And so she basically said she didn't know how long
4  it would be, and I said well, look, we'll just carry our end
5  and your end for awhile, and then at some point, you know, not
6  knowing how long it would be, we'll settle the account however
7  we can.

8     Q.    You used those words, we'll carry our end and your
9  end?

10    A.    Something just to the affect, yes.  I got that idea
11 across, in other words, of what I was going to do.

12    Q.    What was her response?

13    A.    I never had any response to that one way or the
14 other.  I never had any dissent.  I never had any notice.  I
15 never had any written endorsement of it.  I just said look,
16 that's what I'll do for awhile, and then it never really went
17 any further than that.

18    Q.    And after you said that what did you she say?

19    A.    I don't remember her saying anything to me about
20 that subject at all --

21    Q.    I'm just saying --

22    A.    -- taking any kind of position.

23    Q.    I'm not talking about -- what did she say next in
24 the conversation?  When you mentioned this, what did she say?

25    A.    That's all I remember of the conversation.

1     Q.    That's all you remember?

2     A.    Yes, those clear points. we didn't know how long it

3  would be, and it was clear that they couldn't do the routine

4  stuff that they normally did, and I would just try to, you

5  know, hold up both ends for awhile and we could settle later,

6  maybe after their account got unblocked.

7     Q.    And the response you're saying you got was you

8  didn't receive an approval or disapproval, right?

9     A.    Right.  I don't recall receiving anything.

10     Q.    Okay.  Anything.  And you interpreted that as the

11  State Department giving you the right to incur that expense?

12     A.    I didn't interpret it as anything.  I just told them

13  what I thought would be a -- the most reasonable thing to do

14  under the circumstances.  You realize that the alternative

15  would have been for us to abandon the property and cut off

16  their cash flow completely?  Now would that be decent?  No.

17  So I did what I thought was the most reasonable thing.

18     Q.    Let's talk about what you had permission to do under

19  the lease, okay?

20     A.    Okay.

21     Q.    You had this conversation with the State Department,

22  and is it your allegation that this conversation gave you the

23  right and obligated the State Department to pay for all

24  expenses you incurred after that point in time?

25     A.    I am saying that the State Department had the

1    obligation to pay for those expenses under the lease.  I

2    didn't need any letter to give me the right to hold them to

3    that obligation.  They were obligated under the lease.

4        Q.   Okay.  I'm glad we can --

5        A.   And then they said they couldn't keep up their

6    obligation for awhile.

7        Q.   So this February -- so we would agree then that this

8    February 5th, 2003 letter had nothing -- did not change the

9    obligations under the lease one way or the other, did they --

10   did it?

11       A.   The February 5th letter did not amend the lease.

12       Q.   Okay.

13       A.   Correct.  That doesn't mean that when they breached

14   by sending me the letter and telling me they couldn't hold up

15   their end anymore I wasn't entitled to do something in

16   response to that that was reasonable.

17       Q.   Okay.  What term of the lease does this letter --

18   I'm assuming you mean that they would only to make more

19   serious repairs, right?

20       A.   Yes, which was interpreted for me in my phone

21   conversation as we can't do this routine maintenance anymore.

22       Q.   Okay.

23       A.   Yes.

24       Q.   What routine maintenance are you referring to?

25       A.   The types of things that were routine in this house.

1  This house had an ongoing heavy maintenance and repair

2  problem.

3      Q.    Well, those routine things were your responsibility

4  as a tenant under the lease, were they not?

5      A.    The lease says what the responsibilities are, and

6  I've read it to you.  Structural is the State Department's 100

7  percent.  Equipment and appliances and nonstructural things

8  are our responsibility up to 200.

9      Q.    Right.  And the routine repairs that you're

10  referring to were nonstructural, were they not?

11     A.    They were both.

12     Q.    And nonstructural --

13     A.    Leaking walls we think  are structural.  We can

14  debate a little bit what's structural.

15     Q.    But the nonstructural you were responsible for under

16  the lease?

17     A.    Up to $200.

18     Q.    Okay.

19     A.    We were responsible for seeing that it got done, and

20  we were supposed to pay up to $200, right.  That's what the

21  lease -- that was the lease deal, right.

22     Q.    Let's take a break.

23                    (Off the record)

24                    (On the record)

25              BY MR. MUSSENDEN:

1    Q.    Now it's your contention that the February 2003

2  letter constitutes a breach of the contract -- of the lease,

3  if I understand you correctly, right?

4    A.    To say it right, I would say the inability or

5  refusal to make necessary repairs would be what the breach is.

6  The letter was just informing us why this would happen.

7    Q.    Okay.  Now you're using the word inability or

8  refusal to make --

9    A.    Yeah.

10    Q.    -- repairs, but we agreed earlier that that's not

11  what that letter says, right?

12    A.    We discussed the letter and it said we will be

13  unable to make anything but the most serious requests, we will

14  be unable to respond, and that's what it says.

15    Q.    Okay.

16    A.    So that's what I'm talking about.

17    Q.    All right.  So when you say inability or refusal,

18  what are you referring to, not that letter?

19    A.    Well, no.  I have no reason to know whether the

20  State Department could have made the repairs anyway from some

21  other source.  I have no reason to know that.  They just told

22  us that our bank account is frozen, we can't do it anymore for

23  some period of time.  That's why I say inability or refusal.

24  I actually don't know whether they had the ability to do it or

25  not.

1        Q.    Well, the words -- when you say inability or

2   refusal, you're not referring to that -- the notice in that

3   letter, are you?

4        A.    Of course.   That's what the letter says.

5        Q.    Where does it say inability or refusal?

6        A.    It says our bank account has been frozen.   Some bank

7   account that we use for this has been frozen.   Therefore, we

8   can't do it, inability.   And I'm just saying I don't know

9   whether they actually could have gotten the money from some

10  place else or not.   I have no way of knowing that.

11       Q.    All right.   The record is now confused on that, so

12  when you say inability or refusal, you're not talking about

13  this letter because this letter says they will make repairs to

14  -- although they can't do it -- they will make repairs, only

15  the most serious damage is what they'll address, right?

16       A.    Well, what they said was we are unable to respond

17  favorably to other than the most serious --

18       Q.    Okay.

19       A.    -- repairs.

20       Q.    Thank you, sir.   Now --

21       A.    That's what it says.

22       Q.    -- you never asked by complying with the lease

23  terms, giving -- you never gave the State Department notice

24  and received a response saying that they would refuse to make

25  a serious repair, did you?

1    A.    No.  I called them up and I said what's going on,

2  you know, and we talked about it.

3    Q.    Yeah.  I'm talking about after receiving this

4  letter, during the term -- to the time when you left, you

5  never gave the Department of State notice of some serious

6  repair that they refused to repair, did you?

7    A.    Right.  After the letter we did not --

8    Q.    Answer that question.  Did you --

9    A.    Did you ask after the letter or not?

10    Q.    After the letter did you -- my question is very

11  specific.

12    A.    We did not give them prior notice of a repair that

13  needed to be made after the letter.

14    Q.    Nor did you ever receive a refusal to make a serious

15  repair?

16    A.    We did not give them a notice of what I understood

17  to be a serious repair because there weren't any, and we did

18  not get a refusal to make a serious repair.  That's correct.

19  They did not violate their letter, if that's what you're

20  trying to get straight.

21    Q.    It's going to be a long -- I was hoping this would

22  be short, but if we've got to go through that exercise the

23  whole time, Mr. Tedards, it's --

24    A.    No, I'm sorry, but we're going to keep it straight.

25    Q.    Yeah.  I mean my questions are not tricky or -- now

1   as far as your counter-claim is concerned, are there any other

2   breaches -- other than the failure in your view of the State

3   Department to respond to notices and this February 2003

4   letter, are there any other breaches of the counter-claim?

5        A.    I think we've identified the source of the breaches

6   in my prior testimony.

7        Q.    Okay.  Think we've covered all the breaches that

8   you're alleging?

9        A.    The sources.  Yes, the sources.

10       Q.    The sources, all right.  Other than the $12,000

11  that's listed in your counter-claim -- I don't know if you

12  have a copy of that.  Do you have a counter-claim over there?

13  Here you go.  Let me just just clarify something on paragraph

14  7.  You indicate that the -- you've described the lease

15  relationship between OFM and the counter-claimants, and you

16  allege that on March 7th, 1996 you entered into a lease

17  arrangement with OFM.  The lease -- that lease that you signed

18  in March of 1996 was no longer current after you signed the

19  June 2002 lease, right?  That lease had expired, the term had

20  ended, right?

21       A.    Yeah.  The only thing that carried over, I think,

22  from that lease was the security deposit.

23       Q.    And you allege that the arrangement was for an

24  indefinite period beginning May 1st, 1996, but it wasn't an

25  indefinite period, was it?

1       A.      Yes.

2       Q.      The lease you signed --

3       A.      You want more explanation?

4       Q.      -- from May 1st, 1996 was an indefinite period?

5       A.      Yes.

6       Q.      Isn't it true that it ended after three years?

7       A.      I'm not talking about the first three years.  I'm

8  talking about what the relationship was.  We entered into a

9  long term relationship.  We made it clear that we expected to

10  renegotiate the lease terms, particularly to allow them to

11  raise the price as they went along, and we told them the

12  reason that we didn't want to move quickly, and on that basis

13  -- it was on that basis that we made the heavy investments in

14  the property that we made like renovating the kitchen and so

15  forth.  That's what I'm talking about when I say the lease

16  relationship.

17      Q.      When you say --

18      A.      The leases themselves were to be reentered every

19  three years.

20      Q.      Well, when you talk about a lease relationship,

21  you're talking about the contractual relationship, right?

22      A.      I'm talking about the relationship I just described.

23      Q.      And --

24      A.      -- manifested in a secession of three year

25  contracts, right.

1    Q.    You don't mean to say that you had a lease that had

2  an indefinite period?  That's not what you're saying?

3    A.    No, I didn't say that.

4    Q.    Okay.  And so when you say the arrangement was for

5  an indefinite period beginning May 1st, 1996, you're not

6  saying that you had a lease for an indefinite period, correct?

7    A.    No.  I am saying that they said we will need to

8  renegotiate the price and the period is indefinite.  It was

9  indefinite on our side because we didn't want to have to move

10 again any time soon, and it was indefinite on their side

11 because they were a trustee and the political situation could

12 change and they would have to give up the property.

13   Q.    What was indefinite?

14   A.    The length of time we might inhabit that structure

15 was indefinite, unknown.

16   Q.    Unknown, okay.

17   A.    Um-hum.

18   Q.    That's what you mean by indefinite?

19   A.    I mean going on into the foreseeable future with no

20 defined end.

21   Q.    And the lease you entered in May 1996, are you

22 saying that didn't have a defined end?

23   A.    The lease itself was for a three year term, and this

24 is part of what we agreed to, that the leases would be

25 renegotiated every three years, yes.

1    Q.   Okay.  All right.  In paragraph 8 when you say under

2   this arrangement the counter-claimants occupied the premises

3   as tenants from May 1st, 1996 through July 31st, 2004.  You

4   don't mean to say that you had a lease -- you had to sign a

5   lease with the State Department for a period of -- stemming

6   from May 1996 to July 2004?

7    A.   I've not said that.  The leases were three year

8   terms.

9    Q.   Okay.  When you say this arrangement, you're not

10  talking about a lease, are you?

11   A.   No.  I'm talking about the lease arrangement that I

12  described before that.

13   Q.   Because the basis of your counter-claim is only the

14  June 2002 lease, correct?

15   A.   All of our breach of contract claims are based on

16  that lease.  The events themselves may have been before and

17  after and who knows, but the contract claims are rooted in

18  that lease, right, right.

19   Q.   And only conduct that occurred during the term of

20  that lease is the basis of the breach of contract claim, isn't

21  that true?

22   A.   Yeah.  Technically that's true.

23   Q.   In other words, there's no amount that you're

24  claiming in the counter-claim that was incurred outside of the

25  June 2002 lease period?

1    A.    That's not true.  That statement doesn't follow.

2    Q.    So your counter-claim includes claims and

3  expenditures that were incurred outside the June 2002 lease

4  period?

5    A.    Sure.  Do you want an example?

6    Q.    Is that --

7    A.    Don't want an example.

8    Q.    Is that -- so for the $12,000 that you claim in your

9  counter-claim, paragraph 11, some of that money is actually

10  expenditures incurred outside of the June 2002 lease period?

11    A.    I'd have to look at the 12,000 to be sure.  The

12  example I use is the tiles.  We put the tiles on those

13  balconies before June 2002 and they stayed there, and they're

14  still there now as far as I know.

15    Q.    Under the terms of the lease can you identify what

16  term would allow you to -- what obligates the State Department

17  to pay for expenditures incurred outside of the term of that

18  lease?

19    A.    From 2002 forward and for periods preceding the

20  State Department had an obligation to get those balconies

21  straight so that we could take our swimming pool tiles off

22  there and resell them or do something with them and they

23  didn't do it.

24    Q.    I understand that you have a strong opinion on that.

25  I'm just talking --

1    A.    Well, no, that's my claim.

2    Q.    I'm talking -- well, claims are based on people's

3  beliefs and opinions.

4    A.    That's right.

5    Q.    What I'm trying to find out is is there any term

6  that the State Department agreed to under the June 2002 lease

7  that would obligate them to pay for expenditures incurred

8  outside the term of the lease?

9    A.    Yes.  They --

10    Q.    What term, can you identify it for me?

11    A.    The balcony -- I would put the balcony in the

12  structural category, and those balconies were structurally

13  unsound.  The balconies were leaking with standing water the

14  entire time we were there, including after 2002 which they

15  were aware of --

16    Q.    So you can't identify any term in the 2002 lease,

17  can you?

18    A.    -- and that is the term.  That is the term.  They

19  did not come in and ever get those balconies straight, and I

20  believe that falls in the category of structural, yes.  And

21  including from 2002 until the end of the lease, and that's the

22  part.

23    Q.    And only including 2002 until the end of the lease,

24  correct?

25    A.    No.  Their failure to do it also was the core.

1    Q.    Well, you mean under a separate lease, correct?

2    A.    In the preceding years before 2002.  It began then

3  and continued through to the end, and they have our tiles now

4  on their balcony making them habitable unless they've taken

5  them off and thrown them away and fixed it.  I don't know

6  whether they have or not.

7    Q.    You agree that when you left the property in July of

8  2004 you didn't provide the State Department with any notice,

9  correct?

10    A.    No.  We left July 31st and sent them a long letter

11  afterwards, not at the time we left.

12    Q.    And under the Lease Agreement you were required to

13  provide the notice if you were going to leave the premises and

14  abandon the premises, isn't that true?

15    A.    If we were leaving on our volition, yes, but we

16  didn't.  We left in response to a Notice to Vacate.

17         MR. MUSSENDEN:  Let me have this marked.

18      (Whereupon, the document that was referred to as Exhibit

19      Number 15 was marked for identification.)

20         BY MR. MUSSENDEN:

21    Q.    Sir, I'm having marked this letter from our office

22  dated January 12th, 2005.  When you left isn't it true that

23  the house was left in a state of disrepair?

24    A.    Not by us, no, no.  The house had the same problems

25  in it that it had had for a long time that we had been

1   wrestling with and trying to get fixed and so forth.  It also

2   had -- it also required transitional repair from our moving

3   out, for which we left our security deposit which was probably

4   worth around 4,000 or so.  It had picture holes which I think

5   you hit yesterday, and it probably had some other things that

6   would be part of -- that were part of the things that would

7   have to be fixed up for a new tenant.

8        Q.    Like what?

9        A.    I don't know.  I'm just assuming there must have

10  been some other things they needed to do that constituted

11  them, you know, reconditioning after we were there.  I'm

12  assuming that, but I don't know exactly what it is.  I

13  remember the picture holes from yesterday.  The bulk of the

14  State Department's $11,000 claim I have looked at, and I made

15  a determination that at least $7,000 of that is the State

16  Department fixing things that they caused and problems that

17  had been there the whole time, for which we have very good

18  pictures and documentation to illustrate it.

19          For example, the State Department is trying to

20  charge us for replacing a three-bulb fixture in a bathroom

21  that was corroded and rusted when we moved into there and was

22  never fixed by them, although we discussed it from time to

23  time, and when we left it was still there, and then they

24  replaced it and sent us -- and they're trying to bill us for

25  it now.  That is an example.

1           A second example, there were windows all through the
2   house that leaked and so forth.  Apparently they did some work
3   on the windows and tried to charge us for that, which was a
4   problem that had been there throughout that we had not been
5   able to get them to fix.

6           When we moved in there were old cables from some
7   kind of cable service that somebody had that were difficult to
8   remove, and so we left them there, and they did not remove
9   them for us.

10      Q.   Who installed the cables?  Wasn't it you that
11  installed the cables?

12      A.   No.  I'm talking about cable service.  There was one
13  in one of our daughters' bedrooms, for example.  She never had
14  any cable TV in there.  This was there when we moved in and it
15  stayed there the whole time we were there.  And at the end of
16  the lease they removed it for the next tenant and they're
17  trying to charge us for it, and there are many items like that
18  in their $7,000 or so of claims above our security deposit.

19      Q.   So you'd agree that at least --

20      A.   So the answer is no.

21      Q.   You'd agree that at least 4,000 of the 11,000 it
22  mentioned in Exhibit 15 -- I believe the exact amount is
23  $11,572.84.

24      A.   Yes.

25      Q.   You'd agree that at least 4,000 of that were

91

1  legitimate restoration costs?

2      A.   I can't quite say that.  What I can say is we told

3  the State Department when we moved they could have our

4  security deposit to cover any necessary restoration or

5  transitional costs, reconditioning costs, and I am confident

6  that the cost of fixing up anything that they needed to do as

7  a result of our leaving and transiting to the next tenant

8  would not exceed that, but I can't tell you that I know that

9  it's $4,000.

10      Q.   Did you -- isn't it true that you painted a lot of

11  the walls in the house?

12      A.   Yes.

13      Q.   Different colors?

14      A.   Yes.

15      Q.   Like purple, for example?

16      A.   Well, I didn't paint them, but the house had

17  different colors in them, yes.  The walls had different

18  colors.  Sorry.

19      Q.   And when you --

20      A.   If you're trying to --

21      Q.   -- say you didn't paint them, what do you mean by

22  that?

23      A.   I mean I'm not the painter, and I don't know or

24  remember exactly what the colors were.

25      Q.   I'm not suggesting you painted.

1    A.   I don't know what the colors were.

2    Q.   Well, sir, you know what I'm asking you, is that you

3    had repainted?

4    A.   Our house was painted, yes.

5    Q.   Okay.

6    A.   Different parts of it were painted, yeah.  Different

7    parts of it needed painting.

8    Q.   You were responsible for getting it painted,

9    correct?

10   A.   The tenants were responsible for any painting that

11   needed to be done, yes.

12   Q.   I misspoke.  In other words, no one else came in

13   there and painted the house?  You hired whomever to go and

14   paint the house?

15   A.   I did not.

16   Q.   It was you that did that, right?

17   A.   I did not.

18   Q.   Either you or your wife?

19   A.   Yvonne did.

20   Q.   Okay.  And a lot of the rooms were painted different

21   colors, isn't that true?

22   A.   I remember different colors in different places,

23   yeah, yes, but the only ones I remember for sure -- when you

24   say a lot of rooms, the only rooms I remember for sure are the

25   big playroom in the bottom and the kitchen area.  That's the

1   only ones I remember having.  And I think there -- I'll tell

2   you one other room that needed repainting and the shade was

3   changed.  I think it was the -- there's a little room in the

4   entry.  I think I remember seeing that one was a -- yeah, the

5   entry, family room area and the kitchen, that area I think was

6   painted and I think the children's playroom was painted.

7   Those are all I remember.  That constitutes approximately 15

8   percent of the house, something like that.  And then we

9   repainted wherever it needed repainting with the same color.

10        Q.    Now under the terms of the lease you agree that you

11   were responsible for exterminating, correct, as a tenant?

12        A.    Well, that one's a little ambiguous, too, because

13   the State Department was responsible for delivering a vermin-

14   free house under the lease, and when they didn't, somebody had

15   to do something about it, so it's hard to say.  We were

16   responsible -- let me put it this way.  We were responsible

17   under the lease, as I recall, for, you know, what would be

18   routine extermination where the house isn't infested.  We

19   would be responsible for that.  I would agree with that.  But

20   our problem was that we had to do a lot of work, whatever you

21   call it, exterminating type work because it was not delivered

22   vermin-free which is something they were supposed to do under

23   the lease.

24        Q.    Well, you were satisfied with the premises before

25   you moved in in 1996, correct?

1    A.    Well, you mean was it okay?  Yeah yeah, we moved in.

2    Q.    You wouldn't have moved into a vermin infested

3 house, correct?

4    A.    You know, when you move into a house you don't know

5 there are mice in the walls.  I mean that's something that you

6 learn later.

7    Q.    That's a good point.

8    A.    Yeah.

9    Q.    That's a good point.  So now --

10    A.    It's not like we -- we did not order in an

11 exterminating company to verify that that house was vermin-

12 free when we moved in.

13    Q.    Okay.

14    A.    We did not do that ever, and we didn't do it in the

15 2002 lease either.  But the State Department had an obligation

16 to give us a vermin-free house, so when we discovered, you

17 know, rat problems and stuff like that, that was probably

18 their obligation and I'll agree that we had an obligation to

19 get after that, too.

20    Q.    But certainly after living in the house for five or

21 so years you would know whether or not it was satisfactorily

22 vermin-free or not, right?

23    A.    No.  That was a big place.

24    Q.    No?

25    A.    No, no, because pests came and went.  It was

1  completely free of ants on one side of the house for three
2  years and then they popped up on another side of the house.
3       Q.    So why did you sign a lease saying that you were
4  satisfied?  Why didn't you just not re-rent the house if five
5  years after moving in you still felt that it wasn't vermin
6  enough -- wasn't vermin-free enough for you to move in?
7       A.    I didn't say we didn't think it was vermin-free
8  enough to move in.  I just said that if --
9       Q.    So by 2002 you would have known because you were
10 there for five years or so.  You would have known whether or
11 not it was satisfactory for you to live there or not, wouldn't
12 you?
13      A.    Hey, rats come in in the winter, they leave in the
14 summer, they're gone for years at a time.  This is a coming
15 and going problem.
16      Q.    So you knew in 2002 after being -- after having the
17 benefit of being there for several years whether or not it was
18 satisfactory for you to stay there or not, wouldn't you agree?
19      A.    It was definitely satisfactory enough for us to
20 stay.  We're not talking about whether it was -- whether we
21 wanted to stay.  We obviously wanted to stay.  We're talking
22 about who had what obligation, and I'm telling you that the
23 obligations were they deliver it vermin-free and we --
24      Q.    Why did you stay --
25      A.    -- handle the regular exterminating.

1     Q.   Why did you sign the lease saying you were satisfied

2 with the premises if you thought the house wasn't vermin-free?

3     A.   We didn't know if the house was vermin-free.

4     Q.   Well, you have to have.  You were there for five

5 years before.  How wouldn't you know?

6     A.   I told you.  You can have an ant problem creep up

7 the next day.  It can come up anytime.  You can have a big

8 storm and a hole is made in your wall and rats start coming

9 in.  I mean it can happen anytime when you've got a big house

10 like that.

11     Q.   That doesn't mean it wasn't delivered to you vermin-

12 free, though, in that instance, does it?

13     A.   Well, I would agree that you can have a factual

14 argument at some point about whether it was vermin-free or not

15 on June 31st or whatever of 2002.  I agree with that.

16     Q.   The fact of the matter is --

17     A.   I'm just telling you what the lease responsibilities

18 are.

19     Q.   The fact of the matter is that before signing the

20 lease you examined the premises and it was in good and

21 satisfactory order?

22     A.   It's whatever that says in the lease.

23     Q.   Okay.

24     A.   It was good enough for us to want to stay there, and

25 it stayed that way almost until the end, yes, yes.  And the

1   people who were responsible for this house in the State

2   Department were very nice people, and the whole thing was

3   cooperative and worked well under the circumstances, it was a

4   tricky property, most of the way.  It was only toward the end

5   it just got to the point where we couldn't handle it anymore,

6   so that was the way the thing worked.  And if there was a

7   vermin problem, there was a vermin problem, you know, and we

8   said well, you're supposed to get this vermin-free and you're

9   supposed to do the exterminating, and you figure out, you

10  know, what to do about it.  That's why I said it's somewhat

11  ambiguous.

12        Q.    Well, it wasn't ambiguous as to exterminating.  The

13  tenants were responsible for exterminating.

14        A.    Well, let's suppose that we move in and we discover

15  a pack of rats.

16        Q.    You don't agree with that, do you?

17        A.    Well, let me just say I wouldn't agree.  If we had a

18  vermin infestation, not just routine monthly exterminating as

19  a preventive matter, and exterminators had to be used to clear

20  that out, I would --

21        Q.    I withdraw the question.  I withdraw the question.

22  I withdraw the question.

23        A.    Okay.

24        Q.    And as you sit here today, Mr. Tedards, other than

25  the $12,000 that's in your counter-claim, you do not or you

 1  can't state how much you're claiming as part of your

 2  counterclaim?

 3      A.    I can't state the full extent of the dollar.  No, I

 4  can't do it.

 5      Q.    How about April 19, 2006 for you coming back and

 6  telling me about that?

 7      A.    Is that what we said?

 8      Q.    No, I'm asking.

 9      A.    What I'd like to do is agree that the whole thing

10  will be cleared up in three weeks and go back over the next

11  few hours and look at a calendar and just make sure about when

12  we can do what what day.  There's a direct conflict on April

13  the 19th.  I might have to do --

14      Q.    Sure.

15      A.    But I would agree that we're going to get it -- get

16  this done in a three week time frame.

17      Q.    Get what done, that you'll return for a deposition

18  in three weeks?

19      A.    Yes, yes.

20      Q.    That you'll return for a deposition in three weeks?

21      A.    If that's the way you want to do it.

22      Q.    Well, that's the only reason I'm asking you.  Do I

23  have your agreement to return for a deposition?  That's what

24  I'm asking you.

25      A.    Yes, but I can't give you the exact date right now.

1      Q.   Okay.  I'm available on April 19th.  If we need to

2  -- you know, like we did for this one, I'm happy to juggle the

3  dates.

4      A.   Yes, yes.

5      Q.   Of course, that's subject to the Court's approval

6  because we may, in fact, file a motion saying that we don't

7  have this information.  I don't want to mislead you.  And, you

8  know, if the Court feels that it wants to extend the discovery

9  even more for us to get it, then we'll do that.  If it wants

10  to exclude it, the Court will do that.

11      A.   Well, we'll get the answer to your motion, too.  All

12  right.

13      Q.   Now is there -- have you ever been arrested, sir?

14      A.   No -- but hold on one second.  Can I look at the

15  counter-claim for a minute?  I want to be sure I answered your

16  question right in terms of --

17      Q.   It's Exhibit 9?

18      A.   Yeah.  Hold on.  Okay.

19      Q.   No other claims in your breach of contract claim

20  that we haven't discussed, correct?

21      A.   I think we've gone over the breach of contract.

22      Q.   Have you ever been arrested?

23      A.   No.

24      Q.   Ever been convicted of a crime?

25      A.   No, no.

1     Q.    Have you ever had your license to practice revoked

2  in any jurisdiction?

3     A.    No.

4     Q.    Suspended?

5     A.    No.

6     Q.    Do you have any judgments, monetary judgments,

7  against you at this time?

8     A.    Yes, I think so.

9     Q.    You think so?

10    A.    I think so, and I'm saying that because somebody

11  sent us a notice recently for Renewal of Judgment from way in

12  the past.  It's something growing out of the law practice and

13  their retention of a local counsel, and we were unable to

14  locate our records on that judgement, but there's something

15  there.  We're trying to figure that out.

16    Q.    What was the amount of the judgment?

17    A.    70,000, I'm guessing.

18    Q.    And who was the creditor?

19    A.    I don't remember the name, but it's a local counsel

20  in California.

21    Q.    An attorney?

22    A.    Yeah.

23    Q.    Okay.  Any other judgments?

24    A.    I would want to ask Yvonne to be sure, but --

25    Q.    Sure.  She's right here.  I don't mind.

1     WITNESS:  Are there any other judgments?

2     MS. TEDARDS:  I have to think.

3     WITNESS:  She doesn't have any right now either.

4 We'll try to amend that if we come up with one -- another one.

5     BY MR. MUSSENDEN:

6   Q.  Do you have any lawsuits pending for money damages

7 where you are the plaintiff?

8   A.  I think this is the only one.  Is that right?  Let

9 me check.  This is the only one.

10   Q.  Do you have any lawsuits pending against you for

11 money damages?

12   A.  Let me check again.

13     WITNESS:  Besides this one -- this is the only one

14 I'm aware of.

15     BY MR. MUSSENDEN:

16   Q.  That you're aware of?

17   A.  Yes, that we can actually remember.

18   Q.  There could be a lawsuit filed against you that you

19 don't remember?

20   A.  There could be a disputed claim somewhere.  Somebody

21 could file a small claims or something like -- I'm just not

22 sure.  I don't like to answer categorically.

23   Q.  Okay.  Just give me one second.

24   A.  Okay.

25   Q.  Okay.  No further questions.

1    A.    Let me ask you if I have a --

2    Q.    Let's go off the record.

3                      (Off the record)

4                      (On the record)

5         WITNESS:  Okay.  With respect to evidence, I want to

6    clarify that you have a large body of pictures that are post-

7    June 2002, in other words, pictures related to the present

8    lease.  In your questioning of Yvonne yesterday you had a

9    stack of pictures and it looks like the impression was created

10   that she doesn't have pictures, but she -- for 2002 forward,

11   but she, in fact, gave you a CD with a large number of

12   pictures on it that covers the period 2002 to the present.  Do

13   you have it?

14        MS. TEDARDS:  This is the printout of the CD that

15   we're providing in discovery.

16        WITNESS:  And these are all post-2002, and you have

17   those.

18        BY MR. MUSSENDEN:

19   Q.    Can I have this?

20   A.    I wanted you to be -- no.

21        MS. TEDARDS:  No.

22        WITNESS:  You have the CD.

23        MS. TEDARDS:  You have a CD with all the

24   photographs.  I printed that from your CD.

25        WITNESS:  But I just wanted you to be aware of it,

1   that you have these pictures because yesterday I think you

2   were getting the impression that she does not have current

3   pictures.

4           BY MR. MUSSENDEN:

5       Q.    Okay.  Anything else?

6       A.    That's all I have.

7           MS. TEDARDS:  And there is this other --

8           MR. MUSSENDEN:  I think we're off the record.

9           (Reading and signature not waived.)

10          (Whereupon, at 1:15 p.m., on Tuesday, March 28,

11  2006, the deposition was concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE
 2        I, Timothy J. Atkinson, a Shorthand Reporter and a Notary
 3   Public, do hereby certify that the foregoing witness,
 4   WILLIAM P. TEDARDS, JR., was duly sworn on the date indicated,
 5   and that the foregoing is a true and accurate transcription of
 6   my stenographic notes and is a true record of the testimony
 7   given by the foregoing witness.
 8        I further certify that I am not employed by or related to
 9   any party to this action by blood or marriage and that I am in
10   no way interested in the outcome of this matter.
11        In witness whereof, I have hereunto set my hand this
12   27th day of April, 2006.
13
14
15                              /S/
16                         Timothy J. Atkinson, Jr.
17                         Notary Public in and for the
18                         District of Columbia
19
20
21
22   My commission expires:
23   February 28, 2011
24
25
```