COPY

1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4  - - - - - - - - - - - - - - - -x

 5  UNITED STATES OF AMERICA          :

 6              Plaintiff,            :

 7     vs.                           :   Case No: 05-0991 (JGP)

 8  WILLIAM P. TEDARDS, JR. and       :

 9  YVONNE TEDARDS,                   :

10              Defendants.           :

11  - - - - - - - - - - - - - - - -x

12

13                                    Washington, D.C.

14                                    Thursday, April 27, 2006

15

16

17  Deposition of:

18              WILLIAM P. TEDARDS, JR.

19  the Deponent, called for examination by counsel for the

20  Plaintiff, pursuant to notice and agreement as to time and

21  place, at 501 3rd Street, N.W., Washington, D.C., before Jack

22  L. Becker, a Notary Public in and for the District of

23  Columbia.

24

25
```

```
 1 | APPEARANCES:

 2              On Behalf of the Plaintiff:

 3              PAUL A. MUSSENDEN, ESQUIRE

 4              Assistant United States Attorney

 5              555 4th Street, N.W.

 6              Washington, D.C.  20530

 7              (202) 305-4740

 8

 9              On Behalf of the Defendants:

10              Pro Se

11

12              On Behalf of the Department of State:

13              RICHARD MASSEY, ESQUIRE

14              Office of Foreign Missions

15              2201 C Street, N.W.

16              Suite 2238

17              Washington, D.C.  20520

18              (202) 647-4554

19

20

21

22

23

24

25
```

3

```
 1 |                    I N D E X
 2 | WITNESS:              EXAMINATION:              PAGE:
 3 | William Tedards         Direct - Mr. Mussenden    3
 4 |                         Cross - Mr. Tedards       43
 5 |                         Redirect - Mr. Mussenden  45
 6 |
 7 |                    E X H I B I T S
 8 | EXHIBIT NO.:            DESCRIPTION:              PAGE:
 9 |      1              Lease                         7
10 |      2              Declaration                   8
11 |      3              Counterclaim                  9
12 |      4              Exhibit 1 to the Declaration  42
13 |                     Listing Rent Amounts Due
14 |      5              Exhibit 3 to the Declaration  43
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
```

4

```
 1                    P R O C E E D I N G S
 2                                           (10:10 a.m.)
 3  Whereupon,
 4                    WILLIAM P. TEDARDS, JR.
 5  was called as a witness and after having been first duly
 6  sworn, was examined and testified as follows:)
 7                    DIRECT EXAMINATION
 8           BY MR. MUSSENDEN:
 9       Q.   Good morning, Mr. Tedards.   This is a continuation
10  of your deposition so that we can learn the precise
11  evidentiary basis for the damages asserted in your
12  counterclaim.   Just a reminder that you're still under oath
13  under penalty of perjury just as if you were in a court of
14  law.   Do you understand that?
15       A.   Yes.
16       Q.   Before you go forward, just let me remind you to
17  keep your voice up for the court reporter and to give audible
18  responses.
19       A.   Yes.
20           MR. MUSSENDEN:   Also present on behalf of the
21  Department of State is Richard Massey of the Office of Foreign
22  Missions.
23           BY MR. MUSSENDEN:
24       Q.   And any health reasons why you can't give truthful
25  and accurate testimony today, Mr. Tedards?
```

1      A.    No.

2      Q.    Okay.  Now since concluding the first half of your

3  deposition, did you review any documents in preparation for

4  this half?

5      A.    I prepared the declaration that I sent you, and

6  that's all I've done.

7      Q.    Okay.  Any other documents you reviewed?

8      A.    I don't think so.

9      Q.    Discussed the facts of the case with anyone since

10 your deposition was opened?

11     A.    No.  I just had this declaration prepared and I

12 asked Yvonne to produce it for me.

13     Q.    Okay.  Now the -- between your wife's testimony, the

14 other defendant in the case, and your testimony the last time

15 we were expecting some documents to complete the document

16 production.  Do you have any?  I didn't receive any of those

17 documents within the three week time frame that we agreed to.

18 Do you have those documents today?

19     A.    I didn't bring anything other than my declaration.

20 If she made a commitment to look for some documents, I didn't

21 involve myself with that to come here and testify.  I don't

22 know what that was.  I don't remember.

23     Q.    She's a codefendant.  It's part of your case, and as

24 I understood it, she said that you were taking care of the law

25 and you told me that well, there are some portions she's going

1  to testify, there are some portions you're going to testify

2  to, but you're both defendants in the case, so do you have any

3  documents responsive?

4      A.    I'm saying that the only thing I did to come here

5  and finish this deposition was to prepare this declaration to

6  make it clear and simple for everybody.

7      Q.    Well, you were --

8      A.    That's all I've done.

9      Q.    Okay.  You were present the last time at the

10  deposition, right?

11      A.    Yes.

12      Q.    Her deposition.

13      A.    Yes.

14      Q.    And we talked about a document production.

15      A.    I don't -- you'd have to remind me of what that was.

16  I don't know what that was.  I don't remember what that was.

17      Q.    All right.  So as far as you know there are no more

18  documents and you don't know what happened to the documents

19  she was supposed to produce, correct?

20      A.    I don't know what she was supposed to produce.  I

21  don't remember.

22      Q.    Okay.  You can't think of any other documents or

23  other pieces of evidence that you're going to use to support

24  your case or to defend against our case, correct?

25      A.    Yes, I can't think of any.  Everything that I have

1    to support our case is referred to in this declaration.

2         Q.    Has the Government received every evidentiary item

3    that you're going to use to support the case?

4         A.    Insofar as I know, but that would include, for

5    example, the photographs that I told you about that you have

6    that -- I think your line of questioning last time indicated

7    either that you didn't know that you had them or you didn't

8    want to refer to them, but I just wanted to remind you that

9    when I testified last time I referred you to some items that I

10   knew you had that your line of questioning indicated you might

11   not know you had.  And so I want to be sure that that's

12   included in the documents that we say will support our case.

13        Q.    Okay.  All I want to know is --

14        A.    Yes.

15        Q.    We've sent out a document request.  Discovery has

16   been closed for some time, and I want to know if I received

17   everything that you're going to use to support the case, so

18   I'm not seeing any surprises when I file the motion or at

19   trial.

20        A.    And I'm saying --

21        Q.    Is that true?

22        A.    I'm saying as far as I know that is true, yes.  I

23   can only answer as far as I know.

24        Q.    Will you agree that if we haven't received anything

25   that you produced in response to the motions that they can be

1    stricken from the record?

2        A.    If we were to find something and try to use it,

3    there are procedures that would govern how that came out.

4        Q.    Okay.

5        A.    I can't figure out how that would work at that time.

6        Q.    Okay.  You've mentioned an expert witness that you

7    might have used.  Do you have a name?

8        A.    We decided to narrow our request for relief in that

9    we didn't need an expert.  I dropped that idea.

10        Q.    Okay.  Now I just want to clarify a few pieces of

11    background information.  Do you own any property anywhere?

12        A.    No.

13        Q.    Do you have any bank accounts outside the United

14    States?

15        A.    No.

16        Q.    Do you have any interest in any assets outside the

17    United States?

18        A.    No.

19        Q.    Any interest in any assets that you haven't

20    disclosed to date during your deposition?

21        A.    No.

22        Q.    Let's refer to the lease that governs both our

23    claims here.  This will be marked as Exhibit 1.

24        (Whereupon, the document that was referred to as Exhibit

25        Number 1 was marked for identification.)

1          BY MR. MUSSENDEN:

2      Q.    This is the same lease marked in the deposition.

3  Just take a look at it.  I know the attachment isn't signed,

4  but as far as the main document, just let me know that that's

5  an accurate copy of the lease that you signed.

6      A.    It appears to be.

7      Q.    Okay.  Your signature is on the back?

8      A.    Yes.

9      Q.    On the last page?

10     A.    Yes.

11     Q.    All right.  Let's move into the evidentiary basis

12 for your counterclaim.  I'm going to show you what we'll have

13 marked as Exhibit 2, which is a declaration that you produced

14 a few days ago this week.

15     A.    Yes.

16     (Whereupon, the document that was referred to as Exhibit

17     Number 2 was marked for identification.)

18         BY MR. MUSSENDEN:

19     Q.    What was the purpose of that declaration?

20     A.    To make life easier for you today and to simply the

21 deposition by giving you a complete written presentation ahead

22 of time.

23     Q.    Does that declaration describe the full scope and

24 nature of your counterclaim in terms of the damages?

25     A.    Yes.

1    Q.   Okay.  And that was the purpose of it, correct?

2    A.   Well, in part.  It describes more than that

3 actually.  I think it describes our entire position --

4    Q.   Okay.

5    A.   -- with respect to any kind of offset or damages we

6 might pursue.  I'll have the counterclaim marked as Exhibit 3.

7    (Whereupon, the document that was referred to as Exhibit

8    Number 3 was marked for identification.)

9    BY MR. MUSSENDEN:

10    Q.   Now you also attached to that declaration several

11 exhibits.

12    A.   Yes.

13    Q.   And those exhibits, why don't you tell me what they

14 represent.

15    A.   Those exhibits are communications that you already

16 have, and they simply represent a good summary of the sources

17 from which we will claim our offset.

18    Q.   You mean the amount of the offset?

19    A.   Yeah, and the sources of it, the things that we're

20 talking about when we say may be entitled to an offset.

21    Q.   Okay. All right.  Now we continued the deposition

22 today because I needed to know the precise amount and what

23 sources in terms of the damages that you allege in your

24 counterclaim, okay, and that's what I want to cover today.

25    A.   Sure, sure.

1    Q.    I have your -- you have in front of you -- you can

2  let me know if this is the document you filed -- the top line

3  of your counterclaim.  Just let me know if that's an accurate

4  copy of it.

5    A.    It appears to be.

6    Q.    Okay.  Can you tell me what is the total amount

7  you're claiming as damages in your counterclaim?

8    A.    It would be the total of --

9    Q.    First of all, is that amount listed in your

10  counterclaim?

11    A.    No.

12    Q.    Okay.

13    A.    It would be the total of the last four items on

14  Exhibit 1 to the counterclaim which is your list of amounts

15  due as of August 31st, 2004.

16    Q.    Is this your copy that you're looking at --

17    A.    Yes.

18    Q.    -- of the declaration?

19    A.    Yes.

20    Q.    Okay.  And what are you referring to?

21    A.    Exhibit 1, which is the list of items that we

22  received from you.  It's the total of the last four items,

23  May, June, July, August.

24    Q.    Okay.  I'm a little confused.  These items are what

25  we indicated was due to us under the lease and that's the

1   basis for our complaint.

2       A.   Right.

3       Q.   My question is what is the total amount that you're

4   claiming as part of your counterclaim?

5       A.   The exact same amount.

6       Q.   The exact same amount?

7       A.   Yes, because we're claiming it as an offset.  Let me

8   state it another way.  We are not going -- we are going to

9   stop if we offset completely.  We are not going to try to

10  claim beyond that.  We're not going to try to claim

11  affirmative damages beyond that.

12      Q.   Okay.  So you are limiting the amount of your

13  counterclaim to the total value of the last four items on

14  Exhibit 1?

15      A.   Yes, without regard to what the counterclaim might

16  be stretched to.  We're not going to do it.

17      Q.   Okay.  Let's talk in terms of dollars and cents

18  because I can only understand things for purposes of a

19  complaint like this in those terms.  Why don't you tell me

20  what that total amount is?  Obviously, it's not based on these

21  sources.  It's just that you're saying this is -- the total

22  amount is the value of the last four items?

23      A.   It's the -- that's correct.  It's the total amount

24  we're going to claim.

25      Q.   Okay.  And that amount is what?

1    A.    Well, we have for May $5,150 plus $257.50, so if you

2  add those, it appears to come to $5,407.50.  And for June we

3  have $5,400 and --

4    Q.    Let's just go off the record for a second if you

5  need to do the math.

6                         (Off the record)

7                         (On the record)

8             REPORTER:  Okay.  The time is now 10:30 and we are

9  back on the record.  You may begin.

10            BY MR. MUSSENDEN:

11    Q.    I hope you've figured out the exact amount of the

12  counterclaim since you knew that's what we were going to do

13  today so that we don't have to take up each other's time doing

14  that.  But let me know -- the question I had was the total

15  amount of the counterclaim, and I got to tell you it's taken

16  me the depo of your wife, the depo of you, and now going into

17  30 minutes to find this answer out when that's the whole

18  nature of your claim, so let me know that magic for the first

19  time, please.

20    A.    Yeah.  What I did is I added up the four columns

21  that you've had in front of you since I gave you the

22  declaration several days ago and they come to $22,417.50.

23    Q.    22,000 --

24    A.    $417.50.

25    Q.    Okay.

1     A.   Now our counterclaim damages could reduce further

2  if, for example, the month of August 2004, if the amount due

3  were ultimately reduced.  As I recall, we were given a notice

4  that we had to vacate by August 23rd.

5     Q.   Okay.  We'll cover all that.

6     A.   Well, let me finish my answer.

7     Q.   There's no question pending.  I'm going to ask the

8  questions and you're going to answer.  If you want to do

9  settlement negotiations, we can do that some other time.

10     A.   I'm not doing settlement negotiations.  You have to

11  let me finish my answer.

12     Q.   I didn't ask a question.

13     A.   You asked me for the amount of the counterclaim and

14  I'm entitled to tell you, so it's $22,417.50, but it may go

15  down.

16     Q.   Sir, we're not going to do this like this today,

17  okay, so you need to figure out if you're going to calm down

18  because I'm not going to spend my time trying to pull teeth.

19  That's not the purpose of the deposition.  When you're under

20  oath I ask a question and you answer, period.

21     A.   And you have to let me complete the answer.

22     Q.   And I didn't ask a question, and only when a

23  question is pending -- and you're a lawyer and you should know

24  this.  I'm a little frustrated that you're taking us down the

25  valley like this.

1      A.    I know about lawyers cutting off --

2      Q.    Let's keep the procedure according to the rules and

3 let's be efficient.   The whole mission of the Federal Rules is

4 a just, speedy and inexpensive resolution of a matter, and you

5 doing this counteracts all of those purposes and I'm not going

6 to let you do that without involving the judge.   Now let's go

7 forward.   What term of the lease does your counterclaim allege

8 was breached to result in $22,417.50 in damages?

9      A.    All of the --

10      Q.    You have the lease there.   Can you point to the

11 specific term that was breached?

12      A.    All of the repair and maintenance obligations of the

13 State Department which are set forth in Repairs and

14 Alterations.

15      Q.    You're looking at the lease right now, correct?

16      A.    I am looking at the lease.

17      Q.    All right.   What term was breached?

18      A.    Repairs and Alterations is the paragraph that

19 contains the maintenance and repair obligations of the State

20 Department, and that is the term that was breached.

21      Q.    Okay.   What specific language was breached?

22      A.    The deductible provision and the structure provision

23 which we discussed last time.

24      Q.    All right.   I'm looking at page 3 of the lease.   Are

25 you also?

1       A.    I am.

2       Q.    And there's Repairs and Alterations on the left

3  margin.    That's the paragraph you're looking at?

4       A.    Sure.

5       Q.    And it has obligations of the tenant.  What I'm

6  asking you is what obligations on the State Department -- can

7  you point to the language that was breached?

8       A.    The State Department has an obligation where there

9  are necessary repairs to repair the amounts above the

10 deductible, and the deductible is stated as not to exceed

11 $200.  The State Department further has an obligation to

12 maintain and repair all structural elements.

13      Q.    All right.  Can you -- I'm not reading that.  Can

14 you point me to the language?

15      A.    You mean read it to you?

16      Q.    Right.  I'm seeing tenant shall.  The next paragraph

17 I see --

18      A.    At this his/her own expense, not to exceed $200 per

19 repair, tenant shall keep all parts of the premises, including

20 appliances and equipment therein, a state of good repair and

21 cleanliness.

22      Q.    Okay.  That's the tenant.  Tell me where -- what

23 obligation the State Department was breached?

24      A.    That provision, whether inarticulately worded or

25 not, set up a deductible system by which when a repair had to

 1  be done.  The lease says it has to be done and it says that we

 2  have to pay a deductible, and the State Department pays the

 3  rest.  In the first two charges that we've agreed to pay are

 4  examples of that deductible provision in action.

 5      Q.   Okay.

 6      A.   First two charges on Exhibit 1.

 7      Q.   I'll let you explain the term after we identify it.

 8  You need to --  I want to learn what obligation from the lease

 9  you're saying was breached.

10      A.   Yeah, and you asked me why it's a State Department

11  obligation and I just explained it to you.

12      Q.   No, I didn't ask you why yet.  I'm trying to get the

13  term.  It says at his or her own expense.  That's the

14  tenant's, right, obligation?  Point to me the State

15  Department's obligation under Repairs and Alterations.

16      A.   I am telling you -- I just told you and I'll tell

17  you again.  That provision was put in there to establish a

18  deductible system under which we would be responsible for up

19  to $200 of each necessary repair other than structural, and

20  the State Department would be responsible for the rest.  That

21  was the purpose of that provision and it is the way the

22  provision was operated.

23      Q.   Okay.  So you can't point to me any part of that

24  paragraph that says the State Department will pay X?

25      A.   I just pointed one out to you.

1    Q.    It doesn't say the State Department.

2    A.    That's because you're trying to limit yourself to

3  what you can read on the surface of it without understanding

4  its purpose and how it worked.  That's the problem.  And I'm

5  telling you its purpose.  We discussed what had to be done to

6  have a fair allocation of repairs between the tenants and the

7  landlord and this provision was the result, and its purpose

8  was to set up a deductible system.  Now you're trying to just

9  read the words on the page and refuse to understand its

10  purpose, so I'm telling you the purpose.

11    Q.    Okay.  All right.  What other term in the lease was

12  breached by the State Department that resulted in the damages

13  you've just identified to me?

14    A.    Nothing contained herein or otherwise is intended

15  to, nor shall cause the tenant to be responsible for repairing

16  or maintaining the structural elements or roof of the

17  premises, all of which landlord hereby agrees to maintain and

18  repair.

19    Q.    Okay.  How are you defining structural elements and

20  what's the source of that?

21    A.    I'm sorry.  I am not an engineer.  I can't define

22  structural elements.

23    Q.    Well, apparently there are repair items that you

24  attribute to structural elements that have -- are at least in

25  part of this $22,417, correct?

1     A.    I think it would be one or the other, is that way I

2  would put it.  The items that needed to be repaired are either

3  in structure or they're in appliances, equipment, fixtures, et

4  cetera.  A lot of those, I don't know what legal category

5  they'll fall into.  I'll use as an example, however, of

6  structure the roof of our garage which was torn apart by

7  leaks, thereby causing leaks in the walls of the balcony.

8     Q.    So the roof --

9     A.    Do you want me to finish?

10     Q.    What is the definition?

11     A.    The roof of the garage.

12     Q.    Okay.  What else?

13     A.    Walls and balconies.  Light fixtures that were in

14  the balcony walls.

15     Q.    You defined light fixtures as walls?

16     A.    I don't know.  It's going to be one or the other.  I

17  don't know which one.

18     Q.    I'm just talking about what you consider structural

19  elements.

20     A.    And I'm telling you I don't know.

21     Q.    Light fixtures?

22     A.    I don't know.  The door jambs, the door jambs, the

23  windows leaking water, I don't know how that's going to end up

24  being defined.

25     Q.    Well, what definition are you applying?  Do you

 1  believe that's a structural element, a window?

 2       A.    The door jambs and the wall?  Yes.  The door jambs

 3  and the jambs around the windows, I think that could be

 4  structural, yes.

 5       Q.    Okay.

 6       A.    That would be --

 7       Q.    You think a light fixture's a structural element?

 8       A.    The light fixtures that were built into the walls of

 9  the house on the back, someone could call that structure.  I'm

10  not sure how that will come out.

11       Q.    I'm asking what you believe.  Do you believe that's

12  a structural element?

13       A.    I think so because it's in the wall.

14       Q.    Okay.  Any other part of the lease that you're

15  alleging was breached by the State Department?

16       A.    No.  The Repairs and Alterations paragraph is the

17  entire thing.

18       Q.    Without your interpretation of the purpose, you'd

19  agreed that there's no part of this lease that says that the

20  State Department will pay and is responsible for repairs?

21  Would you agree with that?

22       A.    No.

23       Q.    Okay.  Where do you see that it specifically says

24  that?

25       A.    The two paragraphs that I just both read and

1  explained to you impose repair and maintenance obligations on

2  the State Department.

3     Q.   I understand that you feel it should be interpreted

4  that way, but I'm asking you wouldn't you agree that there's

5  no specific term that says that in the lease?

6     A.   I would not agree to that, no.

7     Q.   Well, then show it to me.  Can you?

8     A.   A term says what it is interpreted to mean.

9     Q.   Okay.

10     A.   I have told you what those two terms mean.

11     Q.   Interpreted to mean, correct?

12     A.   I've told you what they mean.

13     Q.   Okay.  Where do you draw that interpretation from,

14  what do you base it on?

15     A.   Over several years the repair and alteration

16  responsibilities were discussed extensively because it is a

17  very expensive property to maintain, and the provision was

18  changed from lease to lease.  It was adjusted.  And there was

19  a determination for this particular lease that the State

20  Department should not be 100 percent responsible for the

21  breakdown of non-structural elements, that we should share in

22  that responsibility, and the deductible system was set up to

23  accommodate that.  I am aware of that because I'm a party to

24  the lease and I know that these things were discussed.

25     Q.   Okay.  Did anyone from the State Department tell you

1  that?

2      A.    Did anybody tell me what?  They wrote the lease.

3      Q.    That the State Department would be responsible for

4  repairs, for appliances and non-structural repairs?

5      A.    Yeah, and they sent us bills using the deductible

6  system.

7      Q.    Did anyone from the State Department tell you that

8  the State Department was responsible for that?

9      A.    Yes.  That's what that negotiation was about, yes.

10      Q.    Who told you that?

11      A.    I don't remember.  I don't even remember which

12  people we talked to.

13      Q.    Okay.  All right.  I need you to break down -- and

14  if you need time to do this, we can go off the record, but I

15  was assuming that you did this already, but let me know.  I've

16  got all day.  The $22,417.50, what portion of that is due to a

17  breach of the paragraph you identified, as his or her own

18  expense, not to exceed $200 in repairs?

19      A.    I can't give you that.

20      Q.    You don't know that, do you?

21      A.    No.  I can't give you that sitting here.

22      Q.    You need even more time?

23      A.    It's not a question of time.  I can't tell you which

24  ones of these categories various things will end up falling

25  into.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1      Q.   So how do you know which aspect -- you said that

2   these two were breached.   How do you know what the damages

3   amount is related to what breach?

4      A.   I know that the damages exceed the amount that we're

5   going to limit it to, so I don't think I need to know sitting

6   here now which ones are going to end up being slotted in which

7   breach.

8      Q.   When you say end up, when, end up at what period of

9   time?

10     A.   After the case is tried.

11     Q.   After the case is tried?

12     A.   Yeah.

13     Q.   Well, this is a portion -- we don't -- see, we're

14  not supposed to be surprised at trial.   The whole purpose of

15  discovery is to avoid that.   So I'm asking you now to tell me.

16  If it's impossible for you, then please say so.

17     A.   Let's go through the list.   Exhibit 2 --

18     Q.   No.   If you need to go through the list, you do

19  that.   I'm asking a specific question.   I'm asking you of the

20  $22,417.50 which aspect of that, how much of that, is related

21  to this repair term that you've identified was breached by the

22  State Department?

23     A.   Repairs and Alterations, the paragraph?

24     Q.   Right.

25     A.   All of them.

1      Q.    No, not the paragraph.  You said there's -- I asked

2  you what specific terms were breached in the lease --

3      A.    Right.

4      Q.    -- and you identified two.

5      A.    Right.

6      Q.    The first one was this not to exceed $200 for repair

7  term, and I don't understand --

8      A.    Deductible.

9      Q.    I don't understand how that's an obligation, but I'm

10  assuming for purposes of your deposition that that was

11  breached, okay, and all I'm asking you is how much of this

12  damage amount is due to that breach, and then we'll go into

13  the sources of that so we can identify it.

14      A.    I can't, I can't tell you that part.

15      Q.    It's impossible for you to tell me that?

16      A.    You asked me to give you the total damage amount and

17  the sources and I did.  I can't tell you --

18      Q.    We didn't get into the sources.

19      A.    -- how I divided it up between those two.

20      Q.    So you can't tell me -- you think that this specific

21  term was breached, but you can't -- you don't know what damage

22  is related to that breach?

23      A.    I can go through the detail list, which you've had

24  for actually quite some time, and I can tell you I would call

25  that structural, I would call this deductible.  I can tell you

1  that now.

2      Q.    And you can add it up?

3      A.    But that's as far as I can go.

4      Q.    Okay.  Well, why don't you do that?  I need to know

5  what damages are related to what breach.

6      A.    That's about the only way I can do it is to go

7  through it.

8      Q.    And give me a dollar figure, and if you want to mark

9  up your documents and tell me exactly what items are related

10  to the total amount under each breach, okay?

11      A.    Exhibit -- let's start with Exhibit 5 to the

12  declaration.

13      Q.    Just tell me the total amount.

14      A.    I'm going to tell you the total on Exhibit 5, I

15  believe.

16          MR. MUSSENDEN:  Let's go off the record.

17                      (Off the record)

18                      (On the record)

19          REPORTER:  Back on the record.  The time is now

20  10:50 and we are back on the record.  You may begin.

21          BY MR. MUSSENDEN:

22      Q.    Okay.  Mr. Tedards, you were going to calculate --

23      A.    I --

24      Q.    Let me ask the question first so that a question is

25  pending.  You were going to calculate how much of the 22,000

1    was related to the breach of the term at his or her own

2    expense, not to exceed $200 per repair, tenant shall keep all

3    parts of the premises, including appliances and equipment

4    therein, in a state of good repair and cleanliness.  What part

5    of that 22,000 resulted from a breach by the State Department,

6    just the amount, just the amount?  I just need to know the

7    dollar amount.  I understand that you've figured that out.

8    Here's a calculator.

9        A.    No, I don't need the -- I don't know how to use the

10   calculator.  That's not -- I'm going to answer and then you

11   ask me a further question if you need to.  In paragraph 11 of

12   the counterclaim there is a figure which is described as a

13   list of expenditures totalling $12,033.44, and those

14   expenditures were presented some time ago on January 9th, 2004

15   as the amount that the counterclaimants had absorbed through

16   the end of December 2003.  The letter of January 9th, 2004 is

17   Exhibit 4 to the declaration which has --

18       Q.    All right.  We have a disconnect.  I withdraw the

19   question.  We have a disconnect.  What amount of the -- you've

20   identified to me $22,417.50 as the total amount of your

21   counterclaim, correct?  Is that true?

22       A.    I said it is the total amount that we are going to

23   claim.

24       Q.    Okay, that's fair.  All I'm asking you now is of

25   that amount how much is related to the breach that you

1  identified related to the repair term?

2      A.   And I am responding that Exhibit --

3      Q.   Just the dollar amount, sir.  Do you know the dollar

4  amount?

5      A.   I am responding that $12,033 that I spoke about,

6  which is an itemized list that you have, will all be claimed

7  as structural.

8      Q.   I'm not asking about the structural breach.  I'm

9  asking about the breach we --

10     A.   You're not?

11     Q.   I've been referring to the repair term that you said

12  was breached.  Now either you know or you don't.  There's no

13  need to have us here if you don't know the answer.  Can you

14  tell me the dollar amount?

15     A.   Exhibit -- yes.  Exhibit 5 and it's -- no, sorry,

16  not Exhibit 5.  Exhibits 4 and 5 and their detailed exhibits

17  are all structural, and they add up to $12,333 -- $12,033.44.

18     Q.   So you don't know how much is related to the term

19  that you said was breached regarding repairs?

20     A.   And --

21     Q.   Do you or do you not?

22     A.   Well, that's the part -- I'm giving you this much

23  information.  The part -- the remaining 10,000 that you're

24  looking for, I have to go back and tell you --

25     Q.   Can you tell me --

1    A.    -- which ones I think they are.

2    Q.    -- what amount?  I got 12,000.

3    A.    I can't use the calculator.

4    Q.    The structural amount is --

5    A.    No.  I have -- I know that those exhibits amounting

6  to 12,000 are structural.

7    Q.    My question is --

8    A.    Now we have, now we have -- so that's one item.

9    Q.    What's the item?  What are you talking about?

10    A.    I'm talking about the $12,033.44 that is paragraph

11  11 of the complaint, and it's itemized in the letter with

12  exhibits of January the 9th, 2004.

13    Q.    We're going to talk about the sources later.  I just

14  want the total amount that's related to a specific breach.

15  And that amount is related to the structural term that you

16  believe was breached?

17    A.    Yes.

18    Q.    Okay.  So that's 12,033.44.

19    A.    No, no.

20    Q.    Now what amount was --

21    A.    Well, I have --

22    Q.    -- the 22,000 --

23    A.    I'm giving you more now, if you'll let me do it.

24    Q.    Okay.  Let me ask you a question.  You gave me the

25  response to the structural breach.  What's the response to the

1    repair, how much of the 22,000?

2        A.    I'm not through with the response from the

3    structural yet.

4        Q.    Okay.

5        A.    I'm not finished with that yet.   In paragraph 14, 15

6    and 16 --

7        Q.    I'm just looking for a dollar amount.

8        A.    I'm going to tell you.   In paragraph 14, 15 and 16

9    of the counterclaim there is a reference to the breakdown of

10   the heating and air conditioning plant on the second and then

11   the third floor, and that I will categorize, for now at least,

12   as structural.   I will categorize that as structural since

13   you're asking me to choose which it ought to be.

14       Q.    What's the dollar amount?   Do you know --

15       A.    Particular items?

16       Q.    Do you know the dollar amount?

17       A.    Yes, but you need to understand something that may

18   help you.   We are claiming as --

19       Q.    I only want to know the dollar amount.

20       A.    -- the rest.

21       Q.    What is the dollar amount, the rest of what?   Give

22   me a figure.   I need a figure.   I'm not going to ascribe

23   figures to your claim.   You need to identify the total amount

24   for me.

25       A.    The difference between $22,417.50 and $12,033.44.

30

1    Q.    I need a dollar amount.  I'm not going to identify

2 something for you.  You need to identify the dollar amount.

3 Here's a calculator.

4    A.    I don't use calculators.  I don't know how to do it.

5 I'll subtract it.  $10,384.06.

6    Q.    Okay.  And that's related to the repair term that

7 you think was breached, correct?

8    A.    I am going to categorize that in my opinion as

9 structural.

10    Q.    Okay. So what does the 12,000 refer to?

11    A.    I categorize that as structural also.

12    Q.    So there's no damage amount that's related to the

13 repair term that you say was breached, correct?

14    A.    That I did not say.

15    Q.    Okay.

16    A.    Now we go to the next one.

17    Q.    So the total amount is 22,417, so I think you're up

18 to that amount already of your counterclaim.

19    A.    Well, that may be, but I have more items that go

20 into more damages whether I'm going to claim them or not, and

21 to give you the answer to your question, I'm not going to

22 arbitrarily stop at the amount that is the limit we're going

23 to claim.

24    Q.    Sir, you just started out by saying that the total

25 amount you're going to claim was $22,417.50.  Is that true or

1  not true?

2      A.   That is the total amount we're going to claim, but

3  if you're asking me where all the breakdowns and the

4  obligations came from, that is a bigger answer.

5      Q.   No, I'm not.  I'm asking you of the $22,417 which

6  amount is related to the repair term you said was breached and

7  which amount is related to the structural term you said was

8  breached.

9      A.   All right.  So so far I've given you two well

10 identified categories, and I've said I'm going to categorize

11 them all as structural.  That's what I've done so far.  Now I

12 have to tell you the remaining sources.

13     Q.   I'm just talking about the $22,000, sir, that you're

14 claiming.  There's no need for us to talk about matter that

15 you're not claiming in this case, and if your testimony under

16 oath is true, that you're only claiming 22,417, that's the

17 only amount we need to talk about, so why don't we stick with

18 that so we can save ourselves some time?

19     A.   I won't agree to let you limit the sources of my

20 counterclaim.  That I will not do.  I have told you that I

21 will not claim any amount beyond the offset amount that we

22 have discussed.

23     Q.   And that's your representation, not mine.

24     A.   That's what I told you.

25     Q.   Okay.  I'm willing to accept that.

1     A.    Right.  And now you're asking me to identify all of

2 the State Department's obligations which may have been

3 breached, which -- and to put them in categories and ascribe

4 dollar amounts to them, and I am doing that.  And the fact

5 that it may add up to more than 22,000 does not mean that I

6 have to stop just because I get to 22,000.  We might have

7 40,000 worth of damage.  Just because I'm not going to claim

8 it doesn't mean it's not part of the obligations.

9     Q.    If you're not claiming it in this case, sir, it's

10 not relevant and we don't need to discuss it.  And all I want

11 to know is what's related to the amount that you said you're

12 going to limit your counterclaim to.  I didn't create that

13 number, you did, and we're working with that.  So within the

14 22,417 how much is related to the structural breach that you

15 allege and how much is related to the repair breach that you

16 allege?  That's all I'm asking you.

17     A.    The best I can tell you is I can't answer within the

18 22,000, but I can tell you that the obligations which have

19 been given to you in detail, these obligations in my opinion

20 -- and that's all it is now since nobody has interpreted the

21 lease sufficiently to decide what's structural and what's the

22 other deductible.  Nobody's done that.  In my opinion the

23 structural portion of that total amount of damage will

24 probably be about 75 percent of it.  That's my opinion.  I

25 can't give it to you any more precisely than that.

1    Q.    Seventy-five percent.  What's the dollar amount?

2    A.    I don't know how far beyond 22,000 we might have

3  tried to claim.  I don't know the answer to that.

4    Q.    You can't answer that question, can you?

5    A.    No.

6    Q.    Okay.

7    A.    No.  I'm not even going to try to answer it because

8  I'm going to stop at 22,000.

9    Q.    All right.  Regardless of the amount of your

10  counterclaim which, as far as I can understand, is completely

11  up in the air still at this point, regardless of the amount,

12  can you point to any expense that is the basis for whatever

13  amount you will claim at whatever time for your counterclaim

14  that was incurred after obtaining written approval by OFM to

15  incur the expense?  Can you identify any expense as the basis

16  of your counterclaim which was incurred after obtaining

17  written approval by OFM to incur the expense?

18    A.    No.

19    Q.    With the exception of the March 2004 -- well, with

20  the exception of March 2004 and a $3,423.33 payment received

21  in April of 2004, do you agree that neither you or your wife

22  paid rent from January to August of 2004?  It may make it

23  easier for you.

24    A.    You mean up to this point?

25    Q.    With the exception of your March payment and the

1   partial April payment, isn't it true that you or your wife
2   failed to pay rent from January of 2004 to August of 2004?
3       A.    Up to this point with the understanding that we've
4   agreed and said we will pay everything up to May, yes.
5       Q.    Do you agree with my statement that I made?
6       A.    I agree with it.  That's true as of today.
7       Q.    As of today?
8       A.    As of this moment, yeah.  If we completed the other
9   payment next week, it would no longer be true.
10      Q.    And you'd agree that there's no specific term in the
11  lease that permits you to fail to pay rent, correct?
12      A.    I can't agree to that.
13      Q.    Can you point to a specific term in the lease that
14  allows you to fail to pay rent?
15      A.    I've given you the terms that I think are the basis
16  of our claims, and I believe the law will be found to allow us
17  certain forms of offsets based on the State Department's
18  failure to carry out its obligations under those terms.
19      Q.    All that may be true.  The Court may agree with you.
20  All I'm asking you is isn't it true that you can't point to a
21  specific term in the lease that permits you to fail to pay
22  rent?
23      A.    Everything we do is based on the lease.  It's how
24  it's interpreted in light of the law.  I will not agree to
25  that.

1    Q.   Well, you have the lease in front of you.  It's

2  Exhibit 1.  And you point to me a specific term that allows

3  you to fail to pay rent.

4    A.   The repair and alteration term, if not honored by

5  the State Department, allows us to offset.

6    Q.   I'm not asking for your interpretation.  I'm just

7  asking you to point to specific -- and it's fine.  My question

8  is if there's none, just say so, and you can explain that to

9  the Court later.  All I'm asking you is isn't it true that

10  there's no specific term in that lease that says that?

11    A.   My answer is the same.  The repair and alteration

12  obligation, if not held up by the State Department, under the

13  law allows us a later offset.

14    Q.   So you can't point to any part in the lease, can

15  you?

16    A.   I just pointed to the part that I will point to.

17    Q.   Well, you haven't.  The lease is in front of you.

18  You can't point to one, can you?  Isn't that true, sir?

19    A.   The repair and alteration clause is what I am

20  pointing to and the way it will be interpreted under the law

21  --

22    Q.   Okay.

23    A.   -- one way or the other.

24    Q.   Now how much of the damages you're claiming, the

25  22,000, was incurred after February of 2003?

1       A.    All of it.

2       Q.    Now you were provided a letter that expressly put

3   you on notice that only the most serious repairs would be

4   taken care of in February of 2003, correct?

5       A.    Yes.

6       Q.    And even after that notice you did not seek approval

7   before incurring any of the expenses that you're claiming,

8   correct?

9       A.    I told the State Department that we would handle it

10  on our own for awhile and try to figure out how to reconcile

11  it later after they got over their problem.  That's what I

12  did.

13      Q.    Even after that notice you did not seek approval

14  before incurring any of the expenses you were claiming, isn't

15  that true?

16      A.    I don't know whether what I told them is seeking

17  approval or not.  I don't know the answer to that.  I am

18  telling you the facts.  That's what I did.

19      Q.    You didn't receive any written approval for any of

20  the expenses that you incurred from the State Department,

21  isn't the true, after February 2003?

22      A.    Not to my knowledge, no.

23      Q.    Let me just ask you one point of clarification as a

24  factual matter.  One of your exhibits identifies a heat pump

25  on the second floor.  Isn't it true that there's no heat pump

1    on the second floor?

2        A.    Do you know which exhibit that is?

3        Q.    I think Exhibit 3.

4        A.    Is it in the exhibits to Exhibit 3?  Well, here it

5    is.  I found it.

6        Q.    It's Item 4.

7        A.    All I know about that item is it's an electrical

8    item, and I think it works on some type of recirculation

9    principle --

10       Q.    So would you --

11       A.    -- and I don't know whether it's properly called a

12   heat pump method or not.  I don't know the answer.

13       Q.    Okay.  So would you agree that there is no heat pump

14   per se on the second floor or --

15       A.    I just told you everything I know about it.  There

16   is an integral heating and air conditioning unit on the second

17   floor, and whether it operates on any kind of heat pump

18   principle or not, I don't know.

19       Q.    You don't know.  Okay.

20       A.    To help with this if you're trying to get this

21   straight, I will say this.  There is only one heating and air

22   conditioning unit on the second floor, and this is clearly

23   talking about that one unit, so there is no other separate

24   heat pump or other device to my knowledge.  There is the one

25   second floor heating and air conditioning unit, and that's

1   what this item is talking about for sure.

2        Q.   Now in your declaration I believe that paragraph 3

3   -- rather, page 1, paragraph 2, in your declaration you state

4   in order to narrow the range of this dispute, we, the

5   defendants, intend to pay the amounts in the first five items,

6   two deductible charges and rent for three months, and you're

7   referring to Exhibit 1, correct?

8        A.   Yes.

9        Q.   Okay.  And then in paragraph 3 you go on to say as

10  to the remaining amount, which -- essentially rent and fees

11  from May through August, we intend to apply our affirmative

12  defenses.

13       A.   Yes.

14       Q.   Okay.  Now you lived in the house from May through

15  July, correct?

16       A.   Yes.

17       Q.   You're not saying in paragraph 3 -- I'm just trying

18  to understand the -- to clarify exactly what you mean.  You're

19  not saying in paragraph 3 of your declaration that rent was

20  not properly charged and due for those months under the lease,

21  are you?

22       A.   I am saying that whatever rent was due, the

23  cumulative effect of the State Department's failure to perform

24  its obligations entitles us to an offset.

25       Q.   Okay.  So you're not saying that rent was not due

1  for those months?

2      A.   Well, I don't know what the significance of saying

3  that is.  I am saying that the lease specifies rent for those

4  months --

5      Q.   Okay.

6      A.   -- and we did not pay it, and our position is that

7  we're entitled to an offset for that period as a result of the

8  cumulative effect of all of the items which follow in this

9  explanation.

10      Q.   So rent was due, but you believe that you're

11  entitled to an offset for those months, correct?

12      A.   That's what it says, offset, prior material breach,

13  unclean hands, the various affirmative defenses.

14      Q.   Sir, wouldn't it be more accurate -- I withdraw

15  that.  Now the first time you told the State Department that

16  you were not on the property was in a September letter,

17  correct?

18      A.   Well, are you asking if this is the first time they

19  were aware or are you asking if this is the first

20  communication we sent them in writing?  I'm not sure I

21  understand your question.

22      Q.   Well, my question is the first time you told the

23  State Department that you had essentially abandoned the

24  property was in a September 9th letter?  Unless you have some

25  other documentation, isn't that the first time you indicated

1  to them that you were not --

2      A.   We never indicated to anybody that we abandoned the

3  property.  We were given a Notice to Vacate.

4      Q.   Well, the first time you made the State Department

5  aware that you were not -- you were no longer living in the

6  property was in a September letter, isn't that true, September

7  2004 letter?

8      A.   I don't think that's true for this reason.  I think

9  --

10     Q.   Just tell me when -- just identify what other letter

11 you have that indicated to them?

12     A.   I'm not aware of any letter that went to them before

13 a letter at some point at the end of August.  In other words,

14 at the end of the time that they told us we had to vacate.  I

15 don't remember what the date of that letter is.  I am not

16 aware of any other letter.  It is my understanding, although

17 Yvonne, I think, knows more about this, that the State

18 Department or someone from the State Department was aware that

19 we had left at the end of July, but she's the one who knows

20 about that.  I don't.

21     Q.   All right.  We have a serious disconnect.  The first

22 time -- and it's fine if you told them at some earlier time.

23 I'm just here to find out facts, okay, and my facts as I have

24 now, the first time you told the State Department that you

25 were no longer on the property was the September 2004 letter.

1 Is that true or not, sir?

2     A.    Yvonne has told me that she believes they were aware

3 before that, but I don't know --

4     Q.    Okay.  So you --

5     A.    -- why they would be aware.

6     Q.    Let's leave aside what your belief of the State

7 Department's awareness is, okay?  I'm not asking you that

8 question, and I'd appreciate it if you'd try to answer the

9 question that's put.  I don't know, maybe it's not the

10 clearest question, but my question is isn't it true that the

11 first time you made the State -- told the State Department

12 that you were not living in the property was in a September

13 2004 letter?  Is that true or not?

14     A.    That is the first letter I sent to them, yes,

15 sometime around the end of August, yes.  That part is true.

16     Q.    When you say sometime around the end of August, it

17 was in a September letter, correct?

18     A.    I don't know the date of the letter.

19     Q.    Okay.  Assuming you were entitled to the offset

20 you're claiming, how much would you owe the government?

21     A.    Just a moment, please.  Assuming the offset, how

22 much would we owe?

23     Q.    Right.  Assuming everything you said the Court

24 believed and you prevailed, how much would you owe the

25 government even under your calculations?

1    A.   Well, if you assume we also prevail with respect to

2   the attempt to get what are called restoration charges from

3   us, then we would owe them nothing.  It would be a wash.

4    Q.   And that's based on what?  Adding up the rent due

5   through August and then taking off your offset, you think that

6   would be a wash?

7    A.   Well, we have two issues.  We have the rent issue

8   and the offset claims related to that.  And then we have their

9   attempt to charge us with $11,000 worth of restoration charges

10  which is a separate issue.  And so if we prevailed on the

11  offset, then that would be that issue.  We still have to

12  defend and defeat the restoration cost issue, as well, before

13  we would know who -- whether we owe anything to the

14  government.

15   Q.   Excuse us a moment.

16   A.   Do you want me to leave?

17   Q.   No.  That's fine.  You can stay.

18       REPORTER:  Do you want me to go off the record?

19       MR. MUSSENDEN:  Go off the record, yeah, please.

20            (Off the record)

21            (On the record)

22       REPORTER:  The time is now 11:24 and we are back on

23  the record.  You may begin.

24       MR. MUSSENDEN:  Now I just want to make sure that we

25  have a couple things marked that we referred to.  I'll have

1  Exhibit -- this marked as Exhibit 4.

2       (Whereupon, the document that was referred to as Exhibit

3       Number 4 was marked for identification.)

4            BY MR. MUSSENDEN:

5       Q.   This is Exhibit 1 to your declaration that we've

6  been referring to, Mr. Tedards, which lists the rent amounts

7  due as of August 31st, 2004.  And do we have your declaration

8  marked as an exhibit?  I believe we do.

9       A.   You have.

10      Q.   Yes.

11      A.   You have so far the declaration without exhibits.

12      Q.   Right.  That was the earlier exhibit.  Well, let's

13  also put on the record Exhibit 3 which is the --

14      A.   I don't know if it will help you any, but I'm going

15  to put the whole thing in so you'll have it all.

16      Q.   I have that already.

17      A.   I mean I'm going to put it in the exhibits.

18      Q.   No.  I'm not having that marked.

19      A.   No.  I'm going to have it marked when I do my cross-

20  examination.  I'm just letting you know that so you'll know

21  you have the whole thing.

22            MR. MUSSENDEN:  Can I have this marked as the next

23  in order, Exhibit 3?

24            REPORTER:  Exhibit 5.

25       (Whereupon, the document that was referred to as Exhibit

1          Number 5 was marked for identification.)

2               MR. MUSSENDEN:  Okay.  I have no further questions.

3               WITNESS:  Thank you.

4                         CROSS EXAMINATION

5               MR. TEDARDS:  In cross-examination, I simply want to

6    put in the entire declaration with all the exhibits in order

7    that I prepared prior to this deposition.

8               REPORTER:  That's Deponent's Exhibit 1.

9          (Whereupon, the document that was referred to as

10         Deponent's Exhibit Number 1 was marked for

11         identification.)

12              MR. TEDARDS:  And then to avoid any confusion that

13   may have been created in the direct examination as to our

14   claim, we are claiming that -- as this declaration explains,

15   we are claiming that we are entitled to offset May through

16   August on the basis of the cumulative effect of all the

17   difficulties we had with the repair and maintenance

18   obligations as set forth in the declaration which includes,

19   among other things, the repair and maintenance items that were

20   notified to the State Department in October of 2002, which is

21   an exhibit to the declaration.

22              It also includes the detailed list of expenditures

23   expended by us on behalf of the State Department during the

24   approximate 12 months from February '03 to January of '04, as

25   explained in paragraph 11 of the counterclaim and also

1  detailed in the exhibits to the declaration.

2          And, finally, it includes the breakdowns -- the

3  subsequent breakdowns in the property, as described in

4  paragraphs 14 and 15 and 15 of the counterclaim, as also

5  detailed and set forth in the declaration.  The cumulative

6  effect of that, we believe, entitles us to offset at least May

7  through August, and we will not attempt to obtain any

8  affirmative damages from the government. If we succeed in that

9  offset, we will stop there.

10          And then that leaves us with the issue of the

11  $11,000 charge that we got from the State Department after we

12  vacated at their direction, and that is discussed in paragraph

13  4 of the declaration and was discussed also in the previous

14  depositions.

15          Essentially, we believe that any necessary

16  transitional costs to switch over to the new tenants were more

17  than covered by our leaving our entire security deposit with

18  its accumulated interest, which we told the State Department

19  we would do when we left.

20          And the remainder of the restoration costs that the

21  State Department wishes to impose, we will -- we claim and

22  will prove are repairs to items which were longstanding in

23  that house, were caused by the State Department, and in many

24  or most instances were actually repairs that we had been

25  asking the State Department to address for some time.

1        And so we believe that we will not owe anything to

2    the State Department with respect to the separate issue of the

3    $11,000 charge.   Thank you for giving me an opportunity to

4    summarize it.

5                    REDIRECT EXAMINATION

6        BY MR. MUSSENDEN:

7        Q.   Okay.  And, sir, nothing that you just said

8    withdraws your earlier testimony, correct?

9        A.   I'm not aware -- I've not seen the transcript.  You

10    know, we have a read and sign provision and I have not seen

11    it.

12        Q.   Sir, did you tell the truth earlier?

13        A.   Yes.

14        Q.   Okay.  Did anything you just say contradict what you

15    said earlier or make that any less true?

16        A.   Well, I think it's possible that until we made the

17    decision to narrow the controversy, we may have indicated we

18    were going to try to claim a larger offset.  I think that's

19    possible, so it would contradict that.

20        Q.   Sir, for purposes of your testimony today I asked

21    you a series of questions and you gave what I assumed to be

22    truthful questions under penalty of perjury -- truthful

23    answers under penalty of perjury, okay?

24        A.   I did.

25        Q.   In your statement that you made just now, nothing in

1  that statement contradicts what you said earlier today, does

2  it?

3       A.   Oh, today?

4       Q.   Right.

5       A.   I'm sorry.  Not to my knowledge, no.

6       Q.   Okay.  Thank you.

7            REPORTER:  May I ask the deponent if he wishes to

8  waive signature?

9            MR. MUSSENDEN:  No, he will not.  He'll read and

10  sign.

11           REPORTER:  Okay.  The time is now 11:31.  We are off

12  the record.

13           (Reading and signature not waived.)

14           (Whereupon, at 11:31 a.m., on Thursday, April 27,

15  2006, the deposition was concluded.)

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE
2        I, Jack L. Becker, a Shorthand Reporter and a Notary
3   Public, do hereby certify that the foregoing witness,
4   WILLIAM P. TEDARDS, JR., was duly sworn on the date indicated,
5   and that the foregoing is a true and accurate transcription of
6   my stenographic notes and is a true record of the testimony
7   given by the foregoing witness.
8        I further certify that I am not employed by or related to
9   any party to this action by blood or marriage and that I am in
10  no way interested in the outcome of this matter.
11       In witness whereof, I have hereunto set my hand this
12  12th day of May, 2006.
13
14
15                              _____
                                           /S/
16                              Jack L. Becker
                                Notary Public in and for the
17                              District of Columbia
18
19  My Commission Expires:
20  February 28, 2011
21
22
23
24
25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947