6470 N. Silversmith Place ◆ Tucson, AZ 85750

TEL: 520.577.9877 ◆ FAX: 520.577.9878

February 9, 2005

VIA FAX and U.S. MAIL

Kenneth L. Wainstein
United States Attorney
U.S. Department of Justice
ATTN: Brian J. Sonfield
Assistant U.S. Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530

    Re: 3410 Garfield Street, N.W.

Dear Mr. Wainstein:

Here is our reply to your letter of January 12, 2005.

    **1.    With respect to your list of light fixtures purchased totaling $1,170.95 and installation charges of $3,633.60.**

    (a)    Some of the existing fixtures on the list were removed by an authorized contractor of the State Department and stored at a State Department off-site storage facility, so that we could put in our own chandeliers (for example first floor foyer and staircase). When we left, we took our light fixtures. All the State Department had to do was put back its own fixtures or install cover plates to cover the electric box. The State Department did not have to purchase new fixtures. The largest fixture, the fluorescent fixture to the front sitting room, was stored in the basement utility room.

    (b)    Some of the light fixtures were defective or broken when we moved in, for example, the brass light fixture in the family room near the kitchen. It was repaired at least once by the State Department and, when the repair did not work, we indicated we would install our own. When we left, we left the brass light fixture in

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN:  Brian J. Sonfield
February 9, 2005
Page 2

the garage and we took our own light fixture with us.  The State Department could have repaired that fixture, if it so desired, but cannot expect us to replace it for them.

Another example - the bathroom light fixtures on the second floor.  When we moved in, the metal backboards for three of them were completely corroded as were some of the metal switchplates on the wall.  We requested a replacement for these items, but the State Department declined to replace them because they weren't broken.  The State Department has now replaced the ones that were damaged or broken when we moved in.  We left them as we found them.

The same holds true for many of the recessed lights.  Over the years many of them would pop out of the ceiling, or parts would fly off (such as rims or springs holding the rims) or the chassis would hang below the ceiling level. Over the years the recessed lights would be repaired, parts rigged temporarily, spackled back in, and then they would pop out again – a continuing problem.  Several, in the end, had their rims removed by the State Department contractor and were left that way after unsuccessful attempts to rig them together.  We did not cause any of these problems.

Another example is the wall fixture in the staircase from the kitchen to the garage.  The shade was chipped and cracked and the electrical box was loose in the wall when we moved in, and with age and regular removal of the cover to change the light bulbs (after seven years we could no longer remove the glass shade at all because of the rusted hinges holding it on and had to contract an electrician to do so), the shade eventually broke.  We used it without the shade until the electrical box eventually became a fire hazard when sparks flew when we were trying to change a light bulb because it was shaking within its over-sized hole in the wall.  We did not cause this problem.

Other light fixtures ceased to work while we were there.  The house generally had fluorescent plain brown fixtures with round fluorescent bulbs and plastic covers (not glass).  Over time, the plastic covers burned and cracked.  At one point the State Department replaced all the second floor lights with regular light bulb fixtures; at

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN: Brian J. Sonfield
February 9, 2005
Page 3


another time, the ones in the coat room closet.  Eventually, the one at the top of the stairs on the 3rd floor quit working and we replaced it with a similar regular-lightbulb fixture. We also replaced two ceiling lights in the basement to replace the old ones. (We recall one shade cracked and it could not be replaced.)  We are aware that one of the replacement fixtures is missing a shade.

(c)    The remainder of the outlets on this list did not have light fixtures when we moved in, just coverplates covering the electric box. (Example: the dining room had three such locations).  We installed our chandeliers and fixtures.  We took our chandeliers and fixtures when we left.  The State Department could have just put back the cover plates to cover the electrical boxes, which were left in the garage. It was the State Department's choice to install new fixtures instead of putting up the coverplates.

None of the bedrooms on the second floor had overhead light fixtures when we moved in.  We installed two new ceiling fixtures and removed them when we left. All that needed to be done was to install coverplates to cover the electric boxes.  The exception for this floor is the sitting room for the master bedroom.  That fixture, which we repaired during the time we were there, was left in the garage and could have been just put back.  The State Department's choice to exchange it for a new fixture was not related to anything we did.

    **2.    With respect to the cost of repairs and priming of $5,568.29 ("Waxel List").**

The list includes priming work done to paint over newly-painted areas, patching nail holes (and holes left when wall grids were removed), removal of stickers, stars, pencil scribbling, and figures from the ceilings, walls, and doors of the children's rooms, one bathroom screen (second floor), and removal of the computer cabling and wiremold (a shame, since the house was networked).  We accept full responsibility for these items at $4,084.15. We have put an asterisk next to these items on the Waxel Construction itemization list.  [Our security deposit just about covers this.]

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN:  Brian J. Sonfield
February 9, 2005
Page 4


The rest of the items on the Waxel List arose as a result of defects in the house, itself, many of which we tried to persuade the State Department to repair over the years without success.  For example:

    -The door bell didn't work and did not get replaced after numerous requests.  We should not be charged for a new doorbell now.

    -The front door intercom did not work when we moved in, and there was no security system.  We were told the State Department would not include either an intercom or a security system in the leased premises.  We installed a security system and an Aiphone intercom to work with the security system and telephone system connecting to the Aiphone intercom.  When we left, we took our Aiphone intercom with us.  The telephones and the security system remain.  Now you are charging us for a new telephone intercom, while using our telephone connections and our telephones (basement, kitchen, master bedroom sitting room, and two on the top floor).

    -Charging us for toilets:  many toilets were subject to continuous repairs over eight years (all of them were old) and we were charged for deductibles every time they were repaired.  It is unreasonable that we are now being charged for new toilets, when they all worked as a result of those repairs (for example, the master bathroom toilet must have been repaired a dozen times).  There were continuous problems with toilet seats, flushers, etc. -- a constantly running toilet was the usual problem for repair.  We did not break any toilets.

    -Continuous water damage from the decks leaking over eight years caused serious baseboard damage on all floors including the master bath, master bedroom closet (creating a serious mildew problem and requiring the installation of a dehumidifier that had to run 24-7-365 to protect our clothing), dining room, kitchen, and garage.  We did not cause those leaks.

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN: Brian J. Sonfield
February 9, 2005
Page 5

-Continuous water damage from the window casings caused water damage on window sills, walls and ceilings on all floors. Also, water came in under the front double doors and single side doors <u>every time it rained in Northwest Washington, D.C.</u> requiring us to get out of bed in the middle of the night (when it rained in the middle of the night) to put towels down to soak up the water. Other water leaks such as the nanny room shower stall into the basement carpet caused permanent stains and mildew damage. We did not cause any of those leaks.

-We found the house number in the bushes (the brass numbers were corroded, were dangling due to missing nails, and the backboard was warped). We left it in the garage. We replaced it with our own and took ours with us when we left. We did not cause the first one to fall off.

-There was no trash left on the property at the front or rear when we left. We had the house cleaned and all trash removed, and the house was inspected by a trustworthy individual who had a key to report that all was sound.

-We have not broken any toilet seats or covers (two toilets had cracked toilet lids). One was removed by CBS to locate a replacement (they kept trying to locate one and then never came back), and the other remains in the nanny's room in the basement.

-We should not be charged for replacement of the bathroom exhaust fan in the lower level. When it quit working, the State Department inspected it, would not repair it, and told us they would remove it when we repainted the bathroom. When we repainted the bathroom, the State Department was no longer making repairs, so we covered the ceiling with cork circles (we have agreed to pay for the cost of the cork removal).

-We should not be charged for a new closet door between the master bedroom and sitting room (the door was in the utility room). All other doors were removed

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN: Brian J. Sonfield
February 9, 2005
Page 6

by the State Department contractor and stored off-site, so there was no need to purchase new ones.

    -Charging us for replacement of the closet rod and shelving in the third floor closet and not giving us credit for replacement of the closet rod and shelving in basement doesn't compute. Both were aged wooden rods (one had hairline lengthwise cracks) and the other was bowed somewhat, so it is not surprising that over time they would break under normal wear and tear (we weren't hanging from them).

    -Charging us for cleaning the attic when we've never been in it makes no sense. The State Department installed attic fans (twice, we believe) and our electrician installed one in 2003. The fans run constantly when the weather was warm and were installed after we moved in, because the top floor would not cool, even with the AC on full blast.

    -Charging us for replacement of bathroom light fixtures that were corroded when we moved in is not right.

    -Charging us for repairs to the ceiling where original light boxes were converted to recessed lights is not right. This is something we did not do.

    -Charging us for materials, repairs, and relamping of 15 recessed light fixtures is not right. These are the same problematic ones we've been dealing with over the last eight years.

    -Charging us for patching large areas in the ceiling [of garage] makes no sense. One hole was left when the garage doors were replaced by the State Department, because the first one could not be fixed and was not to code, and the equipment and brackets for the automatic door openers were changed (the hole was never repaired despite repeated requests to finish the partially-completed repair). The other

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN: Brian J. Sonfield
February 9, 2005
Page 7

hole/ceiling damage was caused by a new leak from the second floor balcony wall (another repair not done after repeated requests).

    -Charging us for replacement of 5 double pane windows is not right. We have been requesting this to be done for years. The windows collected condensation between the panes and, therefore, did not have a proper seal, thus providing no insulation whatsoever, creating unduly high electric bills.

The house was full of old receptacle covers (a lot of brown ones) with painted-over switches. Many receptacle covers did not cover the hole for the electrical box in the wallboard. We eventually replaced all (or almost all) eye-level or exposed switchplates and light switches in the public areas and also installed 3-way switches (which are substantially more expensive than a regular switch) and dimmers in the staircase and all main areas. We also plastered and filled in many of the pre-existing gaping holes outside the switchplates. All were working properly when we left. There is no basis for charging us for leaving the State Department with better switches than they started out with.

We made many cosmetic repairs to unsightly water-damage repairs over the years (e.g., front sitting room ceiling, first floor) and did preventive maintenance on others, such as repairing the front door and protecting it with polyurethane to repair the warping and splitting caused by the rain so it wouldn't get worse, repairing the side door, which was a new door already replaced by the State Department (old one had to replaced because it was rotten and the inset panels were transferred and set in the new door – a costly expenditure), and installing tiles on the decks in order to disperse the water and make them drain properly. (The decks did not drain, despite resurfacing twice, and the standing water seeped back into the house, causing damage inside.) We were charged $900 for moving our planters and furniture off the decks for the second round of resurfacing. This was not caused by us.

We object to the deductibles taken for the dishwasher and cooktop. We do not believe we have ever been charged for a deductible in the replacement of a fixture.

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN: Brian J. Sonfield
February 9, 2005
Page 8

The dishwasher was replaced twice, the washer and dryer were replaced twice, two condensers were replaced, and we do not recall any deductible applied to any of that equipment.

    **3.    Repairs we made.**

You have ignored items B, C, D (except one part of D) in our letter of November 30, 2004.

    **4.    Improvements.**

You have ignored item F in our letter of November 30, 2004.

    **5.    Miscellaneous**

You have ignored items G (damage to our personal property caused by vermin and water leaks) and the items E (cost of pest control) in our letter of November 30, 2004.

In closing, over the eight-year period we leased the premises at Garfield, we were denied our right to a peaceable and quiet tenancy caused by continuing repair issues, water leaks, standing water on the decks, vermin, lack of air conditioning in the summers and or lack of heat in the winters (on certain floors, and at varying times for different reasons) and finally, after giving us notice of no further repairs due to freezing of funds in 2003, we were finally driven away when the cost of repairs to aging and malfunctioning items exceeded our capability to advance costs for repairs (when the dryer ceased to dry, the air conditioning quit cooling the second floor, etc.) In addition, the State Department failed to return our interest on the security deposit that was due us in 2002 and consistently failed to take timely, effective corrective measures to solve problems, instead either ignoring the problems or resorting to interim, quick-fix, patch-ups as the norm, while at the same time charging us repeatedly for deductibles to repair the same item over and over.

Kenneth L. Wainstein, United States Attorney
U.S. Department of Justice
ATTN:  Brian J. Sonfield
February 9, 2005
Page 9


Please review and contact me for further discussion.  We would like to resolve this fairly.

                                        Sincerely,


                                        William P. Tedards, Jr.

WPT/8231
Enclosure